# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

_____

|  |  |  |
|---|---|---|
| **TRANSWEB, LLC,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 10-4413 (FSH)** |
| | : | |
| **v.** | : | |
| | : | |
| **3M INNOVATIVE PROPERTIES** | : | |
| **COMPANY, ET AL.,** | : | **OPINION** |
| | : | |
| **Defendants.** | : | |
| | : | |

_____

**SHWARTZ, United States Magistrate Judge**

## I. INTRODUCTION

This matter comes before the Court by way of Plaintiff TransWeb, LLC's ["TransWeb"] motion for leave to file a Second Amended Complaint, the motion of Defendants 3M Innovative Properties Company and 3M Company [collectively, "3M"] for leave to file an Amended Answer, and various motions to seal materials submitted in connection with those motions. For the reasons set forth herein.[1] the Court grants TransWeb leave to file a Second Amended Complaint, terminates as moot 3M's motion because it is required to file an Answer to the Second Amended Complaint under Fed. R. Civ. P. 12(a), and grants in part and denies in part the motions to seal.

_____

[1] A separate opinion addressing the motions to seal has been dictated on the record on June 1, 2011. A transcript of the Opinion can be obtained by contacting Kings Transcription at (973) 237-6080.

## II. BACKGROUND

## A. Factual History

Because 3M opposes TransWeb's motion for leave to file the Proposed Second Amended Complaint based primarily on futility, the Court must accept as true the factual allegations in the Proposed Second Amended Complaint to determine if the motion should be granted. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3d Cir. 1997); see also Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009).

### 1. The Filtration Media Market

This case concerns patents on products that use "filtration media," which are materials that block contaminants from being inhaled or circulated in the air. (Proposed 2d Am. Compl. ¶ 10, Apr. 18, 2011, ECF No. 58.) Some filtration media, such as the ones at issue here, use fluorine to create an "electric attraction to filter [out] contaminants." (Id. ¶¶ 12, 20.) Non-fluorinated filtration media use multiple layers of material to achieve the same level of filtration as fluorinated media. (Id. ¶ 94.) One use of filtration media is particulate-filtering facepiece respirators. (Id. ¶ 81.)

The Occupational Safety and Health Administration ["OSHA"] has standards and requirements for facepiece respirators used in various environments and the National Institute for Occupational Safety and Health ["NIOSH"] has the responsibility to certify that a respirator meets minimum specified requirements. (Id. ¶¶ 85–87.) Environments containing oil (such as lubricants, cutting fluids, and glycerin) degrade respirator effectiveness and only two categories of respirators can be used in oil environments, namely the "P" series (oil proof) and "R" series

(oil resistant).  (Id. ¶¶ 88, 90.)  Within these series, there are four classes of NIOSH-approved particulate filtering facepiece respirators: P100, P99, P95, and R95.  (See id. ¶ 89.)  The numbers correspond to a respirator's ability to remove contaminants from the air; the higher the number, the greater the percentage of airborne particles that are captured by the filter.  (Id. ¶¶ 14, 89.)

According to the Proposed Second Amended Complaint, very few environments require P100 respirators, and P100, P99, and R95 respirators are "frequently interchangeable with the only significant difference being the durational use" of the product.  (Id. ¶¶ 88, 92.)  Makers of P99 respirators have allegedly been forced out of the market.  (Id. ¶ 89.)  Few manufacturers allegedly make P100, P95, or R95 respirators without using fluorinated filtration media.  (Id. ¶ 94.)  Allegedly, only TransWeb and 3M manufacture the fluorinated filtration media used in P100, P95, and R95 respirators, and 3M has a dominant market share of P100, P95, and R95 respirators.  (Id. ¶¶ 94–95.)  Since TransWeb, no new competitors have entered the market for supplying filtration media for NIOSH-certified P100, P95, or R95 particulate respirators, and there are allegedly substantial barriers to entry, namely, substantial capital in research and development, facility construction costs, and cooperation with respirator manufacturers to complete the NIOSH certification process.  (Id. ¶¶ 96–97.)

**2. Development and Patent Procurement of Fluorinated Filtration Media**

Before 1996, 3M manufactured an electrostatically charged filtration media by infusing or weaving fluorine into the fibers of the media.  (Id. ¶ 20.)  In 1996, TransWeb began developing an allegedly cheaper process by coating the filtration media with fluorine.  (Am. Compl. ¶¶ 19, 21, Nov. 12, 2010, ECF No. 18; Proposed 2d Am. Compl. ¶¶ 19, 21.)

In December 1996 and May 1997, TransWeb met with Racal Filter Technologies, Inc.

3

["Racal"], offered to sell them fluorine filtration media, and sent them samples. (Am. Compl. ¶¶ 27–28; Proposed 2d Am. Compl. ¶¶ 27–28.) On April 30, 1997, TransWeb filed a patent application with the Patent and Trademark Office ["PTO"] for its fluorine filtration media. (Am. Compl. ¶ 23; Proposed 2d Am. Compl. ¶ 23.) In May 1997, TransWeb notified Racal of its pending patent application. (Am. Compl. ¶ 29; Proposed 2d Am. Compl. ¶ 29.) The patent application was later rejected.[2] (Am. Compl. ¶ 26; Proposed 2d Am. Compl. ¶ 26.)

Meanwhile, by March 31, 1998, 3M had purchased Racal and its assets, including the samples and records of the meetings wherein Racal learned of TransWeb's patent application and sales offers. (Am. Compl. ¶ 30; Proposed 2d Am. Compl. ¶ 30.)[3] On December 2, 1998, 3M's research laboratories issued a report detailing an analysis of the TransWeb samples. (Am. Compl. ¶ 32; Proposed 2d Am. Compl. ¶ 32.) In 1999, 3M expressed an interest in purchasing quantities of TransWeb's fluorinated filtration media. (Am. Compl. ¶ 33; Proposed 2d Am. Compl. ¶ 33.) From June to August 2000, TransWeb shipped non-commercial quantities of its fluorinated filtration media to 3M. (Am. Compl. ¶ 34; Proposed 2d Am. Compl. ¶ 34.) From April to July 2001 and May to September 2002, TransWeb shipped commercial quantities of its fluorinated filtration media to 3M. (Am. Compl. ¶ 35; Proposed 2d Am. Compl. ¶ 35.)

On January 6, 2000, 3M filed a patent application, later approved as U.S. Patent No.

_____

[2] On May 25, 2000, TransWeb filed a separate patent application for methods to treat the surface of a filtration media with fluorine, which was approved on July 16, 2002, as U.S. Patent No. 6,419,871 ["the '871 patent"]. (Proposed 2d Am. Compl. ¶¶ 77–79, Ex. E.) This is the patent that TransWeb now seeks to claim that 3M infringes.

[3] On July 2, 1998, 3M filed patent application no. 09/109,497 ["the '497 application"]. (See Proposed Am. Compl. Exs. B, D.) The '497 application is the parent application of the patents at issue here. (Pl.'s Letter, May 23, 2011, ECF No. 92).

6,397,458 ["the '458 patent"],[4] for a fluorine-coated filtration media.  (Am. Compl. ¶¶ 36, 68;

Proposed 2d Am. Compl. ¶¶ 36, 68.)  In connection with this application, 3M disclosed to the

PTO information regarding TransWeb's media.  (Id. ¶¶ 45–65.)  The disclosure indicated that

samples sent to Racal were provided under the terms of a confidential disclosure agreement, 3M

was aware of no public disclosures of TransWeb's samples, TransWeb's media "may have been .

. . commercialized", and no patent applications had been filed by TransWeb.  (Id.)  Contrary to

these representations, TransWeb alleges that the samples were sent before any non-disclosure

agreement had been entered, 3M had received commercial shipments of TransWeb's media, and

3M knew from Racal's assets that TransWeb had filed a patent application for its fluorinated

media.  (Id. ¶¶ 48–49, 52–53, 56–57, 68, 64–65.)  TransWeb further alleges that this information

was material and that 3M withheld this anticipatory prior art from the PTO with deceptive intent.

(Id. ¶¶ 36, 38–42, 45–46, 50–51, 54–55, 58–59, 62–63, 66–67, 69.)  On June 4, 2002, the PTO

approved 3M's patent application and issued the '458 patent.  (Am. Compl. ¶¶ 36, 68; Proposed

2d Am. Compl. ¶¶ 36, 68.)

