Liza M. Walsh
Christine I. Gannon
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
Tel.: (973) 535-0500
Fax: (973) 535-9217

*Attorneys for Plaintiff*
*TransWeb, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRANSWEB, LLC, ) | CIVIL ACTION NO. 10-04413 (FSH/PS) |
| ) | |
| Plaintiff and ) | |
| Counterclaim-Defendant, ) | |
| ) | |
| v. ) | **SECOND AMENDED COMPLAINT** |
| ) | **AND JURY DEMAND** |
| 3M INNOVATIVE PROPERTIES ) | |
| COMPANY and 3M COMPANY, ) | |
| ) | |
| Defendants and ) | |
| Counterclaim-Plaintiffs. ) | |
| ) | |
| ) | |

Plaintiff TransWeb, LLC ("TransWeb") hereby brings this action against Defendants 3M

Innovative Properties Company and 3M Company (collectively "the 3M Defendants"), alleging

as follows:

### INTRODUCTION

The 3M Defendants have engaged in a course of conduct designed to monopolize the

market for OSHA-required, NIOSH-certified oil resistant particular respirators and the

fluorinated filtration media that is a critical component of these respirators through the use of

invalid and fraudulently obtained patents, sham litigation and anti-competitive activities.  The

3M Defendants have sought to enforce, in an anti-competitive manner, invalid and unenforceable patents against TransWeb, the only other supplier of fluorinated filtration media that is capable of being used effectively in NIOSH-certified oil resistant respirator products. TransWeb supplies this fluorinated filtration media to all major respirator manufacturers in the United States that compete with the 3M Defendants for these products. The 3M Defendants only supply themselves and their wholly owned subsidiaries. By eliminating TransWeb and its fluorinated media, the 3M Defendants would effectively eliminate all other competitors selling oil resistant respirators using this technology.

The 3M Defendants know the asserted patents are invalid and unenforceable, as evidenced by, among other things, the fact that they have been aware of TransWeb's products in the market for years before the asserted patents issued but never attempted to assert them until 3M's recent attempts to eliminate TransWeb as a competitor through acquisition were unsuccessful. In addition, evidence of the 3M Defendants' specific intent to monopolize this market has recently come to light through the course of these proceedings and others. Finally, discovery in the course of this action indicates that the 3M Defendants' fluorinated filtration media used in these and other products infringes a valid patent held by TransWeb for surface fluorinated filtration media.

## THE PARTIES

1.      Plaintiff TransWeb, LLC, is a limited liability corporation organized and existing under the laws of the state of New Jersey with its principal place of business at 1473 West Forest Grove Road, Vineland, New Jersey, 08360.

2.      Defendant 3M Innovative Properties Company is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 3M Center, St. Paul, Minnesota, 55133-3427.

3.      Defendant 3M Company is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 3M Center, St. Paul, Minnesota, 55133-3427.

## JURISDICTION AND VENUE

4.      This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, and the patent laws of the United States, 35 U.S.C. § 1 et seq.

5.      This Court has subject matter jurisdiction over this action under at least 28 U.S.C. §§ 1331, 1338, 2201 and 2202, and under 15 U.S.C. § 15.

6.      Defendant 3M Innovative Properties Company is registered to do business in New Jersey with identification number 100783929, and has appointed as an agent for service of process in this judicial district The Corporation Trust Company, 820 Bear Tavern Road, West Trenton, New Jersey, 08628.  3M Innovative Properties Company has repeatedly availed itself of the forum provided by this judicial district.  Most recently, 3M Innovative Properties Company is a plaintiff in the currently ongoing *Graceway Pharmaceuticals, LLC et al. v. Perrigo Company et al.*, Civil Action No. 10-937 (D.N.J.), filed on February 23, 2010.

7.      Defendant 3M Company is registered to do business in New Jersey with identification number 6112410000, and has appointed as an agent for service of process in this judicial district The Corporation Trust Company, 820 Bear Tavern Road, West Trenton, New Jersey, 08628.  3M Company maintains multiple facilities in New Jersey, including in Parsippany, Flemington, and Belle Mead, New Jersey.

8.      Upon information and belief, the 3M Defendants have continuous and systematic contacts in New Jersey, including maintaining offices and doing business in New Jersey, and are subject to the personal jurisdiction of this Court under the United States Constitution, the laws of the state of New Jersey, and the Federal Rules of Civil Procedure.

9.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

## FILTRATION METHODS AND TERMINOLOGY

10.      Filtration is the removal of unwanted material from a stream of gas or liquid. Filtration "media" is the material that performs the filtration.  When a gas or liquid moves through filtration media, the media filters it by allowing some material to pass, while blocking or retaining other material – the contaminants.

11.      Filtration media can perform this function in several ways.  Some filtration media perform purely "mechanical" filtration, in which the media's pores are large enough to allow desirable matter through, but small enough to block contaminants.  For example, a coffee filter performs mechanical filtration: the brewed coffee passes through the filter, while the larger coffee grounds are prevented from passing.

12.      In addition to mechanical filtration, some filtration media also use chemical or electric attraction to filter contaminants.  For example, an "electrostatically charged" air filter will attract contaminant particles carrying an opposite charge, causing them to stick to the media even if they might otherwise be small enough to pass through.

13.      Similarly, depending on its source material and fabrication technique, filtration media may have innate chemical properties that attract or repel certain contaminant particles. For example, material that is "hydrophilic," or water-loving, may attract and hold water molecules while letting other molecules pass through.

14.      A filter's "efficiency" describes its ability to remove a contaminant, in percentage terms.  If a filter is rated with a 75% efficiency regarding a particular contaminant, it will remove 75% of that contaminant, either by weight or by volume, under lab conditions.  Generally speaking, the more "efficient" filter media is, the better job it does filtering out contaminants.

15.      Because any filter interferes, at least somewhat, with the flow of gas or liquid

through it, the pressure on the outflow side will generally be lower than the pressure on the inflow side, reflecting the force necessary to push the gas or liquid through the filter.  In air filtration, this differential is known as "pressure drop," which measures the difference in air pressure between the filter's inflow and outflow sides.

16.     Filtration media with a low pressure drop requires less energy to move air through the filter than filtration media with a high pressure drop.  Consequently, a person wearing a respirator with low-pressure-drop media can breathe more easily with a lower physiological burden than a person wearing a respirator with high-pressure-drop media.  As a result, air filtration media with a low pressure drop is more desirable than media with a high pressure drop.

17.     Makers of filtration media often face a trade-off between efficiency and pressure drop. In order to remove more contaminants and therefore achieve a higher efficiency, filtration media generally must restrict more air flow and therefore suffer from a higher pressure drop. Manufacturers strive to develop filtration media that has both high efficiency and low pressure drop.

18.     This trade-off between efficiency and pressure drop is most apparent in filtration media relying solely on mechanical filtration.  Mechanical filtration requires forcing a gas through pores small enough to block contaminants (*supra* ¶ 11); smaller pores mean greater efficiency, but require more energy to pass material through them, especially as they clog up with contaminants.  For this reason, manufacturers of filtration media often use additional materials and techniques, such as electrostatically charged media, to improve efficiency without overly increasing pressure drop.

### TRANSWEB'S INVENTION AND PATENT APPLICATION

19.     Beginning in the fall of 1996, TransWeb worked to develop an electrostatically charged air filtration media that had both high efficiency and low pressure drop.

20.     Prior to 1996, the 3M Defendants had manufactured electrostatically charged filtration media using a process of infusing the media with chemicals containing fluorine, the best element for imparting an electrical charge. In other words, the 3M Defendants used fluorine as an ingredient in the media's fibers themselves.

21.     During its development efforts, TransWeb discovered that it could produce filtration media with both high efficiency and low pressure drop by "surface-treating" media with a fluorine-rich plasma, rather than infusing the fibers themselves with chemicals containing fluorine.  TransWeb's surface-treated filtration media performed comparably to the 3M Defendants' filtration media infused with fluorine, and could be produced at a lower price.

22.     TransWeb's filtration media surface-treated with a fluorine-rich plasma was also more "hydrophobic" and "oleophobic" than filtration media infused with chemicals containing fluorine – that is, it was better at repelling both water and oil.  Increased hydrophobicity and oleophobicity are desirable features for filtration media used in environments with water or oil in the air, such as a respirator used in a paint booth.  In general terms, hydrophobic and oleophobic filtration media cause water and oil molecules to bead on the media's surface, rather than spread across it, and will therefore hold more of these molecules, improving the life of the filter.

23.     On April 30, 1997, TransWeb filed U.S. patent application no. 08/841,348, describing a "filter medium, comprising a web of electret fibers, said fibers having been formed from a material that was treated with a fluorine-containing plasma prior to being electrically charged."