On October 7, 2003, 3M filed another patent application.[5]  (Am. Compl. ¶¶ 70, 75;

Proposed 2d Am. Compl. ¶¶ 70, 75.)  On January 7, 2004, 3M sent a supplemental disclosure to

the PTO in support of this application that contained the identical representations set forth in its

disclosure submitted in connection with the '458 patent application regarding TransWeb's

fluorinated media, commercialization, and patent application.  (See id. ¶ 74; see also Pl.'s Letter

---

[4] This application was a division of the '497 application.

[5] This application was a continuation of several patent applications, originating with the '497 application.

1–2, May 23, 2011.)  The patent was approved on October 26, 2004, as U.S. Patent No. 6,808,551 ["the '551 patent"].  (Am. Compl.¶ 75; Proposed 2d Am. Compl. ¶75.)

On two separate occasions during this period, 3M tried to purchase TransWeb.  Sometime in 2000, 3M unsuccessfully sought to acquire TransWeb.  (Proposed 2d Am. Compl. ¶¶ 107, 169.)  In 2008, 3M employed a consultant to inquire whether TransWeb was for sale.  (Id. ¶¶ 107, 169.)

### 3. The Minnesota Action

On May 21, 2010, 3M filed an action against TransWeb in the United States District Court for the District of Minnesota ["Minnesota Action"].  (Am. Compl. ¶ 77; Proposed 2d Am. Compl. ¶ 98; see also 3M Innovative Props. Co. v. TransWeb LLC, Civ. No. 10-2132 (D. Minn., May 21, 2010).)  In the Minnesota Action, 3M alleged that TransWeb directly infringed the '458 and '551 patents.  (Am. Compl. ¶ 78; Proposed 2d Am. Compl. ¶ 99.)  On August 20, 2010, TransWeb filed a motion to dismiss the Minnesota Action for lack of personal jurisdiction.  (Am. Compl. ¶ 80; Proposed 2d Am. Compl. ¶ 102.)  On September 29, 2010, 3M voluntarily dismissed the Minnesota Action.  (Am. Compl. ¶ 81; Proposed 2d Am. Compl. ¶ 103.)

## B. Procedural History

While the motion to dismiss was pending in the Minnesota Action, specifically, on August 27, 2010, TransWeb filed a Complaint against 3M in the District of New Jersey seeking a judgment declaring that 3M's '458 and '551 patents are invalid and unenforceable and that TransWeb does not infringe these patents.  (Compl., Aug. 27, 2010, ECF No. 1.)  TransWeb alleged that 3M failed to properly disclose material information regarding TransWeb's product that would have affected its ability to receive the '458 and '551 patents.  (Id. ¶¶ 10–13.)

In November 2010, 3M settled a separate action against the Safe Life Corporation and Triosyn Corporation [collectively "Safe Life"]. (Proposed 2d Am. Compl. ¶¶ 89, 109, 171.) Safe Life was a customer of TransWeb's fluorinated filtration media and the only manufacturer of P99 particulate facepiece respirators. (Id.) Safe Life stipulated to a permanent injunction that allegedly forced them out of the market for P99 respirators. (Id.)

On November 12, 2010, TransWeb filed an Amended Complaint adding causes of actions asserting that the '458 and '551 patents were unenforceable based upon laches and 3M's inequitable conduct. (Am. Compl., Nov. 12, 2010, ECF No. 18.) On November 29, 2010, 3M filed its Answer and Counterclaims against TransWeb for the infringement of the '458 and '551 patents. (Answer & Countercls., Nov. 29, 2010, ECF No. 22.) TransWeb filed a reply to these Counterclaims. (Answer to Countercls., Jan. 3, 2011, ECF No. 36.)

In December 2010, 3M's business director allegedly told TransWeb that "the respirator business is very profitable and that the 3M Defendants do not want any competition in it," that TransWeb could not afford to pay for its defense in this patent infringement litigation, and that it should exit the market. (Proposed 2d Am. Compl. ¶¶ 108, 170.)

On December 6, 2010, the Court held a scheduling conference and thereafter issued a pretrial scheduling order setting deadlines, including April 18, 2011, as the deadline to amend pleadings and October 14, 2011, as the close of fact discovery. (Pretr. Sched. Order, Dec. 6, 2010, ECF No. 25.)

On March 3, 2011, the Court held a telephone conference and thereafter issued an Order directing the parties to submit a proposed extension of certain deadlines that would not impact the date of the final pretrial conference. (Order, Mar. 3, 2011, ECF No. 49.) At the joint request

of the parties, the Court issued orders on March 8, 2011 and April 5, 2011, extending deadlines for disclosing infringement and invalidity contentions, claims construction, and fact, expert and Markman discovery.  (Am. Pretr. Sched. Order, Mar. 8, 2011, ECF No. 51; Order, Apr. 5, 2011, ECF No. 53.)

On April 18, 2011, TransWeb filed the present Motion for Leave to File a Second Amended Complaint.  (Mot. to Am., Apr. 18, 2011, ECF No. 56.)  TransWeb seeks to add claims that 3M infringed the '871 patent and violated federal and state antitrust laws by attempting to monopolize the market for oil resistant, NIOSH-certified P100, P95, and R95 particulate respirators through Walker Process fraud and sham litigation.  (Proposed 2d Am. Compl. ¶¶ 147–185.)  TransWeb alleges that it suffered harm by: (1) being forced to expend substantial amounts of money, time, and resources defending 3M's patent infringement litigation; (2) being forced to sell itself to CLARCOR Inc. at a low price because of its inability to bear the costs and burdens of litigation; (3) lost business from its customer Safe Life because 3M forced Safe Life from the market; and (4) the likely loss of other customers because of 3M's deposition and document subpoenas.  (Id. ¶¶ 114, 162, 178.)

On the same day, April 18, 2011, 3M filed a Motion for Leave to File an Amended Answer and Counterclaims.  (Mot. to Am., Apr. 18, 2011, ECF No. 59.)  On April 29, 2011, the parties filed motions to seal portions of their motions to amend the pleadings.  (Pl.'s Mot. to Seal, Apr. 29, 2011, ECF No. 69; Def.'s Mot. to Seal, Apr. 29, 2011, ECF No. 70.)  On May 2, 2011, the parties filed briefs in opposition to each other's motions to amend their pleadings. (Pl.'s Opp'n Br., May 2, 2011, ECF No. 71; Def.'s Opp'n Br., May 2, 2011, ECF No. 73.)  On May 13, 2011 and May 17, 2011, the parties filed motions to seal portions of their opposition and

8

reply submissions.  (Def.'s Mot. to Seal, May 13, 2011, ECF No. 85; Pl.'s Mot. to Seal, May 13, 2011, ECF No. 86; Def.'s Mot. to Seal, May 17, 2011, ECF No. 87; Pl.'s Mot. to Seal, May 18, 2011, ECF No. 88.)  On May 23, 2011, 3M filed a response to TransWeb's motion to seal certain materials in its Proposed Second Amended Complaint and its supporting brief (Defs.' Resp. to Pl.'s Mot. to Seal, May, 23, 2011, ECF No. 93), and on May 31, 2011, TransWeb filed a reply. (Pl.'s Reply to Defs.' Resp., May 31, 2011, ECF No. 98.)

On May 20, 2011, the Court granted the parties' request to extend certain claim construction deadlines.  (Order, May 20, 2011, ECF No. 90.)  On May 23, 2011, the Court issued an Order requiring TransWeb to identify certain information regarding its January 7, 2004 supplemental disclosure to the PTO (identified in the Order as "Exhibit C").  (Text Order, May 23, 2011, ECF No. 91.)  TransWeb provided the requested information in a letter dated May 23, 2011.  (Pl.'s Letter, May 23, 2011, ECF No. 92.)

On May 26, 2011, 3M filed a letter to supplement its opposition to the motion for leave to file a Second Amended Complaint and attached a recent opinion from the Court of Appeals for the Federal Circuit, namely, Therasense, Inc. v. Becton, Dickinson & Co., Civ. Nos. 08-1511, 08-1512, 08-1514, 08-1595, 2011 WL 2028255 (Fed. Cir. May, 25, 2011).  (Defs.' Letter, May 26, 2011, ECF No. 95.)  On the same day, TransWeb filed a letter indicating, in part, that it would be amenable to submit additional briefing concerning Therasense if requested.  (Pl.'s Letter, May, 26, 2011, ECF No. 96.)

**III. ARGUMENTS**

**A. Plaintiff**

TransWeb argues that leave to file its Proposed Second Amended Complaint should be

granted because: (1) the proposed pleading is sufficiently detailed to allege patent infringement and antitrust claims; (2) there has been no undue delay as the claims are based on newly discovered evidence; and (3) no prejudice exists as there are six months left in discovery and 3M seeks to add its own new claims.  (Pl.'s Br. 1–2, 10, 12–13, Apr. 18, 2011, ECF No. 57.)