24.     On January 28, 1998, the examiner's first office action rejected all claims of the '348 application, stating that "it would have been readily obvious to one having ordinary skill in the art to apply a fluorine additive by plasma treatment to the admitted prior art fibrous filter element and method of production in order to enhance the separation properties of the filter

element."

25.     On April 27, 1998, Transweb amended the '348 application.

26.     On July 15, 1998, the examiner issued a final rejection of all claims in the '348 application.  TransWeb did not further pursue the '348 application, leading to its abandonment.

## TRANSWEB'S MARKETING OF ITS INVENTION

27.     At least as early as December 1996, TransWeb began meeting with potential customers of its new product.  On December 17, 1996, TransWeb met with representatives of Racal Filter Technologies, Inc. ("Racal").  Following this meeting, TransWeb sent Racal samples of its new filtration media on December 21, 1996.

28.     Racal and TransWeb representatives met again in late April or early May 1997.  During these meetings, TransWeb offered to sell Racal its new filtration media surface-treated with a fluorine-rich plasma.  Following further discussions, TransWeb shipped another set of samples to Racal on May 7, 1997.

29.     After TransWeb filed the '348 application, in May 1997, TransWeb informed Racal that it had applied for a patent covering its new filtration media surface-treated with a fluorine-rich plasma.

## THE 3M DEFENDANTS' ACQUISITION OF RACAL AND ANALYSIS OF TRANSWEB'S INVENTION

30.     In December 1997, the 3M Defendants agreed to purchase the assets of Racal.  In early 1998, no later than March 31, 1998, the 3M Defendants closed the transaction and acquired Racal's assets.  Among these assets were at least some of the samples TransWeb sent to Racal in 1996 and 1997.  (*Supra* ¶¶ 27-28.)  On information and belief, these assets included all of the samples TransWeb sent to Racal in 1996 and 1997, records regarding meetings between TransWeb and Racal during which TransWeb informed Racal of its patent application covering

its filtration media surface-treated with a fluorine-rich plasma and offered to sell Racal this media, and employees who attended such meetings.

31.     The 3M Defendants analyzed TransWeb's samples provided to Racal.

32.     On December 2, 1998, the 3M Defendants' "Corporate Research Laboratories, Corporate Analytical Technology Center, Surface Analysis" reported detailed results regarding the 3M Defendants' analysis of TransWeb's samples provided to Racal.  According to the report from the 3M Defendants' Corporate Research Laboratories, it undertook this analysis because "Dr. J. S. Huberty, Occupational Health & Environmental Safety Division, submitted a sample of the non-woven web labeled Transweb T-Melt 30P.  He requested that the chemical composition of the surface of the sample be determined, especially to determine the amount of fluorine present."  The 3M Defendants' Corporate Research Laboratories reported that approximately 50% of the surface molecules were fluorine, with the balance comprising carbon, oxygen, and nitrogen.  The 3M Defendants' Corporate Research Laboratories also reported that the samples indicated "exposure to a high energy plasma or corona type treatment."

**THE 3M DEFENDANTS' PURCHASE OF TRANSWEB FILTRATION MEDIA**

33.     Beginning in 1999, the 3M Defendants inquired with TransWeb regarding the 3M Defendants' desire to purchase from TransWeb filtration media surface-treated with a fluorine-rich plasma.

34.     In June, July and August 2000, TransWeb shipped to the 3M Defendants filtration media surface treated with a fluorine-rich plasma in non-commercial quantities, which 3M told TransWeb it would use for evaluation and experimentation.

35.     From April through July 2001, and again from May through September 2002, TransWeb sold and shipped to the 3M Defendants commercial quantities of filtration media surface-treated with a fluorine-rich plasma.

## PROSECUTION OF THE '458 PATENT

36.     On January 6, 2000, at least two-and-a-half years after TransWeb provided Racal with filtration media surface-treated with a fluorine-rich plasma and approximately two years after the 3M Defendants purchased Racal's assets, including TransWeb's media, the 3M Defendants filed application no. 09/478,658, which would eventually become the '458 patent.

37.     The 3M Defendants' filing of the '658 application triggered the legal duty of candor to the patent office, including disclosure of information material to patentability. "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned." 37 C.F.R. § 1.56(a) (July 1, 1999); Manual of Patent Examining Procedure § 2001 (7th ed. July 1998). Applicants before the patent office had a duty to disclose "all information known to that individual to be material to patentability" *promptly*, generally before the first office action by the Patent and Trademark Office. 37 C.F.R. § 1.59 (July 1, 1999).

38.     Despite this duty, neither the 3M Defendants nor any other individual associated with the filing and prosecution of the '658 application disclosed any information regarding TransWeb's filtration media surface-treated with a fluorine-rich plasma, which the 3M Defendants had in its possession since early 1998, and had analyzed in December 1998.

39.     The 3M Defendants and other individuals associated with the filing and prosecution of the '658 application violated this duty by failing to disclose TransWeb's filtration media surface-treated with a fluorine-rich plasma, which was anticipatory prior art to the '658 application.

40.     The 3M Defendants and other individuals associated with the filing and prosecution of the '658 application knew, from the 3M Defendants' acquisition of Racal's assets, that TransWeb had offered to sell Racal its filtration media surface-treated with a fluorine-rich plasma no later than May 1997, more than a year before the claimed priority date of the '658 application.

41.     The 3M Defendants and other individuals associated with the filing and prosecution of the '658 application knew, from the 3M Defendants' acquisition of Racal's assets, that TransWeb had informed Racal in May 1997 that it had applied for a patent covering its new filtration media surface-treated with a fluorine-rich plasma.

42.     The 3M Defendants and other individuals associated with the filing and prosecution of the '658 application knew, from 3M's analysis of the TransWeb samples in December 1998, that TransWeb's filtration media surface-treated with a fluorine-rich plasma was material to patentability of the '658 application.

43.     For example, claim 25 of the '658 application claimed a "method of making an electret comprising:  fluorinating a polymeric nonwoven web to produce an article having surface fluorination; and charging the fluorinated web in a manner sufficient to produce an electret."

44.     As the 3M Defendants' own "Corporate Research Laboratories" report had confirmed in December 1998, each limitation of this claim was already present in TransWeb's filtration media surface-treated with a fluorine-rich plasma.  (*Supra* ¶ 32.)  The report confirmed that TransWeb's product was a "non-woven web" with significant surface fluorination that had been subject to "exposure to a high energy plasma or corona type treatment."

45.     Despite its clear materiality to patentability of the '658 application, neither the 3M Defendants nor any other individual associated with the filing and prosecution of the '658

application disclosed TransWeb's filtration media surface-treated with a fluorine-rich plasma to the Patent and Trademark Office for *almost two years*, until December 11, 2001.  A true and correct copy of this disclosure is attached as Exhibit A.

46.     The 3M Defendants and the other individuals associated with the filing and prosecution of the '658 application withheld information from the Patent and Trademark Office with the deceptive intent of preventing the Patent and Trademark Office from realizing that TransWeb's media was anticipatory prior art to the '658 application.

47.     When the 3M Defendants did disclose TransWeb's filtration media surface-treated with a fluorine-rich plasma to the Patent and Trademark Office, it did so in a deceptive and misleading fashion.  For example, the 3M Defendants December 2001 disclosure stated that, "[o]n June 2, 1997, Racal Filter Technologies, Inc, (Racal) entered into a Confidential Disclosure Agreement (Exhibit A) with Transweb, LLC.  As part of this arrangement between the parties, Transweb furnished to Racal a sample of a nonwoven filtration web."

48.     This was not correct: TransWeb sent Racal samples in December 1996 and May 1997, and did not execute the Confidential Disclosure Agreement until June 2, 1997.  (*Supra* ¶¶ 27-28; Exhibit A.)

49.     Neither the 3M Defendants nor any other individual associated with the filing and prosecution of the '658 application disclosed that TransWeb sent its filtration media surface-treated with a fluorine-rich plasma to Racal without executing any non-disclosure agreement, that is, without any restriction on Racal's redistribution.

50.     This information was material to the patentability of the '658 application.  If TransWeb sent its filtration media surface-treated with a fluorine-rich plasma to Racal without executing any non-disclosure agreement, that is, without any restriction on Racal's redistribution, then TransWeb's media was "in public use or on sale in this country, more than one year prior to

the date of the application for patent in the United States," and therefore could be anticipatory prior art to the '658 application.  35 U.S.C. § 102(b).

51.     The 3M Defendants and the other individuals associated with the filing and prosecution of the '658 application withheld information from the Patent and Trademark Office with the deceptive intent of preventing the Patent and Trademark Office from realizing that TransWeb's media was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," and therefore could be anticipatory prior art to the '658 application.  35 U.S.C. § 102(b).

52.     The 3M Defendants' December 2001 disclosure further stated that, "[t]he applicants are unaware of any public disclosure of the Tmelt 30P product before the July 2, 1998 filing date."  Again, this was not correct.  TransWeb sent Racal samples in December 1996 and May 1997, and did not execute the Confidential Disclosure Agreement until June 2, 1997.  (*Supra* ¶¶ 27-28; Exhibit A.)