As for the sufficiency of the allegations, TransWeb contends that it has adequately alleged claims of infringement of its '871 patent as well as attempted monopolization claims under theories of <u>Walker Process</u> fraud and sham litigation.  (<u>Id.</u> at 11–12.)  Regarding <u>Walker Process</u> fraud, TransWeb asserts that 3M fraudulently obtained the '458 and '551 patents and knowingly attempted to enforce invalid and unenforceable patents to lessen or eliminate competition in the oil resistant respirators market.  (<u>Id.</u> at 14–17.)  TransWeb argues that 3M's improper enforcement actions constitute sham litigation.  (<u>Id.</u> at 20–22.)  TransWeb also contends that it has adequately pled all the necessary elements of an attempted monopolization claim, namely, that 3M engaged in predatory or anti-competitive conduct with the specific intent to monopolize and has a dangerous probability of achieving monopoly power.  (<u>Id.</u> at 18–20.)  Lastly, TransWeb asserts that its allegations satisfy parallel claims of attempted monopolization under the New Jersey antitrust laws.  (<u>Id.</u> at 20–23.)

As for delay, TransWeb contends that: (1) the proposed amendments are timely under the pretrial scheduling order and based upon information discovered in the course of this litigation; (2) the patent infringement claim results from an analysis of 3M samples produced in January 2011; and (3) the antitrust claims result from the Safe Life consent judgment in November 2010, statements by a 3M representative in December 2010, and 3M's amended infringement contentions.  (<u>Id.</u> at 1, 12, 23–24.)  TransWeb also argues that the Discovery Confidentiality

Order requires that these claims be brought now because it provides that material disclosed in this case may not be used in any subsequent litigation.  (Id. at 24.)

As for prejudice, TransWeb argues that 3M cannot claim prejudice because: (1) discovery remains open for six more months; (2) 3M has been aware of the '871 patent since August 2002; (3) 3M agreed to April 18, 2011 as the deadline to amend pleadings; and (4) 3M cannot claim prejudice from an amendment to TransWeb's pleading while 3M concurrently moves to amend their own pleading to add claims.  (Id. at 12, 25.)

**B. Defendants' Response**

In response, 3M argues that the Court should not grant TransWeb leave to file a Second Amended Complaint because the patent infringement and antitrust claims are untimely and will cause 3M prejudice and because the antitrust claims are futile.  (Opp'n Br. 4–5, May 2, 2011, ECF No. 73.)

As to timeliness, 3M argues that: (1) the proposed amendment is the latest example of TransWeb's dilatory tactics; (2) TransWeb seeks leverage in settlement discussions; (3) TransWeb could have brought its patent infringement claim months or years earlier as it could have purchased samples on its own and examined them rather than waiting for discovery; (4) TransWeb could have brought its antitrust claims months ago and its purported reason for waiting is nonsensical; (5) the amendment will cause prejudice as the entire schedule will require revision because of the local patent rules and the schedule cannot absorb the additional discovery; (6) the Court instructed the parties that the final pretrial conference will occur in April 2012; and (7) TransWeb failed to mention the addition of new patents during the last status conference when the Court asked about it.  (Id. at 5–9.)

As to futility, 3M argues that TransWeb fails to allege sufficient facts (1) to define a valid product market, (2) to demonstrate 3M's dangerous probability of achieving monopoly power, (3) to show antitrust injury, (4) to show fraud on the patent office, or (5) to demonstrate that 3M's claims are objectively or subjectively baseless.  (Id. at 9–25.)

## C. Plaintiff's Reply

In reply, TransWeb argues that its delay is neither undue nor prejudicial, that it has adequately pleaded each claim, that 3M improperly disputes factual allegations using materials outside of the pleadings, and that certain disputed antitrust issues cannot be resolved in the context of this motion.  (Reply Br., May 9, 2011, ECF No. 76.)

As for delay and prejudice, TransWeb argues that: (1) its motion to amend was filed before the deadline to do so and is therefore presumptively timely; (2) the patent infringement claim could not precede discovery as TransWeb needed 3M to not only identify which products are surface-fluorinated but also specify how they were made; (3) the antitrust claims were asserted when TransWeb had a good faith basis to bring them as provided by 3M's amended infringement contentions which, unlike the Minnesota Action and 3M's initial counterclaims, only concerned oil resistant (as opposed to all) respirator products; (4) even if TransWeb had a good faith basis to assert these claims at the start of this case, the delay in doing so is not undue; (5) 3M presents no support for its accusation that TransWeb is attempting to derail the case schedule; and (6) no prejudice exists because a modest modification is not prejudicial, 3M's supplemental disclosures have previously resulted in schedule adjustments, and TransWeb is willing to sever and stay the antitrust claims until after the determination on the invalidity and inequitable conduct claims.  (Id. at 1–4, n.6.)

As for futility, TransWeb contends that it has adequately pled (1) a valid product market as the alleged products are reasonably interchangeable and further determinations are premature as they involve fact-intensive inquiries; (2) a dangerous probability of monopolization exists and 3M's factual disputes should not be resolved at this stage; (3) antitrust injury allegedly flows from 3M's anticompetitive conduct when viewed as a whole and protecting TransWeb's ability to compete aids competition; (4) the exact dates, submissions, and contents of the purported misrepresentations to the PTO as well as the PTO's reliance on these misrepresentations to support the Walker Process claim; and (5) sham litigation as 3M knew it made misrepresentations to the PTO that render 3M's patents invalid and unenforceable and thus knew it had an improper basis to assert patent infringement.  (Id. at 5–11.)  Finally, TransWeb contends that statements by 3M's representative were properly included because the Confidentiality Agreement did not apply and Fed. R. Evid. 408 does not bar admission because the statements would not be admitted for a claim at issue during negotiations but rather relate to TransWeb's new antitrust claims.  (Id. at 11–12.)

**IV. DISCUSSION**

**A. Rule 15**

Rule 15(a) of the Federal Rules of Civil Procedure, which governs amendments to pleadings, provides, in relevant part:

> (1) Amending as a Matter of Course.  A party may amend its pleading once as a matter of course within:
>
> > (A) 21 days after serving it, or
> >
> > (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

13

> (2) Other Amendments.  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a).  The federal rules liberally allow for amendments in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits," and provide that if the underlying facts relied upon by a party might be a proper subject of relief, that party should have the opportunity to test its claims on the merits.  Foman v. Davis, 371 U.S. 178, 182 (1962) (citations and internal quotations marks omitted).

Under Rule 15, the decision to permit an amendment rests in the sound discretion of the Court.  See id.; Heyl & Paterson Int'l Inc. v. F.D. Rich Hous. of V.I., Inc., 663 F.2d 419, 425 (3d Cir. 1981).  The United States Supreme Court has stated that leave to amend under Rule 15 may be denied in cases of: (1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice; or (4) futility of amendment.  See Foman, 371 U.S. at 182; Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000); see also Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006) (stating that "[l]eave to amend must generally be granted unless equitable considerations render it otherwise unjust").  Stated differently, absent undue or substantial prejudice, an amendment should be allowed under Rule 15 unless denial can be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed, or futility of amendment.  Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004) (citations, internal quotation marks, and emphasis omitted).  Under Rule 15, leave to amend is generally granted where, during the course of discovery, a party discovers "new evidence."  See, e.g., Kronfeld v. First Jersey Nat'l Bank, 638 F. Supp. 1454, 1460 (D.N.J. 1986) (granting motion to amend upon discovery of new evidence where it did "not appear that the amendment would cause undue delay

14

or that plaintiffs have a dilatory motive").

Here, 3M objects to the Proposed Second Amended Complaint on the grounds of undue delay, prejudice, and futility.  (Opp'n Br. 4–5.)  3M contends that Transweb unduly delayed seeking to add its patent infringement and antitrust claims and to add them now would be prejudicial.  (Id. at 5–9.)  3M also contends the proposed antitrust claims are futile.  (Id. at 9–25.)

**B. Undue Delay and Undue Prejudice**

While incidental prejudice and incidental delay are insufficient grounds on which to deny leave to amend, *undue* prejudice or *undue* delay support denial.  Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 468 (D.N.J. 1990).  As the Court of Appeals for the Third Circuit has explained,

> [t]he passage of time, without more, does not require that a motion to amend a [pleading] be denied; however, at some point, the delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party. The question of undue delay, as well as the question of bad faith, requires that we focus on the [movant's] motives for not amending their [pleading] to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the [adverse party].

Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984) (internal citations omitted); see also Cureton v. NCAA, 252 F.3d 267, 273 (3d Cir. 2001) (stating that "the question of undue delay requires that we focus on the movant's reasons for not amending sooner" and that the issue of prejudice focuses on hardship to the nonmovant if the amendment is permitted); Harrison, 133 F.R.D. at 468 (stating that, in cases of delay, the movant must show that "its delay in seeking to amend is 'satisfactorily explained'" (quoting Leased Optical Dep'ts v. Opti-Ctr., Inc., 120 F.R.D. 476, 478 (D.N.J. 1988)).

Here, there has been no undue delay.  First, TransWeb filed the proposed amendment

before the deadline to do so expired.  Second, as to the patent infringement claim, TransWeb contends that it is based on newly disclosed evidence concerning the 3M products that are surface fluorinated versus fluorinated by infusion.  (Reply Br. 2 n.2.)  TransWeb explains it was necessary for 3M to identify which products were "plasma surface-fluorinated" and "rinsed and dried" so that TransWeb could determine whether those products infringed its '871 patent.  (Id. at 2–3.)  Third, as to the antitrust claims, TransWeb similarly asserts that they are based on new evidence, namely: the November 2010 Safe Life settlement, the December 2010 statements of 3M's representative, and 3M's January 2011 amended infringement contentions.  (Reply Br. 3.)  TransWeb asserts that defendants supplemental infringement contentions provided it notice of 3M's intent to target the oil resistant respirator market while the Minnesota Action and 3M's counterclaims targeted media not used in oil resistant respirator products.  (Id.; see also Minnesota Action Compl. ¶¶ 12, 16 attached to Compl. Ex. C; 3M's Countercls. ¶¶ 13, 18, Nov. 29, 2010, ECF No. 22.)  Thus, the Proposed Second Amended Complaint was filed on time and TransWeb has explained that the new allegations are based on recently discovered evidence.  Accordingly,  the delay has been "satisfactorily explained."  See Harrison, 133 F.R.D. at 468; see also Cureton v. NCAA, 252 F.3d at 273.  Moreover, the delay is not undue as it has not "plac[ed] an unwarranted burden on the court."  Adams, 739 F.2d at 868.  As more fully reflected herein, the Court has set deadlines for patent-related disclosures and discovery that may be pursued to address the new claims that ensures the overall schedule is not impacted by the amendments.  See, e.g., L. Pat. R. 1.3 (permitting that "[t]he Court may modify the obligations or deadlines set forth in these Local Patent Rules based on the circumstances of any particular case.").

Further, 3M fails to show any undue prejudice.  As for TransWeb's purported dilatory

16

tactics, 3M supports this accusation with TransWeb's original request for a longer pretrial

schedule and a joint discovery dispute letter wherein TransWeb argued that a possible

amendment could impact the schedule.  (See Joint Disc. Dispute Letter 9, Feb. 1, 2011, ECF No.

43.)  Elsewhere in the record, however, the parties have jointly requested extensions of the

schedule.  (E.g. Stip. & Am. Sched. Order, Mar. 8, 2011, ECF No. 51; Consent Order, Apr. 5,

2011, ECF No. 53.)  Such a record does not support an accusation of one-sided dilatory conduct.

As for any need to amend the pretrial schedule in a way that will disturb the April 2012 Final

Pretrial Conference, 3M's argument is unpersuasive.  There are several months of fact discovery

left in this case, and as such, the cases 3M cites do not apply.  See Amentler v. 69 Main Street,

LLC, Civ. No. 08-351, 2011 WL 1362594, at *8 (D.N.J. Apr. 11, 2011) (stating that

"[d]iscovery, now closed, will have to be reopened" and that dispositive motion practice had

already been delayed).  Moreover, the adjustments to interim pretrial deadlines that the Court has

set will fall more heavily on TransWeb, as it will be constrained to investigate and be prepared to

prove its case with the remaining time left in discovery.  Therefore, there is no undue prejudice to

3M.

 Accordingly, because no undue delay or prejudice exists, the Court will not bar the patent

and antitrust claims on those grounds and allows TransWeb to amend its pleading to include its

patent infringement claim. The Court will next consider whether TransWeb's antitrust claims are

futile.

**C. Futility**

 A court will consider an amendment futile if it "is frivolous or advances a claim or

defense that is legally insufficient on its face."  Harrison Beverage, 133 F.R.D. at 468 (internal

citations and quotations marks omitted).  In determining whether an amendment is "insufficient on its face," the Court employs the same standard as applies under a Rule 12(b)(6) motion to dismiss.  Burlington, 114 F.3d at 1434.  Under a Rule 12(b)(6) analysis, the question before the Court is not whether the movant will ultimately prevail, but rather whether the complaint sets forth "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Detailed factual allegations are not necessary to survive a Rule 12(b)(6) motion, but "a [pleader's] obligation to provide the grounds of his entitlement to relief requires more than labels[,] . . . conclusions, and a formulaic recitation of the elements of a cause of action" and demands that the "[f]actual allegations . . . be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the [pleading] are true (even if doubtful in fact)."  Id. at 555 (citations and internal quotation marks omitted).

A two-part analysis determines whether this standard is met.  Fowler, 578 F.3d at 210 (interpreting Iqbal, 129 S.Ct. 1937).  First, a court separates the factual and legal elements of a claim.  Fowler, 578 F.3d at 210.  All well-pleaded facts set forth in the pleading and the contents of the documents incorporated therein must be accepted as true, but the Court may disregard any legal conclusions.  Id. at 210–11; Iqbal, 129 S.Ct. at 1949 (noting that a complaint is insufficient if it offers "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" (internal quotations marks and alterations omitted)).

Second, a court must determine whether the plaintiff's complaint articulates "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570; accord Fowler, 578 F.3d at 211.  As the Supreme Court instructed in Iqbal, "[a] claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. Although this is not a "probability requirement," the well-pleaded facts must do more than demonstrate that the conduct is "merely consistent" with liability so as to "permit the court to infer more than the mere possibility of misconduct" to make a showing of entitlement to relief. Id. at 1949–50 (citations and internal quotation marks omitted). This "context-specific task . . . requires the reviewing court to draw on its judicial experience and common sense." Fowler, 578 F.3d at 211 (quoting Iqbal, 129 S.Ct. at 1950).[6]

A court may only consider a very limited record when evaluating whether a proposed amendment is futile. When evaluating an objection to a proposed amendment based upon futility, the Court may only consider the pleading, exhibits attached to the pleading, matters of public record, and undisputedly authentic documents if the claims are based on those documents. Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993); accord W. Penn, 627 F.3d at 97 n.6 (reiterating the rule and its limited exception for documents that are "integral or explicitly relied upon in the complaint"). Accordingly, the Court will consider the Proposed Second Amended Complaint and the documents attached to it, but will not consider the additional exhibits that both parties have filed with their briefs.

Here, the plaintiff claims that 3M engaged in attempted monopolization through Walker Process fraud and sham litigation. 3M argues that the plaintiff's antitrust claims of attempted

---

[6] Notably, the Court of Appeals for the Third Circuit has recognized that Twombly expressly rejected that a heightened pleading standard applies in antitrust cases. W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010) (stating that "[w]e conclude that it is inappropriate to apply Twombly's plausibility standard with extra bite in antitrust and other complex cases").

monopolization are futile because TransWeb has alleged insufficient facts to demonstrate

anticompetitive conduct under either <u>Walker Process</u> fraud or sham litigation, a valid product

market, a dangerous probability of achieving monopoly power, or antitrust injury.

**D. Attempted Monopolization**

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to

monopolize, or combine or conspire with any other person or persons, to monopolize any part of

the trade or commerce among the several States."  15 U.S.C. § 2.  The Act's purpose is to protect

the public from the failures of the market and "conduct which unfairly tends to destroy

competition itself."  <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 458 (1993).

Where, as here, the anticompetitive conduct stems from a patent infringement suit,

Federal Circuit law guides the Court's analysis of the conduct, and Third Circuit law defines the

other elements of the alleged antitrust violation.[7]  <u>Nobelpharma</u>, 141 F.3d at 1068 (stating that

Federal Circuit law applies "to all antitrust claims premised on the bringing of a patent

infringement suit [but] . . . . we will continue to apply the law of the appropriate regional circuit

to issues involving other elements of antitrust law such as relevant market, market power,

damages, etc., as those issues are not unique to patent law, which is subject to our exclusive

---

[7] In the Third Circuit, analysis of anticompetitive conduct normally involves consideration of the conduct "as a whole rather than considering each aspect in isolation." <u>LePage's Inc. v. 3M</u>, 324 F.3d 141, 162 (3d Cir. 2003) (citing <u>Cont'l Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. 690, 699 (1962)).  In a broad sense, anticompetitive conduct occurs when an entity "attempts to exclude rivals on some basis other than efficiency or when it competes on some basis other than the merits." <u>W. Penn</u>, 627 F.3d at 108 (internal citations and quotations marks omitted).  The Sherman Act only inhibits anticompetitive conduct and not vigorous competition; the act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  <u>Spectrum</u>, 506 U.S. at 458; <u>see also</u> <u>W. Penn</u>, 627 F.3d at 109 (listing varieties of anticompetitive conduct).

jurisdiction"); see also Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1348 (Fed. Cir. 2007).  In the

Third Circuit, "[t]he elements of attempted monopolization are: (1) that the defendant has a

specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct

that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power."  W.