53.     Neither the 3M Defendants nor any other individual associated with the filing and prosecution of the '658 application disclosed that TransWeb sent its filtration media surface-treated with a fluorine-rich plasma to Racal without executing any non-disclosure agreement, that is, without any restriction on Racal's redistribution.

54.     This information was material to the patentability of the '658 application.  If TransWeb sent its filtration media surface-treated with a fluorine-rich plasma to Racal without executing any non-disclosure agreement, that is, without any restriction on Racal's redistribution, then TransWeb's media was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," and therefore could be anticipatory prior art to the '658 application.  35 U.S.C. § 102(b).

55.     The 3M Defendants and the other individuals associated with the filing and

prosecution of the '658 application withheld information from the Patent and Trademark Office with the deceptive intent of preventing the Patent and Trademark Office from realizing that TransWeb's media was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," and therefore could be anticipatory prior art to the '658 application. 35 U.S.C. § 102(b).

56.     The 3M Defendants' December 2001 disclosure further stated that, "[a]s part of the purchase of Racal's assets, 3M obtained possession of the Transweb product that was submitted under the Confidential Disclosure Agreement dated June 2, 1997."  Again, this was not correct.  TransWeb sent Racal samples in December 1996 and May 1997, and did not execute the Confidential Disclosure Agreement until June 2, 1997.  (*Supra* ¶¶ 27-28; Exhibit A.)

57.     Neither the 3M Defendants nor any other individual associated with the filing and prosecution of the '658 application disclosed that TransWeb sent its filtration media surface-treated with a fluorine-rich plasma to Racal without executing any non-disclosure agreement, that is, without any restriction on Racal's redistribution.

58.     This information was material to the patentability of the '658 application.  If TransWeb sent its filtration media surface-treated with a fluorine-rich plasma to Racal without executing any non-disclosure agreement, that is, without any restriction on Racal's redistribution, then TransWeb's media was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," and therefore could be anticipatory prior art to the '658 application.  35 U.S.C. § 102(b).

59.     The 3M Defendants and the other individuals associated with the filing and prosecution of the '658 application withheld information from the Patent and Trademark Office with the deceptive intent of preventing the Patent and Trademark Office from realizing that TransWeb's media was "in public use or on sale in this country, more than one year prior to the

date of the application for patent in the United States," and therefore could be anticipatory prior art to the '658 application.  35 U.S.C. § 102(b).

60.     The 3M Defendants' December 2001 disclosure further stated that, "[a]pplicants do believe, however, that the product may have been subsequently commercialized by Transweb."  Once again, this was not correct.  By the time the 3M Defendants filed its disclosure in December 2001, TransWeb had sold and shipped to 3M filtration media surface-treated with a fluorine-rich plasma in commercial quantities.  (*Supra* ¶ 35.)  The 3M Defendants knew that TransWeb had actually commercialized its filtration media surface-treated with a fluorine-rich plasma as early as 1999, when it began to obtain commercially available quantities of this media; 3M could not truly state that "the product *may* have been subsequently commercialized by Transweb."  (Emphasis added.)

61.     Neither the 3M Defendants nor any other individual associated with the filing and prosecution of the '658 application disclosed that TransWeb had actually commercialized its filtration media surface-treated with a fluorine-rich plasma as early as 1999.

62.     This information was material to the patentability of the '658 application.  If TransWeb commercialized its filtration media surface-treated with a fluorine-rich plasma as early as 1999, it likely invented the media much earlier, and likely placed its media "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," which could therefore be anticipatory prior art to the '658 application.  35 U.S.C. § 102(b).

63.     The 3M Defendants and the other individuals associated with the filing and prosecution of the '658 application withheld information from the Patent and Trademark Office with the deceptive intent of preventing the Patent and Trademark Office from realizing that TransWeb's media was "in public use or on sale in this country, more than one year prior to the

date of the application for patent in the United States," and therefore could be anticipatory prior art to the '658 application.  35 U.S.C. § 102(b).

64.     Finally, the 3M Defendants' December 2001 disclosure stated that "[n]o patent applications are believed to have been filed by Transweb for this product."  Once again, this was not correct.  3M and other individuals associated with the filing and prosecution of the '658 application knew, from the 3M Defendants' acquisition of Racal's assets, that TransWeb had informed Racal in May 1997 that it had applied for a patent covering its new filtration media surface-treated with a fluorine-rich plasma.  (*Supra* ¶ 29.)

65.     Neither the 3M Defendants nor any other individual associated with the filing and prosecution of the '658 application disclosed that TransWeb had informed Racal in May 1997 that it had applied for a patent covering its new filtration media surface-treated with a fluorine-rich plasma.

66.     This information was material to the patentability of the '658 application.  If TransWeb had applied for a patent covering its new filtration media surface-treated with a fluorine-rich plasma before May 1997, when it informed Racal if its existing application, its invention clearly occurred before the 3M Defendants alleged invention underlying the '658 application.

67.     The 3M Defendants and the other individuals associated with the filing and prosecution of the '658 application withheld information from the Patent and Trademark Office with the deceptive intent of preventing the Patent and Trademark Office from realizing that TransWeb invented its media, and filed for a patent, more than two-and-a-half years before the 3M Defendants filed the '658 application.

68.     On June 4, 2002, the United States Patent and Trademark Office issued U.S. Patent No. 6,397,458 ("the '458 Patent").  A true and correct copy of the '458 Patent is attached

as Exhibit B.  On information and belief, 3M Innovative Properties Company is the owner by assignment of all right, title and interest in the '458 Patent, and 3M Company is the exclusive licensee of the '458 Patent.

69.     During prosecution of the '458 Patent, the 3M Defendants, the named inventors, and other individuals associated with the prosecution of the '458 Patent failed to cite material prior art information, publications and other material showing, among other things, the availability of anticipating technology more than one year prior to the priority date of the '458 Patent.  The 3M Defendants, the named inventors, and other individuals associated with the prosecution of the '458 Patent withheld this prior art information, publications and other material from the Patent and Trademark Office with deceptive intent.  To the extent the 3M Defendants, the named inventors, and other individuals associated with the prosecution of the '458 Patent did provide some information regarding this material prior art, they did so in a deceptive fashion intended to conceal critical elements of the information that would, if known to the Patent and Trademark Office, cause the Patent and Trademark Office to deny issuance of the '458 Patent.  As a result, the inventors obtained the '458 Patent by knowingly and willfully misrepresenting facts to the Patent and Trademark Office.

## PROSECUTION OF THE '551 PATENT

70.     On October 7, 2003, the 3M Defendants filed application no. 10/681,670, which would eventually become the '551 patent.

71.     The 3M Defendants' filing of the '670 application triggered the legal duty of candor to the patent office, including disclosure of information material to patentability.  "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.

The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned."  37 C.F.R. § 1.56(a) (July 1, 2003); Manual of Patent Examining Procedure § 2001 (8th ed. rev. 1 Feb. 2003).

72.     The 3M Defendants and other individuals associated with the filing and prosecution of the '670 application knew, from the 3M Defendants' analysis of the TransWeb samples in December 1998, that TransWeb's filtration media surface-treated with a fluorine-rich plasma was material to patentability of the '670 application.

73.     Indeed, the 3M Defendants and other individuals associated with the filing and prosecution of the '670 application admitted that TransWeb's filtration media surface-treated with a fluorine-rich plasma was material to patentability of the '670 application by disclosing it in their first Invention Disclosure Statement filed in the '670 application.  (Exhibit C.)

74.     Although the 3M Defendants did disclose TransWeb's filtration media surface-treated with a fluorine-rich plasma to the Patent and Trademark Office, it did so in a deceptive and misleading fashion.  The disclosure related to TransWeb's filtration media surface-treated with a fluorine-rich plasma in the '670 application is identical to the disclosure in the '658 application (*compare* Exhibit A *with* Exhibit C), and the deceptive aspects of the disclosure are therefore also identical.  (*Supra* ¶¶ 47-67.)

75.     On October 26, 2004, the United States Patent and Trademark Office issued U.S. Patent No. 6,808,551 ("the '551 Patent").  A true and correct copy of the '551 Patent is attached as Exhibit D.  On information and belief, 3M Innovative Properties Company is the owner by assignment of all right, title and interest in the '551 Patent, and 3M Company is the exclusive licensee of the '551 Patent.