Penn, 627 F.3d at 108 (citing Spectrum, 506 U.S. at 456).  Although these elements are discrete,

they "are frequently interdependent 'so that proof of one may provide circumstantial evidence or

permissible inferences of other elements.'"  Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297,

318 (3d Cir. 2007) (citing Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir. 1992)).  In

addition to these elements, a private antitrust plaintiff must also establish that it has suffered an

antitrust injury.  Race Tires, 614 F.3d at 75.

The Court will first consider the element of conduct under Federal Circuit law and then

consider the other antitrust elements under Third Circuit law.

### 1. Anticompetitive Conduct

The Court of Appeals for the Federal Circuit has stated that a patent holder who sues for

infringement may be liable under antitrust law if the patent holder committed Walker Process

fraud or commenced sham litigation.  Nobelpharma, 141 F.3d at 1068.  Walker Process fraud and

sham litigation provide alternate legal grounds for finding the same conduct improper and either

or both may used to prove a Section 2 violation.  Nobelpharma, 141 F.3d at 1071 (explaining

distinctions between the two claims).

### i. Walker Process Fraud

Under Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S.

172 (1965), antitrust liability may arise when a patent-holder procures "a patent . . . by knowing

21

and willful fraud, . . . has market power in the relevant market, and . . . use[s] its fraudulently

obtained patent to restrain competition." C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1367

(Fed. Cir. 1998).  Thus, Walker Process fraud occurs when a patent-holder fraudulently procures

a patent, causes anticompetitve harm with the fraudulent patent, and meets the other elements of

a Sherman Act violation.  C.R. Bard, 157 F.3d at 1367; Nobelpharma, 141 F.3d at 1071.  To

establish patent prosecution fraud, a plaintiff must prove:

> (1) a false representation or deliberate omission of a fact material to patentability,
> (2) made with the intent to deceive the patent examiner,
> (3) on which the examiner justifiably relied in granting the patent, and
> (4) but for which misrepresentation or deliberate omission the patent would not
> have been granted.

C.R. Bard, 157 F.3d at 1364.  As with other fraud claims, such as inequitable conduct, Walker

Process fraud must be pled with particularity under Fed. R. Civ. P. 9(b).  See Exergen Corp. v.

Wal-Mart Stores, Inc., 575 F.3d 1312, 1328 (Fed. Cir. 2009) (analyzing inequitable conduct and

stating that "the pleading must identify the specific who, what, when, where, and how of the

material misrepresentation or omission committed before the PTO"); Bristol-Myers Squibb Co.

v. IVAX Corp., 77 F. Supp. 2d 606, 613 (D.N.J. 2000) (applying Fed. R. Civ. P. 9(b) to Walker

Process fraud); see also Magnetar Techs. Corp. v. Six Flags Theme Parks Inc., Civ. No. 07-127,

2011 WL 678707, at *2–3 (D. Del. Feb. 18, 2011) (same); In re Wellbutrin SR Antitrust Litig.,

Civ. Nos. 04-5525, 04-5898, 05-396, 2006 WL 616292, at *12 (E.D. Pa. Mar. 9, 2006) (same);

Medtronic Ave, Inc. v. Boston Scientific Corp.. Civ. No. 98-478, 2001 WL 652016, at *1–2 (D.

Del. Mar. 30, 2001) (same).

   Walker Process fraud differs from inequitable conduct.  Put simply, "[i]nequitable

conduct is . . . an equitable defense in a patent infringement action and serves as a shield, while a

more serious finding of fraud exposes a patentee to antitrust liability and thus serves as a sword."

Nobelpharma, 141 F.3d at 1070.  Inequitable conduct in obtaining a patent will render a patent

invalid or unenforceable.  C.R. Bard, 157 F.3d at 1367; Nobelpharma, 141 F.3d at 1069–70.

While previously described as "a lesser offense" and is "a broader, more inclusive concept" than

the common law fraud associated with a Walker Process claim, Nobelpharma, 141 F.3d at 1069,

the Court of Appeals for the Federal Circuit recently ratcheted up the requirements to prove

inequitable conduct.  See Therasense, 2011 WL 2028255, at *9–13 (abandoning the "sliding

scale" approach to analyzing inequitable conduct and holding that intent and materiality are

separate, and requiring proof of specific intent to deceive and a showing of "but-for materiality"

except for affirmative acts of egregious misconduct); cf. Nobelpharma, 141 F.3d at 1070 (stating

that "a conclusion of inequitable conduct may be based on evidence of a lesser misrepresentation

or an omission, such as omission of a reference that would merely have been considered

important to the patentability of a claim by a reasonable examiner").  Therasense, however,

provided no indication that the elements of Walker Process fraud changed.  C.f. Therasense, WL

2028255, at *8 (citing Walker Process and stating "[a] finding of inequitable conduct may also

spawn antitrust and unfair competition claims").

Conduct constituting Walker Process fraud must be "knowing and willful" and "must be

based on independent and clear evidence of deceptive intent together with a clear showing of

reliance, i.e., that the patent would not have issued but for the misrepresentation or omission."

Nobelpharma, 141 F.3d at 1071; see also id. at 1070 (stating that "[s]uch a misrepresentation or

omission must evidence a clear intent to deceive the examiner and thereby cause the PTO to

grant an invalid patent"); C.R. Bard, 157 F.3d at 1365 (stating that "[t]o establish culpability any

omission must be of a fact material to patentability and it must be a deliberate misrepresentation, whether by omission or misstatement, that was intended to and did mislead the examiner into taking favorable action that would not otherwise have been taken").  An act is "knowing and willful" where there is "clear, convincing proof of intentional fraud involving affirmative dishonesty [as a part of] a deliberately planned and carefully executed scheme to defraud . . . the Patent Office."  C.R. Bard, 157 F.3d at 1364 (internal citations and quotation marks omitted); see also id. at 1365 (stating that "[i]ntent to mislead or to deceive must be proved by clear and convincing evidence").  An omission is not "material simply because patentability ensued," C.R. Bard, 157 F.3d at 1365, and "[a] mere failure to cite a reference [of prior art] to the PTO will not suffice" as evidence of fraud without a showing of fraudulent intent.  Nobelpharma, 141 F.3d at 1071; see also C.R. Bard, 157 F.3d at 1365 (noting that deceptive intent may not be inferred simply by omission because "in the usual course of patent prosecution many choices are made, recognizing the complexity of inventions, the virtually unlimited sources of information, and the burdens of patent examination").

Here, TransWeb sets forth sufficient facts for a plausible claim of Walker Process fraud and meets the Rule 9(b) standard because it has identified fraud with "precision and some measure of substantiation."  See LG Electronics, Inc. v. ASKO Appliances, Inc., Civ. No. 08-828, 2010 WL 1377255, at *3 (D.Del. Mar. 29, 2010) (quoting Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004)).  The Proposed Second Amended Complaint alleges several misrepresentations.  First, TransWeb alleges that 3M falsely told the PTO that the TransWeb samples were submitted confidentially and that it was not aware of any public disclosures when,

in fact, 3M was allegedly aware that the samples were public disclosures.[8]  (Proposed 2d Am. Compl. ¶¶ 47–49, 52–53, 56–57.)  Second, TransWeb alleges that 3M falsely stated that TransWeb "may" have commercialized its fluorinated media when, in fact, 3M was allegedly aware that TransWeb had actually commercialized that media.  (Id. ¶¶ 60–61.)  Third, TransWeb alleges that 3M falsely stated that it believed that TransWeb had not filed any patent applications for its fluorinated media when, in fact, it was allegedly aware that TransWeb had applied for such a patent.  (Id. ¶ 64.)  Thus, TransWeb has set forth facts, assumed to be true, that if proven would show that 3M made affirmative false representations to the PTO.