76.     During prosecution of the '551 Patent, the 3M Defendants, the named inventors, and other individuals associated with the prosecution of the '551 Patent failed to cite material

prior art information, publications and other material showing, among other things, the availability of anticipating technology more than one year prior to the priority date of the '551 Patent. The 3M Defendants, the named inventors, and other individuals associated with the prosecution of the '551 Patent withheld this prior art information, publications and other material from the Patent and Trademark Office with deceptive intent. To the extent the 3M Defendants, the named inventors, and other individuals associated with the prosecution of the '551 Patent did provide some information regarding this material prior art, they did so in a deceptive fashion intended to conceal critical elements of the information that would, if known to the Patent and Trademark Office, cause the Patent and Trademark Office to deny issuance of the '551 Patent. As a result, the inventors obtained the '551 Patent by knowingly and willfully misrepresenting facts to the Patent and Trademark Office.

## THE '871 PATENT

77.     On July 16, 2002, United States Patent No. 6,419,871 ("the '871 patent") titled "Plasma Treatment of Filter Media" was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '871 patent is attached hereto as Exhibit E.

78.     TransWeb, LLC is the owner by assignment of all right, title and interest in the '871 Patent.

79.     The '871 patent generally covers methods of forming a non-woven web, treating the surface of the web with a fluorine-containing plasma, charging the treated web to create a web of electret fibers, rinsing and drying the treated web. The methods covered by the '871 patent are used to create filter media with an increased electrostatic charge, resulting in greater filtration efficiency with low pressure drop, which can be used in a large number of filtration applications, including respirators.

## THE MARKET FOR OSHA-REQUIRED AND NIOSH-CERTIFIED OIL RESISTANT RESPIRATORS AND FILTRATION MEDIA

80.     A respirator is a personal protective device that is worn on the face, covering at least the nose and mouth, used to reduce the wearer's risk of inhaling hazardous airborne contaminants such as dust particles and infectious agents, gases or vapors.

81.     Respirators that remove contaminants from the air are called air-purifying respirators.  Air-purifying respirators include particle-filtering respirators, which filter out airborne particles.  Particle-filtering facepiece respirators also are called particulate respirators.

82.     There are two primary types of particulate respirators: the disposable filtering facepiece respirator ("disposable facepiece") and the elastomeric half-mask re-useable respirator ("elastomeric respirator").  A disposable filtering facepiece respirator covers the nose and mouth and has adjustable straps that go around the back of the head to hold the respirator to the face.  It is self-contained and does not need to be inserted into a separate facemask.  When the respirator becomes soiled or the serviceable life of the filter is exhausted, the entire respirator is discarded.  Disposable filtering facepiece respirators can come in the cup style or the flat fold style, examples of which are shown respectively below.



83.     In addition, there are elastomeric respirators which consist of a re-useable mask that fits over the nose and mouth with a chamber that contains a replaceable filter.  Rather than

disposing of the entire facemask when the service life of the filter is exhausted, a user simply replaces the filter.  An example of an elastomeric respirator with a replaceable filter is shown below.



84.     Both the disposable filtering facepiece and elastomeric respirators serve the same function.  It is the filtration media within these respirators that filters out the contaminants while still allowing cleaner air to flow.

85.     To protect workers, the federal government creates standards and requirements for respirator use in various environments.  These standards and requirements are published in the Code of Federal Regulations (CFR).

86.     These requirements regarding workplace safety are created by the Occupational Safety and Health Administration (OSHA), which is part of the U.S. Department of Labor.  OSHA draws upon the research and expertise of the National Institute for Occupational Safety and Health (NIOSH) in making its requirements and standards.  Congress created both OSHA and NIOSH through the Occupational Safety and Health Act of 1970 to ensure safe and healthful working conditions by setting and enforcing standards and by providing training, outreach, education and assistance.  The Occupational Safety and Health Act covers employers and their employees either directly through federal OSHA or through an OSHA-approved state program.

Approved state programs must meet or exceed federal OSHA standards for workplace safety and health.

87.     NIOSH has responsibility for certifying that respirators sold for use in the workplace meet minimum specified requirements.  OSHA requires that all respirators used in workplaces are NIOSH certified and further regulates their use with requirements such as medical clearance of users, training, fit testing and maintenance.

### NIOSH-Certified Oil Resistant Respirators

88.     With the enactment of 42 CFR Part 84 in 1995, NIOSH created various new standards for particulate respirators based on their resistance to oil and the effectiveness of their filtration.  The resistance to oil is important because some filters that rely on electrostatic enhancement of the filter media may degrade and become less protective in the presence of oil. Respirators are categorized by a letter representing their resistance to oil and a number representing their filtration efficiency percentage.  There are two categories of respirators that can be used in environments containing oil:  the "P" series, which stands for oil proof, and the "R" series which stands for oil resistant.  The "N" series respirators are not resistant to oil and cannot be used in environments containing oil.  OSHA requires that the employer properly select respirators for the environment in which they are used.  For environments containing oil, P or R series respirators are required.  There are a limited number of highly toxic workplaces where a High Efficiency Particulate Air ("HEPA") filter is required and even fewer of these environments containing oil.  The only filtering facepiece respirator that meets HEPA requirements in environments containing oil is the P100.  These HEPA-required environments with oil constitute a very limited portion of those in which P100 respirators are used.

89.     To achieve NIOSH certification under the P100 standard, a particulate respirator must filter at least 99.97% of airborne particles as specified in laboratory testing and must be

strongly resistant to oil.  To achieve NIOSH certification under the P95 standard, a particulate respirator must filter at least 95% of airborne particles as specified in laboratory testing and must be strongly resistant to oil.  To achieve NIOSH certification under the R95 standard, a particulate respirator must filter at least 95% of airborne particles as specified in laboratory testing and must have some resistant to oil.  In general, P95 and R95 respirators filter at least 95% of airborne particles as specified in laboratory testing, offering just slightly less filtration protection than the P100.  NIOSH also created a standard for a P99 respirator that filters at least 99% of airborne particles as specified in laboratory testing and is strongly resistant to oil.  Despite this classification, the only respirator certified by NIOSH for P99 respirators is by Safe Life Corporation, but as discussed further below, the 3M Defendants already have successfully forced Safe Life out of the market for oil resistant respirators.

90.    Resistance to oil is important because oils such as lubricants, cutting fluids and glycerin, are present in many workplaces where respirators are used, and they degrade the quality and filtration effectiveness of filters that are not oil resistant.  The presence of oil can quickly degrade the electrostatic charge of non-oil resistant filtration media used in respirators, which would cause the respirator to lose efficiency. The more oleophobic the filtration media is, the longer the media will retain its electrostatic charge, and hence its filtration efficiency.

91.    Because the "P" series respirators are oil proof, a NIOSH-certified P100 and P95 respirator generally can be used and reused in an environment with or without oils for up to 40 hours of actual use or for 30 days, whichever comes first.  Because the "R" series respirators have more limited resistance to oil, the R95 filter can be used in environments with oils for up to one 8-hour work shift before it has to be disposed.

92.    Given the high filtration efficiency of the P100, P95 and R95 respirators, they are frequently interchangeable with the only significant difference being the durational use limitation

of the R95 in environments with oil.  There are a few highly toxic environments with oil requiring a HEPA filter where only a P100 respirator can be used, but these are very limited compared to the many other environments in which either a P95, R95 or P100 are used interchangeably.  The fluorinated filtration media used in these P100 respirators is the same as that used in P100 respirators for non HEPA-required environments.

93.    As discussed above, TransWeb discovered that by surface-coating the media with a fluorine-containing plasma and charging it, it results in increased filtration efficiency with extremely low pressure drop.  Moreover, the fluorine surface coating makes the media much more oleophobic, thus repelling oils that would otherwise degrade non-fluorinated media.

94.    TransWeb and the 3M Defendants are the only manufacturers of P100, P95 and R95 fluorinated filtration media with pressure drop low enough to be used for full work shifts without making it difficult and uncomfortable for the worker to breathe.  Although it is possible to construct a NIOSH-certified P100, P95 or R95 particulate filter without using fluorinated media from either the 3M Defendants or TransWeb, the few other manufacturers of filtration media for certified P100, P95 or R95 particulate filters use multiple layers of non-fluorinated media which has a significantly higher pressure drop, making it physiologically more difficult and uncomfortable for a worker to breathe through the respirator for a full work shift.  As a result, while a few other manufacturers produce NIOSH-certified P100, P95 and R95 respirators, these respirators are not widely used because of the high pressure drop associated with them.  Therefore, the 3M Defendants and manufacturers using fluorinated filtration media of Transweb are essentially the only significant suppliers in the market of NIOSH-certified respirators for environments containing oil, and the 3M Defendants and Transweb are the only two suppliers in the market of fluorinated filtration media that is an essential component for making NIOSH-certified respirators for environments containing oil.  3M has a dominant share of P100, P95 and

R95 respirator sales in the United States and it poses a significant risk of dominating the market.

95.     The 3M Defendants manufacture their own filtration media and supply only themselves and their wholly owned subsidiaries.  On information and belief, the 3M Defendants actively refuse to sell their fluorinated media outside of 3M.  All other major suppliers of P100, P95 and R95 particulate respirators buy their fluorinated filtration media from TransWeb.