The element of intent is met as TransWeb's allegations, which must be assumed to be true on this motion, indicate that 3M, "[the] patent applicant[,] knew one fact and presented another" thereby permitting the inference that 3M made the representations with the intent to deceive.  See Dippin' Dots, 476 F.3d at 1347 (stating that while omission requires separate evidence of intent, "[a] false or clearly misleading prosecution statement may permit an inference that the statement was made with deceptive intent").

TransWeb has also alleged that the facts 3M withheld would be material to the PTO.  For example, TransWeb alleges that, despite 3M's statements to the contrary, TransWeb's fluorinated media was in use, for sale, or the subject of a prior patent application more than a year before the 3M's patent application.  See 35 U.S.C. § 102(b).  Affirmative statements to the

---

[8] 3M contends that a letter dated April 28, 1999 demonstrates that a 1997 non-disclosure agreement applied to samples that TransWeb sent to Racal in 1996 and 1997.  The Court considered these documents because they are attached to the Proposed Second Amended Complaint.  See Pension Benefit, 998 F.2d at 1196.  Despite a review of the documents and the parties' arguments, the import of the documents remains unclear and thus the Court must accept TransWeb's factual allegations that the 1996 and 1997 were public disclosures and not subject to the terms of the subsequently entered 1997 non-disclosure agreement.

25

contrary are material because public sales or use one year before 3M's patent applications would render the patents invalid.  See Dippin' Dots, 476 F.3d at 1345–47 (finding that omission of public product sales, which would have rendered patent invalid, was "highly material" and passed Walker Process' materiality threshold).  Because such statements are material[9] and relevant to patentability, the patent examiner justifiably relied upon them to rule out whether there was publicly available information that would render the proposed patents obvious.  See 35 U.S.C. § 102(b);  see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1361 (Fed. Cir. 2004) (stating that PTO had relied upon fraud as the PTO only issues valid patents and it had issued patent), overruled on other grounds, 546 U.S. 394 (2006); LG Electronics, 2010 WL 1377255, at *3 (finding Rule 9(b) satisfied where pleading specifically identified the prior art omitted, the time of the patent application, and the parties responsible for the fraud as well as alleged that the omission was made with the intent to deceive, the PTO relied upon the omission, and the willful omission caused injury).  Thus, TransWeb's allegations not only raise its right to relief above the speculative level, but are indeed specific enough to give 3M notice of particularized allegations.

Lastly, the plaintiff's allegations about 3M's filing of the Minnesota Action and this case are sufficient to allege that 3M has attempted to enforce the allegedly fraudulently-procured patents to eliminate TransWeb as a competitor.  See Unitherm, 375 F.3d at 1357–58 (stating that

---

[9] TransWeb's allegations involve more than "[a] mere failure to cite a reference to the PTO," Nobelpharma, 141 F.3d at 1071, but rather assert affirmative misrepresentations to the PTO.  Affirmative misrepresentations further support a finding that they are material.  See Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1318 (Fed. Cir. 2006) (stating that "affirmative misrepresentations . . . in contrast to misleading omissions, are more likely to be regarded as material") (quoting Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1367 (Fed. Cir. 2003)).

"if the patentee has done nothing but obtain a patent in a manner that the plaintiff believes is fraudulent, the courts lack jurisdiction to entertain either a Declaratory Judgment Action or a Walker Process claim"); cf. In re Remeron Antitrust Litig., 335 F. Supp. 2d 522, 529 (D.N.J. 2004) (finding no viable Walker Process claim where a plaintiff was never exposed to or even threatened with enforcement of the fraudulently procured patent).

Accordingly, there are sufficient factual allegations to find that the conduct element of the attempted monopolization cause of action, based upon Walker Process fraud, is met.  The Court will next consider whether TransWeb also meets the conduct element based upon its sham litigation claim.

### ii. Sham Litigation

A patent-holder may also be subject to antitrust liability when it engages in "sham" litigation, that is, it "bring[s] suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anti-competitive purposes."  C.R. Bard, 157 F.3d at 1368; see also Nobelpharma, 141 F.3d at 1068 (describing it as an "infringement suit [that] was 'a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor'").  Unlike Walker Process fraud, a patent-holder's "activities in procuring the patent are not necessarily at issue[;] [i]t is the bringing of the lawsuit that is subjectively and objectively baseless that must be proved."  Nobelpharma, 141 F.3d at 1072.  Under Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49 (1993), a party asserting sham litigation must show that: "(1) the lawsuit must be objectively meritless such that 'no reasonable litigant could expect success on the merits' and (2) . . . that 'the baseless lawsuit conceals an attempt to interfere directly with the business

27

relationships of a competitor.'" <u>C.R. Bard</u>, 157 F.3d at 1368 (quoting <u>Prof'l Real Estate</u>, 508 U.S. at 60).  Stated differently, "a sham suit must be both subjectively brought in bad faith and based on a theory of either infringement or validity that is objectively baseless." <u>Nobelpharma</u>, 141 F.3d at 1072.  Therefore, "if a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial." <u>Nobelpharma</u>, 141 F.3d at 1072 (citing <u>Prof'l Real Estate</u>, 508 U.S. at 60–61.)  Sham litigation, however, "requires more than a failed legal theory, " <u>C.R. Bard</u>, 157 F.3d at 1369 (quoting <u>Prof'l Real Estate</u>, 508 U.S. at 60–61 & n.5), and "[n]either the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability." <u>C.R. Bard</u>, 157 F.3d at 1369.

Here, TransWeb's allegations, assumed to be true, state a claim for sham litigation.  As for the objective prong, TransWeb's allegations accuse 3M of knowingly attempting to enforce invalid or unenforceable patents allegedly procured by specific false statements to the PTO.  Such allegations support an assertion that a suit to enforce such patents is objectively baseless.  <u>See, e.g.</u>, <u>Teva Pharm. Indus., Ltd. v. Apotex, Inc.</u>, Civ. No. 07-5514, 2008 WL 3413862, at *6 (D.N.J. Aug. 8, 2008) (Brown, C.J.).

As for the subjective prong, TransWeb's Proposed Second Amended Complaint recounts a series of events that it asserts shed light on 3M's intent to drive TransWeb out of the market.  TransWeb alleges that 3M (1) was aware of TransWeb's publicly disclosed product, its commercialization, and its patent application but concealed this from the PTO; (2) knew that the concealed information helped 3M secure patents they knew were invalid; (3) attempted to buy TransWeb on two occasions but was rebuffed; and (4) brought suit only after all these events transpired.  (<u>See</u> Proposed 2d Am. Compl. ¶¶ 33, 47–49, 52–53, 56–57, 60–61, 64, 107–169.)

28

These allegations satisfy the subjective prong because TransWeb alleges that 3M unsuccessfully attempted to eliminate a competitor by trying to purchase it and then resorted to a lawsuit to enforce patents 3M allegedly knew were invalid.

While 3M asserts that these allegations lack an evidentiary basis and attempts to present matters outside the pleadings to support its argument, the Court may not consider such materials at this stage and must accept the allegations contained in the Proposed Second Amended Complaint as true.  Moreover, as other courts have noted, "when the predicate facts of an allegedly sham lawsuit are disputed, sham litigation claims should not be decided by the court as a matter of law."  In re Gabapentin Patent Litig., 649 F. Supp. 2d 340, 363 (D.N.J. 2009); see also Hoffman-La Roche Inc. v. Genpharm Inc., 50 F. Supp. 2d 367, 379 (D.N.J. 1999); Pactiv Corp. v. Perk-Up, Inc., Civ. No. 08-5072, 2009 WL 2568105, at *14 (D.N.J. Aug. 18, 2009).

Accordingly, the Court finds that there are sufficient allegations to satisfy the conduct element of TransWeb's antitrust claims on the theory of both sham litigation and Walker Process fraud.  The Court must next determine if the Proposed Second Amended Complaint alleges sufficient facts to satisfy the remaining elements under Third Circuit law, namely specific intent, dangerous probability of achieving monopoly power, and antitrust injury.  See Nobelpharma, 141 F.3d at 1068, 1071–72; see also Dippin' Dots, 476 F.3d at 1348; C.R. Bard, 157 F.3d at 1368. Thus, the Court will consider whether TransWeb's allegations sufficiently allege that the defendants had a specific intent to act anticompetitively, whether they allege that the defendants' actions present a dangerous probability of achieving monopoly power, and whether they allege that the defendants' actions caused antitrust injury.