### Barriers to Entry of the Market for Filtration Media for Oil Resistant Particulate Respirators

96.     Substantial barriers to entry prevent new competitors from entering the market for filtration media for NIOSH-certified P100, P95 and R95 particulate respirators.  New competitors would have to invest substantial capital in research and development on technologies that could achieve comparable filtration efficiency with a low pressure drop.  Such a new competitor also must invest substantial capital constructing a facility and must cooperate with a maker of P100, P95 or R95 particulate respirators to complete the NIOSH certification process.

97.     As a result, there have been no new entrants in the market for manufacturing or supplying filtration media for NIOSH-certified P100, P95 or R95 particulate respirators since TransWeb.

### THE MINNESOTA ACTION

98.     On May 21, 2010, the 3M Defendants filed an action against TransWeb in the United States District Court for the District of Minnesota, captioned *3M Innovative Properties Company and 3M Company, v. TransWeb L.L.C.*, Civil Action No. 10-2132 (D. Minn.) (the "Minnesota Action").

99.     In the Minnesota Action, the 3M Defendants alleged that TransWeb directly infringed the '458 Patent and the '551 Patent (collectively, the "3M Asserted Patents").

100.     On July 2, 2010, the 3M Defendants served TransWeb with their Complaint in the

Minnesota Action.

101.     On information and belief, when they filed the Minnesota Infringement Action the 3M Defendants knew that the 3M Asserted Patents were invalid and unenforceable.  On information and belief, the 3M Defendants' claims in the Minnesota Infringement Action were objectively baseless, because no reasonable litigant could conclude that the 3M Defendants' infringement allegations were reasonably calculated to elicit a favorable outcome.  On information and belief, the 3M Defendants did not have probable cause to assert the claims in the Minnesota Infringement Action, because the 3M Asserted Patents were invalid and unenforceable.  Based on developments to date in this action, and on information and belief, the 3M Defendants' claims in the Minnesota Infringement Action were also subjectively baseless, because the 3M Defendants' claims of infringement merely was an attempt to conceal the 3M Defendants' attempt to interfere with the business relationships of TransWeb.  Based on developments to date in this action, and on information and belief, the 3M Defendants' claims were motivated by a desire to impose an anti-competitive injury by pushing TransWeb out of the markets for filtration media for NIOSH-certified P100, P95 and R95 particulate respirators leaving the 3M Defendants with a monopoly, rather than a desire for a justifiable legal remedy.

102.     TransWeb does not have sufficient contacts with the State of Minnesota, and is therefore not subject to personal jurisdiction before the United States District Court for the District of Minnesota.  For this reason, on August 20, 2010, TransWeb filed a timely motion to dismiss the Minnesota Action for lack of personal jurisdiction.  The United States District Court for the District of Minnesota set this motion for hearing on October 20, 2010.

103.     On September 29, 2010, the 3M Defendants voluntarily dismissed the Minnesota action under Fed. R. Civ. P. 41(a)(1)(A)(i).

104.     Although filed in a jurisdiction that cannot exercise personal jurisdiction over

TransWeb, the Minnesota Action demonstrated an immediate, real, and justiciable controversy between TransWeb and the 3M Defendants over the validity and enforceability of the 3M Asserted Patents, and over TransWeb's alleged infringement of the 3M Asserted Patents.

## THE 3M DEFENDANTS' COUNTERCLAIMS IN THIS ACTION

105.    On November 29, 2010, 3M filed counterclaims against TransWeb in this Court for infringement of the 3M Asserted Patents.

106.    On information and belief, when they filed their infringement counterclaims in this action the 3M Defendants knew that the 3M Asserted Patents were invalid and unenforceable.  The 3M Defendants started obtaining commercially available samples of TransWeb's fluorinated media beginning in 1999 and purchased commercial quantities of it for several years beginning in 2000, on which they conducted extensive testing.  Despite this extensive knowledge of TransWeb's fluorinated media, the 3M Defendants waited approximately seven and eight years respectively to bring suit against TransWeb after the Asserted Patents issued.  On information and belief, the 3M Defendants' decision not to enforce these patents during this time demonstrates that they knew their infringement claims were invalid and unenforceable.

107.    Based on developments to date in this action, and on information and belief, the 3M Defendants only sought to enforce its invalid patents against TransWeb to eliminate it from the market after their recent attempts to acquire TransWeb were unsuccessful.  The 3M Defendants had previously sought to acquire TransWeb in 2000 – years before the Asserted Patents issued -- because of its highly effective fluorinated filtration media.  The 3M Defendants' attempts to acquire it at that time were unsuccessful.  Recently, however, the 3M Defendants demonstrated a renewed interest in acquiring TransWeb.  For example, in 2008, TransWeb was approached by a consultant in the non-woven industry, Rob Johnson of Smith Johnson &

Associates, who was retained by the 3M Defendants to inquire on their behalf if TransWeb was for sale. These efforts were also unsuccessful. On information and belief, once the 3M Defendants learned that it could not eliminate TransWeb as a competitor by acquiring it, the 3M Defendants attempted to eliminate it through the enforcement of its invalid patents.

108.   The 3M Defendants' plan to eliminate competition is further evidenced by the unsolicited statement of  Vaughn Grannis', the 3M Defendants' Business Director for Maintenance Free Respirators. Mr. Grannis told TransWeb in December 2010 that the respirator business is very profitable and that the 3M Defendants do not want any competition in it. Mr. Grannis also told TransWeb that this patent litigation would cost millions of dollars for TransWeb to defend, the obvious suggestion being that a small company such as TransWeb could not afford to defend itself against the claims brought by the 3M Defendants and that TransWeb should exit the market. That the 3M Defendants were hoping to use this litigation to crush TransWeb financially is further demonstrated by the aggressive manner in which the 3M Defendants have been litigating this action to date, forcing TransWeb to spend millions of dollars in legal fees to defend itself.

109.   On information and belief, the 3M Defendants' plan to eliminate competition in the oil resistant respirator market also is evidenced by its lawsuit in the District of Minnesota against Safe Life Corporation and Triosyn Corporation (collectively "Safe Life") for patent infringement based upon their sale of oil resistant respirators, the media for which was supplied by TransWeb. The 3M Defendants asserted two different patents in that action which it has not asserted against TransWeb. In November 2010, only months after the 3M Defendants filed this action, the 3M Defendants were able to force Safe Life out of the market for oil resistant respirators. On information and belief, Safe Life could not afford to litigate these claims against the 3M Defendants in Minnesota. Consequently, it stipulated to a Consent Judgment and

Permanent Injunction which barred Safe Life "from making (or having made for them), using, selling, offering to sell, importing and/or exporting respirators that infringe" the patents asserted in that action.  This Consent Judgment and Injunction eliminated Safe Life as a competitor in the market for oil resistant respirators, resulting in lost sales to TransWeb.

110.     The 3M Defendants' motive to eliminate TransWeb as a supplier of fluorinated filtration media for oil resistant respirators was finally clarified after reviewing the 3M Defendants' Amended Infringements Contentions, which were served on March 14, 2011.  In these Contentions, the 3M Defendants accused only fluorinated media products that can be used to make P100, P95 and R95 particulate respirators with respect to the '551 patent, even though the patent is not limited to respirator products.  That the 3M Defendants singled out from the thousands of media samples TransWeb sent to them only those used in such respirators shows that the 3M Defendants' real goal is to eliminate the other major manufacturers of oil resistant respirators which TransWeb supplies.  The 3M Defendants' Amended Infringement Contentions also make it evident that their initial accusations that TransWeb's THHET products infringed their patent was based solely on the fact that it was the one sample TransWeb sent them immediately before filing suit.  On information and belief, the 3M Defendants were only using these products as a way to obtain discovery on those fluorinated media products used in oil resistant respirators, in which the 3M Defendants were primarily interested.  It was thus after the 3M Defendants served their Amended Infringement Contentions on March 14, 2011 that it became clear that their real motive was to discover which media TransWeb was supplying to the oil resistant respirator market and attempt to eliminate TransWeb as a supplier of this media, leaving the 3M Defendants with a monopoly over the oil resistant respirator market.

111.     On information and belief, the 3M Defendants' senior executives, including 3M's Chief Executive Officer, George Buckley, and 3M's Vice President of Occupational Health &

Environmental Safety Division, Julie Bushman, have stressed to the financial community that respiratory protection is an expected driver of future growth for 3M and that the 3M Defendants view respiratory protection as a significant source of revenue and profit.

112.    On information and belief, the 3M Defendants' counterclaims against TransWeb were objectively baseless, because no reasonable litigant could conclude that the 3M Defendants' infringement allegations were reasonably calculated to elicit a favorable outcome based upon the 3M Defendants' inequitable and fraudulent conduct in obtaining the Asserted Patents, as described herein.  On information and belief, the 3M Defendants did not have probable cause to assert the counterclaims against TransWeb because the 3M Asserted Patents were invalid and unenforceable.