### 2. Specific Intent

Specific intent to act anticompetitively is shown where the defendant's conduct is "not related to any apparent efficiency," Broadcom, 501 F.3d at 318 (citing Apsen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, n.39 (1985), or it is without "a valid business justification." LePage's, 324 F.3d at 152. The acts must be engaged in with "something more than an intent to compete vigorously." Spectrum, 506 U.S. at 459; see also Abbott Labs. v. Brennan, 952 F.2d 1346, 1354 (Fed. Cir. 1992) (noting that a valid Walker Process claim may meet the intent and conduct elements of a Sherman Act violation).

As discussed above, TransWeb alleges that 3M fraudulently procured its patents and then attempted to enforce those patents to push TransWeb out of the oil resistant respirator market. (Proposed 2d Am. Compl. ¶ 101.) Assuming these allegations are true, such conduct would be unrelated to any apparent efficiency, business justification, or vigorous competition. Thus, the allegations show the intent with which 3M engaged in Walker Process fraud and sham litigation. See Spectrum, 506 U.S. at 459; Abbott Labs., 952 F.2d at 1354. The Court will now consider whether TransWeb sufficiently alleges a dangerous probability that the defendants could achieve monopoly power as a result of these actions.

### 3. Dangerous Probability of Achieving Monopoly Power

Dangerous probability of achieving monopoly power "requires an inquiry into the relevant product and geographic market as well as the defendant's economic power in that market." Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 75 (3d Cir. 2010) (citing Spectrum, 506 U.S. at 456). The Supreme Court has noted that "[w]ithout a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition."

Spectrum, 506 U.S. at 456 (citing Walker Process, 382 U.S. at 177).  Market share is crucial, but

not determinative.  Race Tires, 614 F.3d at 75.  In the context of an attempted monopolization

claim, "a complaint must allege 'something more' than mere market share, such as 'the strength

of competition, probable development of the industry, the barriers to entry, the nature of the

anticompetitive conduct, and the elasticity of consumer demand.'"  Broadcom, 501 F.3d at 317

(citing Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc., 159 F.3d 129, 141 (3d

Cir. 1998)); accord Barr Labs., 978 F.2d at 112 (citing Int'l Distrib. Ctrs., Inc. v. Walsh Trucking

Co., 812 F.2d 786, 792 (2d Cir. 1987).  Moreover, "[n]o single factor is dispositive," Broadcom,

501 F.3d at 318, and in fact the Court of Appeals for the Third Circuit has stated that question of

whether there is a dangerous probability of obtaining a monopoly is "a particularly fact-intensive

inquiry" and, as a result, "[c]ourts typically should not resolve this question at the pleading stage

unless it is clear on the face of the complaint that the dangerous probability standard cannot be

met as a matter of law."  Id. (internal quotation marks and citations omitted).

  Here, TransWeb sets forth sufficient allegations to plead a claim that 3M has a dangerous

probability of achieving monopoly power.  To begin with, TransWeb has alleged valid

geographic and product markets.  TransWeb alleges that the relevant geographic region is the

United States and the relevant product market is oil resistant, NIOSH-certified P100, P95, and

R95 particulate respirators.  For the purpose of this motion, the Court assumes as true that

respirators must be NIOSH-certified and that only four classes of respirators are oil resistant:

P100, P99, P95, and R95.  Following the Safe Life settlement and consent judgement, the only

source for P99 has been eliminated from the market.  As to P100, P95, and R95 class respirators,

which are the only other ones that may be used in environments containing oil, TransWeb alleges

31

that they are "frequently interchangeable" although not totally and completely interchangeable. (Proposed 2d Am. Compl. ¶ 92.)  TransWeb alleges that "the only significant difference [among this trio of products] being the durational use limitation of the R95 in environments in oil."  (Id.) More specifically, according to TransWeb's allegations, the P100 or P95 respirator generally may be used up to 40 hours in the same oil environment whereas the R95 may only be used for up to 8 hours in that environment.  (Id. ¶ 91.)  Viewing TransWeb's allegations in a light most favorable to it, consumers may purchase multiple R95 respirators to achieve the same effect as a P100 or P95 respirator.  Necessarily, a price rise in one of these products will cause a greater demand in the other classes.  Moreover, TransWeb also alleges that there are only a few specialized environments that require use of the P100 respirators.  (Id. ¶¶ 88, 92.)  Thus, with limited exceptions, each may be used in the same environments.  3M argues that the P100, P95, and R95 are not interchangeable with one another because employers cannot use a lower class filter in an environment requiring a higher one.  (Opp'n Br. 12.)  3M, however, does state that a higher class filter can be used in place of a lower class filter.  (Id.)  Therefore, 3M's argument does not show a lack of interchangeability.  Interchangeability must only be "reasonabl[e]," not absolute, Tunis Brothers Co., Inc., v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1992) (quoting United States v. E.I. Du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)), and TransWeb's factual allegations, which the Court must assume are true, permit an inference that consumers are doing exactly what 3M suggests: they are using higher class filters in place of lower class filters to such an extent that they are reasonably interchangeable.  (See Proposed 2d Am. Compl. ¶¶ 88–93.)  In short, TransWeb's allegations place these three products within the same relevant product market as they are "reasonably interchangeable by consumers for the same purposes" when factors of price,

use, qualities and cross-elasticity of demand are considered.  See Tunis Brothers, 952 F.2d at 722

(quoting Du Pont, 351 U.S. at 380, 395, 400, 404)).  Therefore, TransWeb sufficiently alleges a

relevant product market.

TransWeb also sufficiently alleges 3M's market power in the oil resistant, NIOSH-

Certified P100, P95, and R95 respirator market.  TransWeb alleges that, in this product market,

respirators may have either fluorinated or non-fluorinated filtration media.  (Proposed 2d Am.

Compl. ¶ 94.)  TransWeb, however, further alleges that "few other manufacturers" produce

respirators with non-fluorinated media, "these [non-fluorinated] respirators are not widely used,"

the "3M Defendants and manufacturers using fluorinated filtration media of TransWeb are

essentially the only significant suppliers in the market of NIOSH-certified respirators for

environments containing oil," and 3M and TransWeb are the only suppliers of fluorinated

filtration media.  (Id. ¶ 94.)  Thus, accepting these allegations as true, TransWeb has alleged that

non-fluorinated media makes up an insignificant portion of the oil-resistant, NIOSH-certified

respirator market and that TransWeb and 3M are the only suppliers of fluorinated media.  (See

id. ¶¶ 94–95.)  TransWeb further alleges that 3M has a dominant share of sales of P100, P95, and

R95 and that 3M only supplies filtration media to itself or its wholly owned subsidiaries.  (Id. ¶

99)  Accordingly, although TransWeb sets forth no specific market share data, its factual

allegations sufficiently allege that 3M is the dominant competitor in a two-competitor market and

that elimination of TransWeb as a supplier of the media to manufacturers other than 3M will

destroy competition in this market.

Moreover, TransWeb also alleges that there are barriers to entry into this oil resistant

NIOSH-certified respirator market because of difficulties associated with creating products with

fluorinated filtration media.  Specifically, TransWeb alleges that a new supplier of fluorinated filtration media would need substantial capital for research and development and facilities as well as cooperation with a respirator manufacturer to complete the process of certifying the respirator.  (Id. ¶ 96.)  TransWeb also alleges that there have been no new suppliers of filtration media in this market since its own entry.  (Id. ¶ 97.)

Accordingly, although a debate exists as to the accuracy of TransWeb's factual allegations, the Court cannot resolve this fact-intensive dispute here and TransWeb has set forth plausible allegations of a dangerous probability of monopoly power.  Cf. Broadcom, 501 F.3d at 318 (noting that courts should typically resolve this "particularly fact-intensive inquiry" unless it clear that this element cannot be met as a matter of law).

Having found that TransWeb has sufficiently pled the elements of attempted monopolization, the Court next considers whether TransWeb has alleged that 3M's conduct causes an antitrust injury.

### 4. Antitrust Injury

In addition to the above elements, "[a] private antitrust plaintiff must further establish that it suffered an 'antitrust injury' as a result of the misconduct and therefore possesses the standing necessary to seek relief."  Race Tires, 614 F.3d at 75.  As the Supreme Court has explained, "the antitrust laws . . . were enacted for 'the protection of competition not competitors.'"  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (citing Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)).  To establish antitrust injury and standing, a plaintiff must show that the injury (1) was "of the type the antitrust laws were intended to prevent" and (2) "flows from that which makes defendants' acts unlawful."