113.    Based on developments to date in this action and on information and belief, the 3M Defendants' counterclaims in this action were also subjectively baseless, because the 3M Defendants' claims of infringement against TransWeb merely was an attempt to conceal the 3M Defendants' attempt to interfere with the business relationships of TransWeb, as described herein.  Based on developments to date in this action and on information and belief, the 3M Defendants' claims were motivated by a desire to impose an anti-competitive injury rather than a justifiable legal remedy.  By eliminating TransWeb as a supplier of fluorinated filtration media for P100, P95 and R95 particulate respirators, it would eliminate all major competitors in this market, resulting in monopolistic power by the 3M Defendants.

114.    The 3M Defendants' attempted enforcement of the '458 and '551 patents against TransWeb and the 3M Defendants' anti-competitive conduct have produced significant injury to TransWeb and its owners.  First, they have forced TransWeb to expend substantial amounts of money, time and human resources in order to defend the action.  Second, they forced a premature and unwanted sale of TransWeb to CLARCOR Inc. at a depressed "fire sale" price because of

TransWeb's inability to bear the costs and other burdens that the litigation imposed.  Third, they have cost TransWeb the business of Safe Life as a customer of TransWeb's fluorinated media as well as a corresponding $2.5 million claim by Safe Life for damages.  Fourth, and finally, they are likely to cause TransWeb to lose other existing and potential customers, as a result of the 3M Defendants serving deposition and document subpoenas on some of TransWeb's largest customers which, on information and belief, is intended to and will have a chilling effect on such customers' decisions to continue purchasing fluorinated media from TransWeb.

### FIRST CAUSE OF ACTION
#### (Declaratory Judgment of Invalidity of the '458 Patent)

115.    TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

116.    The claims of the '458 Patent are invalid under Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 200 *et seq.*, and 301 *et seq.*

117.    An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding the validity of the '458 Patent.

118.    TransWeb seeks a judgment declaring that the claims of the '458 Patent are invalid.

### SECOND CAUSE OF ACTION
#### (Declaratory Judgment of Invalidity of the '551 Patent)

119.    TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

120.    The claims of the '551 Patent are invalid under Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 200 *et seq.*, and 301 *et seq.*

121.    An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding the validity of the '551 Patent.

122.    TransWeb seeks a judgment declaring that the claims of the '551 Patent are invalid.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment of Unenforceability for Inequitable Conduct of the '458 Patent)**

123.    TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

124.    Specifically, TransWeb incorporates by reference the allegations set forth in paragraphs 33-69 above.

125.    An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding the enforceability of the '458 Patent.

126.    TransWeb seeks a judgment declaring that the claims of the '458 Patent are unenforceable under the doctrine of inequitable conduct.

### FOURTH CAUSE OF ACTION
**(Declaratory Judgment of Unenforceability for Inequitable Conduct of the '551 Patent)**

127.    TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

128.    Specifically, TransWeb incorporates by reference the allegations set forth in paragraphs 33-69 and 70-76 above.

129.    An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding the enforceability of the '551 Patent.

130.    TransWeb seeks a judgment declaring that the claims of the '551 Patent are unenforceable under the doctrine of inequitable conduct.

### FIFTH CAUSE OF ACTION
**(Declaratory Judgment of Unenforceability for Laches of the '458 Patent)**

131.    TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

132.     Specifically, TransWeb incorporates by reference the allegations set forth in paragraphs 33-35 and 106 above.

133.     An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding the enforceability of the '458 Patent.

134.     TransWeb seeks a judgment declaring that the claims of the '458 Patent are unenforceable under the doctrine of laches.

### SIXTH CAUSE OF ACTION
**(Declaratory Judgment of Unenforceability for Laches of the '551 Patent)**

135.     TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

136.     Specifically, TransWeb incorporates by reference the allegations set forth in paragraphs 33-35 and 106 above.

137.     An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding the enforceability of the '551 Patent.

138.     TransWeb seeks a judgment declaring that the claims of the '551 Patent are unenforceable under the doctrine of laches.

### SEVENTH CAUSE OF ACTION
**(Declaratory Judgment of Non-infringement of the '458 Patent)**

139.     TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

140.     TransWeb has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the '458 Patent.

141.     An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding TransWeb's alleged infringement of the '458 Patent.

142.     TransWeb seeks a judgment declaring that it does not infringe any claim of the

'458 Patent.

## EIGHTH CAUSE OF ACTION
### (Declaratory Judgment of Non-infringement of the '551 Patent)

143.    TransWeb incorporates by reference the allegations set forth in paragraphs 1-114 of this Complaint.

144.    TransWeb has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the '551 Patent.

145.    An immediate, real, and justiciable controversy exists between TransWeb and Defendants regarding TransWeb's alleged infringement of the '551 Patent.

146.    TransWeb seeks a judgment declaring that it does not infringe any claim of the '551 Patent.

## NINTH CAUSE OF ACTION
### (Infringement of the '871 Patent)

147.    TransWeb incorporates by reference the responses and allegations set forth in paragraphs 1-114 of this Complaint.

148.    Upon information and belief, the 3M Defendants are directly infringing the '871 Patent by using a method and process that infringes the '871 Patent and by making, using, offering to sell, and/or selling products that infringe the '871 Patent, including but not limited to the 3M Defendants' P95 2078, 3M's P95 2076 HF, 3M's P95 2071, 3M's P95 5P71, 3M P95 8576, 3M's P95 8271, 3M's P95 8577, 3M's P100 2291, 3M's P100 2296, 3M's P100 2297, and the 3M Defendants' P100 8293 in this District and elsewhere in the United States, in violation of 35 U.S.C § 271.

149.    For each of these products, and potentially others, on information and belief, the 3M Defendants are using a method and process that infringes the '871 Patent, including but not limited to making a non-woven melt-blown polyolefin electret web which is treated with a

fluorine-containing plasma, charged, rinsed and dried as specified in the '871 Patent.

      150.    For example, claim 1 of the '871 Patent covers:

> A method of forming a non-woven web, which comprises: (1) melt blowing polyolefin fibers into a non-woven web; (2) treating said non-woven web with a fluorine-containing plasma at a deposition amount of about 0.03 $g/m^2$ to about 1.5 $g/m^2$; (3) charging said treated non-woven web to form a non-woven web of electret fibers; (4) rinsing said treated and charged non-woven web; and (5) drying said non-woven web.

Exhibit E.

      151.    In the course of discovery in this action, the 3M Defendants have identified each of the products listed above as allegedly practicing the claims of the '458 and '551 patents.  In order to practice the asserted claims of the '458 and '551 patents these products necessarily must comprise a non-woven, polymeric web, which is surface-fluorinated with a fluorine-containing plasma and charged to create an electret.

      152.    Analysis of the samples produced by the 3M Defendants and discovery to date in this action indicates that these samples likely infringe one or more claims of the '871 patent.  Upon information and belief, the media within these respirator products is treated with a fluorine-containing plasma at a deposition rate as described in the '871 patent.  In addition, documents produced by 3M in the course of discovery indicate that this media is charged, rinsed and dried.

      153.    Upon information and belief, the 3M Defendants will continue to infringe the '871 Patent unless and until the 3M Defendants are enjoined by this Court.

      154.    The 3M Defendants' infringement is willful.  The 3M Defendants have been aware of the '871 Patent since it issued and have continued to use a method and process that infringes the '871 Patent despite knowledge of the patent.

      155.    As a result, TransWeb will be damaged and will be irreparably injured unless and

until the 3M Defendants' infringing activities are enjoined by this Court.

## TENTH CAUSE OF ACTION
### (Walker Process Fraud, Attempted Monopolization under 15 U.S.C. § 2)

156.    TransWeb incorporates by reference the responses and allegations set forth in paragraphs 1-114 of this Complaint.

157.    During prosecution of the 3M Asserted Patents, the 3M Defendants, the named inventors and individuals associated with the prosecution of the 3M Asserted Patents, including but not limited to the prosecuting attorney Karl Hanson and inventor Marvin Jones, failed to cite material prior art information, publications and other material showing, among other things, the availability of anticipating technology more than one year prior to the priority date of the 3M Asserted Patents.  The 3M Defendants, the named inventors and individuals associated with the prosecution of the 3M Asserted Patents, including but not limited to the prosecuting attorney Karl Hanson and inventor Marvin Jones, withheld this prior art information, publications and other material from the Patent and Trademark Office with deceptive intent.  To the extent the 3M Defendants, the named inventors and individuals associated with the prosecution of the 3M Asserted Patents, including but not limited to the prosecuting attorney Karl Hanson and inventor Marvin Jones, did provide some information regarding this material prior art, they did so in a deceptive fashion intended to conceal critical elements of the information.