34

Brunswick, 429 U.S. at 489; accord Race Tires, 614 F.3d at 76 (quoting Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993)).  The particular injury must be one associated with an anticompetitive act and it must stem from the particular anticompetitive conduct at issue as "[t]he injury should reflect the anticompetitve effect either of the violation or of anticompetitive acts made possible by the violation."  Brunswick, 429 U.S. at 489.  When determining antitrust injury, the Court views the effect of the anticompetitive injuries as a whole.  Gabapentin, 649 F. Supp. 2d 340, 355–56 (D.N.J. 2009); Biovail Corp. Intern. v. Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 767 (D.N.J. 1999); LePage's, 324 F.3d at 162, 166.  Because causes of an injury are inherently factual in nature, the Court of Appeals has stated "that the existence of antitrust injury is not typically resolved through motions to dismiss." Schuykill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997) (citing Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995) (collecting cases)).

Here, TransWeb alleges that it suffered harm by: (1) being forced to expend substantial amounts of money, time, and resources defending 3M's patent infringement litigation; (2) being forced to sell itself to CLARCOR Inc. at a low price because of its inability to bear the costs and burdens of litigation; (3) lost business from its customer Safe Life because 3M forced Safe Life from the market; and (4) the likely loss of other customers because of 3M's deposition and document subpoenas.  (Proposed 2d Am. Compl. ¶¶ 114, 162, 178.)

Whether litigation costs can qualify as antitrust injury is a "controversial" proposition. Abbot Labs. v. Teva Pharm., 432 F. Supp. 2d 408, 431 n.19 (D. Del. 2006); compare Bristol-Myers Squibb Co. v. Ben Venue Labs., 90 F. Supp. 2d 540, 543–46 (D.N.J. 2000) (fees may be

an antitrust injury) with Brotech Corp. v. White Eagle Int'l Techs. Group, Inc., Civ. No. 03-232,

2004 WL 1427136, at *6–7 (E.D. Pa. June 21, 2004) (fees alone may not be an antitrust injury);

see also CVD, Inc. v. Raytheon Co., 769 F.2d 842, 858 (1st Cir. 1985) (finding antitrust injury

from legal expenses incurred in resolving a claim brought in bad faith).  Because antitrust "injury

should reflect the anticompetitve effect either of the violation or of anticompetitive acts made

possible by the violation," Brunswick, 429 U.S. at 489, an antitrust plaintiff "must show harm to

competition."  Race Tires, 614 F.3d at 83.  Accordingly, some courts require that, for litigation

costs to be an antitrust injury, the pleading must link those costs to some anticompetitive effect.

See, e.g., Varian Semiconductor Equip. Assoc. v. Advanced Ion Beam Tech, Inc., Civ. No. 08-

10487, 2009 WL 2425849, at *5–7 (D. Mass. Aug. 4, 2009) (finding that litigation costs were not

an antitrust injury because of failure to identify how costs affected injured party's participation in

the market or the market itself); Chip-Mender, Inc. v. Sherwin-Williams, Co., Civ. No. 05-3464,

2006 WL 13058, at *6 (N.D. Cal. Jan. 3, 2006) (stating that "[a]n antitrust plaintiff must allege

more than that the defendant's wrongful behavior directly damaged its business-it must also

allege that the accused behavior stifled competition"); Brotech, 2004 WL 1427136, at *7 (finding

that litigation costs were not an antitrust injury because of failure to allege that the costs "had any

effect on competition, on the price, quantity or quality of . . . products, or prevented . . . entry into

the market").  For similar reasons, subpoenas served upon customers as part of the litigation

alone does not necessarily lead to an inference that competition will be reduced.  Moreover, the

fact TransWeb sold itself to a larger corporation does not necessarily show competition has been

impacted.  Indeed, a reasonable inference is that the number of competitors remained the same,

but one now has greater resources behind it.  This act, therefore, would not reduce competition

even though the sale changed the configuration of a competitor from a single purpose entity to a member of a conglomerate who can compete with 3M.

The Court need not decide at this time whether litigation costs, or these other allegations of injury to TransWeb, are sufficient to constitute an antitrust injury because the allegations in the Proposed Second Amended Complaint "viewed as a whole" articulate a sufficient injury to competition. Gabapentin, 649 F. Supp. 2d at 355–56. Specifically, TransWeb's factual allegations, which the Court must take as true on this motion, indicate that the market for oil resistant respirators is essentially a two-competitor market between those products containing 3M media and those products containing TransWeb media. (See Proposed 2d Am. Compl. ¶¶ 89, 94–95, 161.) Moreover, the allegations indicate that there would be barriers to the entry of a new competitor (see id. ¶¶ 96–97) or for TransWeb to remain as a competitor. For example, if 3M were successful in its patent infringement case based upon its allegedly fraudulently procured patents, 3M would eliminate TransWeb media from the market and thereby foreclose competition on a basis other than quality, price, service or some other valid basis for competition. (Id. ¶ 173.) A foreclosure of competition as a result of the enforcement of an allegedly fraudulently prosecuted patent would be the type of injury to competition that the antitrust laws are meant to protect. See Amgen, Inc. v. F. Hoffmann-La Roche Ltd., 480 F. Supp. 2d 462, 468 (D. Mass. 2007) (allegations of anticompetitive harm flowing from Walker Process fraud constitutes antitrust injury). Thus, when the factual allegations are assumed to be true and viewed in their entirety in a light most favorable to the plaintiff, the Proposed Second Amended Complaint has nudged over the line to sufficiently plead antitrust injury.

Accordingly, the Court finds that TransWeb's Sherman Act Claims are not futile and

37

therefore the Court will grant plaintiff leave to file them.

**E. New Jersey Antitrust Claims**

Because New Jersey's antitrust statutes are construed in harmony with federal antitrust statutes, the Court need not separately analyze the state law claims.  See N.J. Stat. Ann. § 56:9-18 (West 2011); see, e.g., Acme Markets, Inc. v. Wharton Hardware & Supply Corp., 890 F. Supp. 1230, 1238 n.6, 1242 n.10 (D.N.J. 1995); Dicar, Inc. v. Stafford Corrugated Prods., Inc., Civ. No. 05-5426, 2010 WL 988548, at *9 n.7 (D.N.J. Mar. 12, 2010); Only v. Ascent Media Grp., LLC, Civ. No. 06-2123, 2006 WL 2865492, at *5, *8 (D.N.J. Oct. 5, 2006). As a result, the Court incorporates its findings concerning the Sherman Act claims and grants TransWeb's request to amend its Complaint to add its New Jersey antitrust claims.

**V. CONCLUSION**

For the reasons stated herein, the Court grants TransWeb leave to file a Second Amended Complaint and terminates as moot the 3M's motion for leave to file an Amended Answer.  The following deadlines shall govern the pretrial proceedings concerning new allegations, claims, defenses, and counterclaims in the Second Amended Complaint and Answer and Counterclaim filed in response thereto:

1.  The plaintiff shall file its Second Amended Complaint no later than **June 3, 2011**;

2.  The defendants shall file their Answer to the Second Amended Complaint and Counterclaim no later than **June 10, 2011**; and

3.  Any party that seeks to serve up to 10 interrogatories (including subparts) and document demands based upon the new allegations in the Second Amended Complaint and/or Answer and Counterclaim filed in response thereto shall serve same no later than **June 14, 2011**,

which shall be responded to no later than **July 14, 2011**.  Any unresolved discovery disputes that arise from these interrogatories and/or document demands shall be presented via the joint letter protocol no later than August 13, 2011.

      The following deadlines shall govern the plaintiff's patent infringement claim:

      1.  The plaintiff shall identify the patent claims and disclose its infringement contentions no later than **June 14, 2011**;

      2.  The defendants shall provide their responses to the infringement contentions and disclose their noninfringement and invalidity (if any) contentions no later than **July 5, 2011**;

      3.  The plaintiff shall provide its responses to the invalidity contentions (if any) no later than **July 22, 2011**;

      4.  The parties shall identify the claim terms that they believe need to be construed no later than **August 3, 2011**;

      5.  The parties shall exchange preliminary claim constructions no later than **August 17, 2011**;

      6.  The parties shall submit the joint claims construction chart no later than **September 13, 2011**;

      7.  Markman fact discovery shall be completed no later than **September 27, 2011**;

      8.  Markman expert discovery shall be completed no later than **October 24, 2011**;

      9.  The opening Markman briefs shall be submitted no later than **October 10, 2011**;

      10.  The responsive Markman briefs shall be submitted no later than **November 4, 2011**; and

      11.  The parties shall submit a joint letter that sets forth the information required by Local

39

Patent Rule 4.6, including the estimated length of the <u>Markman</u> hearing and the names of the witnesses (if any) no later than **November 11, 2011**.

      All other deadlines shall remain in full force and effect.

s/Patty Shwartz                     
UNITED STATES MAGISTRATE JUDGE

Date: June 1, 2011