158.    On information and belief, if the 3M Defendants, the named inventors and individuals associated with the prosecution of the 3M Asserted Patents, including but not limited to the prosecuting attorney Karl Hanson and inventor Marvin Jones, had not withheld critical prior art information and had not misrepresented the information they did present to the Patent and Trademark Office, the Patent and Trademark Office would not have issued either of the 3M Asserted Patents.

159.    As a result, the inventors obtained the 3M Asserted Patents by knowingly and willfully misrepresenting facts to the Patent and Trademark Office.

160.    The 3M Defendants' fraud on the United States Patent and Trademark Office is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Through this fraud, the 3M Defendants engaged in predatory or uncompetitive conduct with a specific intent to monopolize. With respect to the allegations in this counterclaim, the relevant geographic market is the United States.

161.    There is a dangerous probability that the 3M Defendants will achieve monopoly power in the oil resistant respirator market.  The 3M Defendants and manufacturers using fluorinated filtration media of Transweb are essentially the only significant suppliers in the market of NIOSH-certified respirators for environments containing oil, and the 3M Defendants and Transweb are the only two suppliers in the market of fluorinated filtration media that is an essential component for making NIOSH-certified respirators for environments containing oil. By eliminating TransWeb as a supplier of fluorinated filtration media for P100, P95 and R95 particulate respirators, it would eliminate all major competitors in this market, resulting in monopolistic power by the 3M Defendants.

162.    As a result of the 3M Defendants' unlawful acts, TransWeb has suffered and will continue to suffer antitrust injury in an amount to be proven at trial.  The 3M Defendants' attempted enforcement of the '458 and '551 patents against TransWeb and the 3M Defendants' anti-competitive conduct have produced significant injury to TransWeb and its owners.  First, they have forced TransWeb to expend substantial amounts of money, time and human resources in order to defend the action.  Second, they forced a premature and unwanted sale of TransWeb to CLARCOR Inc. at a depressed "fire sale" price because of TransWeb's inability to bear the costs and other burdens that the litigation imposed.  Third, they have cost TransWeb the business

of Safe Life as a customer of TransWeb's fluorinated media and a corresponding $2.5 million

claim by Safe Life for damages.  Fourth, and finally, they are likely to cause TransWeb to lose

other existing and potential customers, as a result of the 3M Defendants serving deposition and

document subpoenas on some of TransWeb's largest customers which, on information and belief,

is intended to and will have a chilling effect on such customers' decisions to continue purchasing

fluorinated media from TransWeb.

### ELEVENTH CAUSE OF ACTION
#### (Sham Litigation, Attempted Monopolization under 15 U.S.C. § 2)

163.    TransWeb incorporates by reference the responses and allegations set forth in

paragraphs 1-114 of this Complaint.

164.    On information and belief, when they filed the Minnesota Infringement Action the

3M Defendants knew that the 3M Asserted Patents were invalid and unenforceable.

165.    On information and belief, the 3M Defendants' Minnesota Infringement Action

was objectively baseless, because no reasonable litigant could conclude that the 3M Defendants'

infringement allegations were reasonably calculated to elicit a favorable outcome based upon

3M's inequitable and fraudulent conduct in obtaining the Asserted Patents, as described herein.

On information and belief, the 3M Defendants did not have probable cause to assert the claims in

the Minnesota Infringement Action, because the 3M Asserted Patents were invalid and

unenforceable.

166.    Based on developments to date in this action and on information and belief, the

3M Defendants' Minnesota Infringement Action also was subjectively baseless, because the 3M

Defendants' claims of infringement merely was an attempt to conceal the 3M Defendants'

attempt to interfere with the business relationships of TransWeb, as described herein.  Based on

developments to date in this action and on information and belief, the 3M Defendants'

Minnesota Infringement Action was motivated by a desire to impose anti-competitive injury on TransWeb by pushing them out of the market for oil resistant filtration media for NIOSH-certified P100, P95 and R95 particulate respirators, rather than by a justifiable legal remedy.

167.    On November 29, 2010 the 3M Defendants filed counterclaims against TransWeb in this Court for infringement of the 3M Defendants Asserted Patents.

168.    On information and belief, when they filed their infringement counterclaims against TransWeb in this action the 3M Defendants knew that the 3M Asserted Patents were invalid and unenforceable.  The 3M Defendants started obtaining samples of TransWeb's fluorinated media beginning in 1999 and purchased commercial quantities of it for several years beginning in 2000, on which they conducted extensive testing.  Despite this extensive knowledge of TransWeb's fluorinated media, the 3M Defendants waited approximately seven and eight years respectively to bring suit against TransWeb after the Asserted Patents issued.  On information and belief, the 3M Defendants' decision not to enforce these patents during this time demonstrates that they knew their infringement claims were invalid and unenforceable.

169.    Based on developments to date in this action, and on information and belief, the 3M Defendants only sought to enforce its invalid patents against TransWeb to eliminate it from the market after their recent attempts to acquire TransWeb were unsuccessful.  The 3M Defendants had previously sought to acquire TransWeb in 2000 – years before the Asserted Patents issued -- because of its highly effective fluorinated filtration media.  The 3M Defendants' attempts to acquire it at that time were unsuccessful.  Recently, however, the 3M Defendants demonstrated a renewed interest in acquiring TransWeb.  For example, in 2008, TransWeb was approached by a consultant in the non-woven industry, Rob Johnson of Smith Johnson & Associates, who was retained by the 3M Defendants to inquire on their behalf if TransWeb was for sale.  These efforts were also unsuccessful.  On information and belief, once the 3M

Defendants learned that it could not eliminate TransWeb as a competitor by acquiring it, the 3M Defendants attempted to eliminate it through the enforcement of its invalid patents.

170.    The 3M Defendants' plan to eliminate competition is further evidenced by the unsolicited statement of  Vaughn Grannis', the 3M Defendants' Business Director for Maintenance Free Respirators.  Mr. Grannis told TransWeb in December 2010 that the respirator business is very profitable and that the 3M Defendants do not want any competition in it.  Mr. Grannis also told TransWeb that this patent litigation would cost millions of dollars for TransWeb to defend, the obvious suggestion being that a small company such as TransWeb could not afford to defend itself against the claims brought by the 3M Defendants and that TransWeb should exit the market.  That the 3M Defendants were hoping to use this litigation to crush TransWeb financially is further demonstrated by the aggressive manner in which the 3M Defendants have been litigating this action to date, forcing TransWeb to spend millions of dollars in legal fees to defend itself.

171.    On information and belief, the 3M Defendants' plan to eliminate competition in the oil resistant respirator market also is evidenced by its lawsuit in the District of Minnesota against Safe Life Corporation and Triosyn Corporation (collectively "Safe Life") for patent infringement based upon their sale of oil resistant respirators, the media for which was supplied by TransWeb.  The 3M Defendants asserted two different patents in that action which it has not asserted against TransWeb.  In November 2010, only months after the 3M Defendants filed this action, the 3M Defendants were able to force Safe Life out of the market for oil resistant respirators.  On information and belief, Safe Life could not afford to litigate these claims against the 3M Defendants in Minnesota.  Consequently, it stipulated to a Consent Judgment and Permanent Injunction which barred Safe Life "from making (or having made for them), using, selling, offering to sell, importing and/or exporting respirators that infringe" the patents asserted

in that action.  This Consent Judgment and Injunction eliminated Safe Life as a competitor in the market for oil resistant respirators, resulting in lost sales to TransWeb.

172.    The 3M Defendants' motive to eliminate TransWeb as a supplier of fluorinated filtration media for oil resistant respirators was finally clarified after reviewing the 3M Defendants' Amended Infringements Contentions, which were served on March 14, 2011.  In these Contentions, the 3M Defendants accused only fluorinated media products that can be used to make P100, P95 and R95 particulate respirators with respect to the '551 patent, even though the patent is not limited to respirator products.  That the 3M Defendants singled out from the thousands of media samples TransWeb sent to them only those used in such respirators shows that the 3M Defendants' real goal is to eliminate the other major manufacturers of oil resistant respirators which TransWeb supplies.  The 3M Defendants' Amended Infringement Contentions also make it evident that their initial accusations that TransWeb's THHET products infringed their patent was based solely on the fact that it was the one sample TransWeb sent them immediately before filing suit.  On information and belief, the 3M Defendants were only using these products as a way to obtain discovery on those fluorinated media products used in oil resistant respirators, in which the 3M Defendants were primarily interested.  It was thus after the 3M Defendants served their Amended Infringement Contentions that it became clear that their real motive was to discover which media TransWeb was supplying to the oil resistant respirator market and attempt to eliminate TransWeb as a supplier of this media, leaving the 3M Defendants with a monopoly over the oil resistant respirator market.

173.    On information and belief, the 3M Defendants' senior executives, including 3M's Chief Executive Officer, George Buckley, and 3M's Vice President of Occupational Health & Environmental Safety Division, Julie Bushman, have stressed to the financial community that respiratory protection is an expected driver of future growth for 3M and that the 3M Defendants

view respiratory protection as a significant source of revenue and profit.

174.    On information and belief, the 3M Defendants' counterclaims against TransWeb were objectively baseless, because no reasonable litigant could conclude that the 3M Defendants' infringement allegations were reasonably calculated to elicit a favorable outcome based upon 3M's inequitable and fraudulent conduct in obtaining the Asserted Patents, as described herein.  On information and belief, the 3M Defendants did not have probable cause to assert the counterclaims against TransWeb because the 3M Asserted Patents were invalid and unenforceable.

175.    Based on developments to date in this action and on information and belief, the 3M Defendants' counterclaims in this action also were subjectively baseless, because the 3M Defendants' claims of infringement against TransWeb merely was an attempt to conceal the 3M Defendants' attempt to interfere with the business relationships of TransWeb, as described herein.  Based on developments to date in this action and on information and belief, the 3M Defendants' claims were motivated by a desire to impose an anti-competitive injury rather than a justifiable legal remedy.  By eliminating TransWeb as a supplier of fluorinated filtration media for P100, P95 and R95 particulate respirators, it would eliminate all major competitors in this market, resulting in monopolistic power by 3M.

176.    The 3M Defendants' sham litigation of the Minnesota Infringement Action and of the counterclaims against TransWeb in this action violated Section 2 of the Sherman Act, 15 U.S.C. § 2.  Through this sham litigation, the 3M Defendants engaged in predatory or uncompetitive conduct with a specific intent to monopolize.

177.    There is a dangerous probability that the 3M Defendants will achieve monopoly power in the market for oil resistant, NIOSH-certified P100, P95 and R95 particulate respirators. The 3M Defendants and manufacturers using fluorinated filtration media of Transweb are

essentially the only significant suppliers in the market of NIOSH-certified respirators for environments containing oil, and the 3M Defendants and Transweb are the only two suppliers in the market of fluorinated filtration media that is an essential component for making NIOSH-certified respirators for environments containing oil.  By eliminating TransWeb as a supplier of fluorinated filtration media for P100, P95 and R95 particulate respirators, it would eliminate all major competitors in this market, resulting in monopolistic power by the 3M Defendants.

178.     As a result of the 3M Defendants' unlawful acts, TransWeb has suffered and will continue to suffer antitrust injury in an amount to be proven at trial. The 3M Defendants' attempted enforcement of the '458 and '551 patents against TransWeb and the 3M Defendants' anti-competitive conduct have produced significant injury to TransWeb and its owners.  First, they have forced TransWeb to expend substantial amounts of money, time and human resources in order to defend the action.  Second, they forced a premature and unwanted sale of TransWeb to CLARCOR Inc. at a depressed "fire sale" price because of TransWeb's inability to bear the costs and other burdens that the litigation imposed.  Third, they have cost TransWeb the business of Safe Life as a customer of TransWeb's fluorinated media and a corresponding $2.5 million claim by Safe Life for damages.  Fourth, and finally, they are likely to cause TransWeb to lose other existing and potential customers, as a result of the 3M Defendants serving deposition and document subpoenas on some of TransWeb's largest customers which, on information and belief, is intended to and will have a chilling effect on such customers' decisions to continue purchasing fluorinated media from TransWeb.

**TWELFTH CAUSE OF ACTION**
**(New Jersey State Antitrust: Fraudulent Procurement of Patent)**

179.     TransWeb incorporates by reference the responses and allegations set forth in paragraphs 1-178 of this Complaint.

180.    The 3M Defendants' inequitable conduct in procuring and enforcing the '458 and '551 patents constitutes a violation of the New Jersey Antitrust Act (N.J.S.A. 56:9-1 *et seq.*).

181.    The 3M Defendants' unlawful acts and conduct as set forth above occurred throughout the United States, including but not limited to, within the State of New Jersey.

182.    By reason of the unlawful acts alleged above, TransWeb has suffered and will continue to suffer irreparable antitrust injury. The 3M Defendants' attempted enforcement of the '458 and '551 patents against TransWeb and the 3M Defendants' anti-competitive conduct have produced significant injury to TransWeb and its owners. First, they have forced TransWeb to expend substantial amounts of money, time and human resources in order to defend the action. Second, they forced a premature and unwanted sale of TransWeb to CLARCOR Inc. at a depressed "fire sale" price because of TransWeb's inability to bear the costs and other burdens that the litigation imposed. Third, they have cost TransWeb the business of Safe Life as a customer of TransWeb's fluorinated media and a corresponding $2.5 million claim by Safe Life for damages. Fourth, and finally, they are likely to cause TransWeb to lose other existing and potential customers, as a result of the 3M Defendants serving deposition and document subpoenas on some of TransWeb's largest customers which, on information and belief, is intended to and will have a chilling effect on such customers' decisions to continue purchasing fluorinated media from TransWeb.

### THIRTEENTH CAUSE OF ACTION
### New Jersey State Antitrust:  Sham Litigation

183.    TransWeb incorporates by reference the responses and allegations set forth in paragraphs 1-178 of this Complaint.

184.    The 3M Defendants' unlawful acts and conduct as set forth in paragraphs 1-178 above constitute sham litigation in violation of the New Jersey Antitrust Act (N.J.S.A. 56:9-1 *et*

*seq.*).

185.    By reason of the unlawful acts alleged in paragraphs 1-178 above, TransWeb has suffered and will continue to be injured in its business and property and has suffered and will continue to suffer damages. The 3M Defendants' attempted enforcement of the '458 and '551 patents against TransWeb and the 3M Defendants' anti-competitive conduct have produced significant injury to TransWeb and its owners.  First, they have forced TransWeb to expend substantial amounts of money, time and human resources in order to defend the action.  Second, they forced a premature and unwanted sale of TransWeb to CLARCOR Inc. at a depressed "fire sale" price because of TransWeb's inability to bear the costs and other burdens that the litigation imposed.  Third, they have cost TransWeb the business of Safe Life as a customer of TransWeb's fluorinated media and a corresponding $2.5 million claim by Safe Life for damages. Fourth, and finally, they are likely to cause TransWeb to lose other existing and potential customers, as a result of the 3M Defendants serving deposition and document subpoenas on some of TransWeb's largest customers which, on information and belief, is intended to and will have a chilling effect on such customers' decisions to continue purchasing fluorinated media from TransWeb.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, TransWeb prays for judgment and relief as follows:

186.    Declaring that the '458 Patent and the '551 Patent are invalid;

187.    Declaring that the '458 Patent and the '551 Patent are unenforceable;

188.    Declaring that TransWeb does not infringe the '458 Patent or the '551 Patent;

189.    Declaring that Defendants are not entitled to damages for or injunctive relief against any alleged infringement by TransWeb of the '458 Patent or the '551 Patent;

190.    Enter judgment that the 3M Defendants have infringed the '871 Patent;

191.    Enter an order preliminarily and permanently enjoining the 3M Defendants, and its respective officers, agents, servants and employees, attorneys and all persons in active concert or participation with any of the foregoing who receive actual notice by personal service of the orders from infringing the '871 Patent in violation of 35 U.S.C. § 271;

192.    Finding that this is an exceptional case under 35 U.S.C. § 285;

193.    Finding that the 3M Defendants violated of Section 2 of the Sherman Act, 15 U.S.C. § 2 and awarding treble damages;

194.    Finding that the 3M Defendants violated the New Jersey Antitrust Act (N.J.S.A. 56:9-1 *et seq.*)

195.    Permanently enjoining the 3M Defendants from monopolizing or attempting to monopolize the relevant product and geographic markets, as provided by 15 U.S.C. § 26.

196.    Awarding TransWeb its costs and attorneys' fees in connection with this action; and

197.    Such further and additional relief as the Court deems just and proper

**<u>DEMAND FOR JURY TRIAL</u>**

198.    TransWeb demands a jury trial on all matters so triable.


Dated: June 3, 2011                     CONNELL FOLEY LLP



                                        /s/ *Liza M. Walsh*
                                        Liza M. Walsh
                                        Christine I. Gannon
                                        CONNELL FOLEY LLP
                                        85 Livingston Avenue
                                        Roseland, New Jersey 07068-1765
                                        Tel.:  (973) 535-0500
                                        Fax:  (973) 535-9217

Harold A. Barza
(admitted *pro hac vice*)
Michael E. Williams
(admitted *pro hac vice*)
Matthew S. Warren
(admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California, 90017
Tel.:  (213) 443-3000
Fax:  (213) 443-3100

*Attorneys for Plaintiff*
*TransWeb, LLC*