1  **NOT FOR PUBLICATION**

RECEIVED

2

3  **UNITED STATES DISTRICT COURT**

NOV 16 2011

4  **DISTRICT OF NEW JERSEY**

AT 8:30_____M
WILLIAM T. WALSH
CLERK

5

6

7  _____ )

8  TRANSWEB, LLC,                   )

9                                   )

10            Plaintiff and          )

11            Counterclaim-Defendant, )

12                                   )

13  v.                              )          Civil Action No. 10-4413 (GEB)

14                                   )          **MEMORANDUM OPINION**

15  3M INNOVATIVE PROPERTIES        )

16  COMPANY and 3M COMPANY          )

17                                   )

18            Defendants and         )

19            Counterclaim-Plaintiff  )

20                                   )

21  _____ )

22  **BROWN, Chief Judge**

23        This matter comes before the Court on requests for claim construction from

24  Plaintiff/Counterclaim-Defendant TransWeb, LLC ("Plaintiff") together with

25  Defendants/Counterclaim-Plaintiffs 3M Innovative Properties Company and 3M Company

26  (collectively "3M" or "Defendants").  The parties submitted their Joint Claim Construction Chart

27  ("JCC") on June 16, 2011, identifying seven (7) disputed terms.  (Doc No. 117.)  On July 15,

28  2011, the parties filed their opening claim construction briefs (Doc. Nos. 128, 129), and on

29  September 2, 2011, the parties filed their reply briefs.  (Doc. Nos. 159, 160.)  A *Markman*

30  hearing was held on November 14, 2011.

31  **I.      BACKGROUND**

32        This is a patent infringement case concerning web material used in respirators, masks,

33  and air filters that capture hazardous materials from the air.  (*See* U.S. Patent 6,397,458 ("the

34   '458 patent"); Doc. No. 128-2; U.S. Patent 6,808,551 ("the '551 patent"); Doc. No. 128-7).[1]  The

35   webs are "electrets"—a type of material that has a quasi-permanent electrical charge. ('458

36   patent, 1:13-14.)  The charge allows an electret to capture and hold onto charged particles,

37   preventing, for example, hazardous materials from entering a mask wearer's lungs. (*Id.* at 1:14-

38   19.)

39        The '458 patent, assigned to 3M, is directed towards a method of making an electret

40   article by transferring fluorine to the article from a gaseous phase. ('458 patent, 1:1-4.)  Electrets

41   can lose their charge if they come into contact with oily particles. (*Id.* at 1:29-32.)  Fluorinating

42   the electret makes it resistant to oil, thereby preserving the filtering quality of the electret. (*Id.* at

43   1:40-50.)  The following '458 claims are representative of those asserted against TransWeb:

44        1. A method of making an electret comprising:
45             fluorinating a polymeric nonwoven web to produce an article
46        having surface fluorination; and
47             charging the fluorinated web in a manner sufficient to produce
48        an electret, the electret comprising at least about 45 atomic %
49        fluorine as detected by ESCA.
50
51        30. The method of claim 18 [making an electret], wherein the
52        charging step includes hydrocharging, DC corona discharge, or a
53        combination thereof.
54
55        53. The method of claim 51 [making an electret], wherein the
56        electret has a Quality Factor of at least 2.0/mm $H_2O$.
57
58        The '551 patent, also assigned to 3M, is directed towards a method of using fluorinated

59   electrets. ('551 patent, 1: 1-2.)  Claim 1 is representative of the claims asserted against

60   TransWeb in this case:

61        1. A method of filtering contaminants, said method comprising:

---

[1] The '458 and '551 patents share a common specification. All citations of the specification will be to '458 patent.

62                  passing an aerosol through a plasma surface modified

63      nonwoven polymeric web electret to remove <u>contaminants</u> from

64      the aerosol,

65                the nonwoven polymeric web comprising plasma surface

66      fluorination, the electret, when tested according to the Initial DOP

67      Penetration Test and the DOP Loading Test prior to contact with

68      the aerosol, exhibiting a DOP penetration of less than 20% for a

69      DOP load from 0.05 grams to 0.2 grams.

70

71      There are seven (7) disputed terms at issue (underlined in the claims above): (1)

72 hydrocharging; (2) contaminants; (3) at least about; (4) the electret having a quality factor of at

73 least $1.0/mmH_2O$; (5) wherein the electret has a Quality Factor of at least $1.5/mmH_2O$; (6)

74 wherein the electret has a Quality Factor of at least $2/mmH_2O$; and (7) charging the fluorinated

75 [web/article] . . . in a manner sufficient to produce an electret.

76

77 **II.    DISCUSSION**

78      **A.    Standard of Review**

79      The first step in a patent infringement analysis is to define the meaning and scope of the

80 claims of the patent. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995)

81 *(en banc)*, *aff'd*, 517 U.S. 370 (1996). Claim construction, which serves this purpose, is a matter

82 of law exclusively for the court. *Id.* at 979. When construing claims, the court must first

83 consider the intrinsic evidence. Specifically, the focus of the court's analysis must begin and

84 remain on the language of the claims, "for it is that language that the patentee chose to use to

85 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as

86 his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.

87 Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2).

3

88    Generally, there is a presumption that the words of a claim will receive the full breadth of

89    their ordinary meaning. *NTP, Inc. v. Research In Motion, Ltd.*, 392 F.3d 1336, 1346 (Fed. Cir.

90    2004). The ordinary meaning may be derived from a variety of sources, including: the claim

91    language, the written description, drawings, the prosecution history, and dictionaries or treatises.

92    *Id.* This presumption may be rebutted if the patentee acted as his or her own lexicographer by

93    clearly setting forth a definition of the claim term that differs from its ordinary and customary

94    meaning. *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298-99 (Fed. Cir.

95    2003). To rebut the presumption, the patentee's intent must be clearly expressed in the

96    specification. *Merck & Co, Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364,1370 (Fed. Cir.

97    2005). When a patent applicant specifically defines a claim term in its description of its

98    invention, that definition controls. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005)

99    (*en banc*) ("In such cases, the inventor's lexicography governs."). The Federal Circuit has

100    "repeatedly encouraged claim drafters who choose to act as their own lexicographers to clearly

101    define terms used in the claims in the specification." *Sinorgchem Co. v. ITC*, 511 F.3d 1132,

102    1136 (Fed. Cir. 2007).

103    When the patentee has not provided an explicit definition of a claim term, the words of a

104    claim are given their plain and ordinary meaning to a person of ordinary skill in the art.

105    *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The person of

106    ordinary skill in the art is deemed to read the claim terms in the context of the entire patent,

107    including the specification. *Phillips*, 415 F.3d at 1313. However, a court should not limit the

108    claims to the embodiments disclosed in the specification. *See Phillips*, 415 F.3d at 1323.

109    A court may also consider extrinsic evidence when an analysis of the intrinsic evidence

110    alone does not resolve the ambiguities of a disputed claim term. *Id.* at 1582-83. While a court

111    may rely on extrinsic evidence to construe a claim, "what matters is for the court to attach the

112    appropriate weight to be assigned to those sources." *Phillips*, 415 F.3d at 1324.  Extrinsic

113    evidence may never be used to contradict intrinsic evidence.  *Id.* at 1322-23.

114        **B.    Analysis**

115           There are seven (7) disputed terms at issue:  (1) hydrocharging; (2) contaminants; (3) at

116    least about; (4) the electret having a quality factor of at least $1.0/mmH_2O$; (5) wherein the electret

117    has a Quality Factor of at least $1.5/mmH_2O$; (6) wherein the electret has a Quality Factor of at

118    least $2/mmH_2O$; and (7) charging the fluorinated [web/article] . . . in a manner sufficient to

119    produce an electret.

120           Several of TransWeb's arguments for claim construction are related to its contentions that

121    the claims of the patents lack sufficient written description in the specification or are indefinite

122    and cannot be construed.  While indefiniteness has the same construction underpinnings as a

123    *Markman* hearing, several reasons militate against deciding indefiniteness at this time.

124           First, indefiniteness is proven "where an accused infringer shows by clear and convincing

125    evidence that a skilled artisan could not discern the boundaries of the claim" based on the

126    intrinsic evidence or knowledge of the relevant art area.  *Halliburton Energy Servs., Inc., v. M-I*

127    *LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).  Thus, there is a high burden that would be

128    difficult to meet at this early stage.  Second, neither party has offered expert testimony to support

129    its indefiniteness or written description arguments[2], but expert testimony is often helpful in this

130    task.  *Phillips*, 415 F.3d at 1318 ("We have also held that extrinsic evidence in the form of expert

131    testimony can be useful to a court for a variety of purposes.");  *see also Ortho-McNeil v. Caraco*

132    *Pharm.*, 476 F.3d 1321 (relying on expert testimony to construe the term "about").  And third,

---

[2] The time for expert discovery has not yet expired.  (*See* Amended Scheduling Order; Doc. No. 51.)

133  rather than giving meaning to a claim, as a *Markman* hearing is meant to do, indefiniteness

134  invalidates the patent claims entirely. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d

135  1371, 1376 (Fed. Cir. 2001).  Thus, the Court could defer the indefiniteness arguments until

136  summary judgment. *See, e.g., Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F. Supp.

137  2d 752, 773 n.3 (N.D. Cal. 2007) ("[The] indefiniteness argument is inappropriate at the claim

138  construction stage."); *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, 2003 U.S. Dist. LEXIS 877,

139  at *2 n. 1 (D. Del. Jan. 13, 2003) ("[T]he court will not address the defendants' indefiniteness

140  argument at [the Markman hearing].").  Indeed, the Federal Circuit in *Halliburton*, *Exxon* and

141  *Datamize* reviewed courts that dismissed the case for indefiniteness at summary judgment, not at

142  a prior *Markman* hearing.  *Halliburton*, 514 F.3d at 1249; *Exxon*, 265 F.3d at 1373; *Datamize,*

143  *LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

144  It may be true that determining the indefiniteness of claim language is a question of law

145  "that is drawn from the court's performance of its duty as the construer of patent claims."

146  *Exxon*, 265 F.3d at 1373.  The same duty gives rise to the *Markman* hearing.  However, this does

147  not outweigh the previous practical considerations that militate against determining

148  indefiniteness prior to the end of fact or expert discovery.  Therefore, as long as the claims are

149  "amenable to construction, however difficult that task may be[,]" the Court will construe them

150  here. *Exxon*, 265 F.3d at 1375.  The Court's constructions will be made without prejudice to

151  TransWeb's ability through dispositive motions to challenge the validity of the patents based on

152  lack of written description or indefiniteness under 35 U.S.C. §112.

153

154       *1.     Hydrocharging*
155

6

156     3M contends that "hydrocharging" means "contacting an article with water in a manner

157     sufficient to impart a charge to the article." (JCC at 1; Doc. No. 117.)  TransWeb proposes that

158     the term means "impinging jets of water or a stream of water droplets onto the article at a

159     pressure sufficient to impart a filtration enhancing electret charge to the web, and then drying the

160     article." (*Id.*)

161     A patent's "specification may reveal a special definition given to a claim term by the

162     patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's

163     lexicography governs." *Phillips*, 415 F.3d at 1316; *see also Honeywell Int'l, Inc. v. Universal*

164     *Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007) ("When a patentee defines a claim

165     term, the patentee's definition governs, even if it is contrary to the conventional meaning of the

166     term.").  Here, 3M acted as its own lexicographer in defining "hydrocharging."  The

167     specification provides that charging can be accomplished using a variety of techniques including

168     "hydrocharging, i.e., contacting an article with water in a manner sufficient to impart a charge to

169     the article, followed by drying the article." ('458 patent, 5:47-49.)  It is clear that 3M intended to

170     define the term and it is this language that 3M adopts as its proposed construction of

171     "hydrocharging." *See Edward Lifesciences LLC v. Cook, Inc.*, 582 F.3d 1332, 1334 (Fed. Cir.

172     2009) (holding that the specification's use of "i.e." signals sufficient intent to define the

173     preceding word).  Interestingly though, 3M does not adopt the *entire* definition from the

174     specification; its proposed construction leaves off the phrase "followed by drying the article."

175     Additionally, the claim language tracks the definition.  Dependant claim 2 recites a

176     method of making an electret "comprising charging the fluorinated article by contacting the

177     fluorinated article with water in a manner sufficient to produce an electret, and then drying the

178  article."[3] ('458 patent, 12:3-6.) That claim is juxtaposed with dependant claim 3, which recites

179  charging by "impinging jets of water or a stream of water droplets onto the fluorinated article at

180  a pressure and for a period sufficient to produce and electret, and drying the article."[4] (*Id.* at 12:

181  8-11.)  Claims 30, 31, and 32 are the only claims that actually recite the word "hydrocharging"

182  as a step. (*Id.* at 13: 41-45.)  Hence, read together, it is apparent that "hydrocharging" is

183  intended to be a term covering several methods.   Otherwise, there would be no need for the

184  patentee to differentiate these claims.  *See Philips*, 415 F.3d at 1314 ("Differences among claims

185  can also be a useful guide in understanding the meaning of particular claim terms.").

186          Nevertheless, TransWeb contends that a person of ordinary skill in the art would

187  understand the term as TransWeb defines it.  The specification states that "[o]ne example of a

188  useful hydrocharging process includes impinging jets of water or a stream of water droplets on

189  the article at a pressure and for a period sufficient to impart a filtration enhancing electret charge

190  to the web, and then drying the article." ('458 patent, 5:51-55.)  TransWeb insists that this

191  example is the only method of hydrocharging described in the patent and that no other

192  embodiments describe any other technique. (*Id.* at 8:45-58) (Example 10).  Moreover,

193  TransWeb points out that the patents-in-suit incorporate U.S. Patent No. 5,496,507 (the "'507

194  patent") when referring to hydrocharging.  The '507 patent recites a method of charging electret

195  filter media and generally claims "impinging on a nonwoven web of thermoplastic

196  nonconductive microfibers capable of having a high quantity of trapped charge jets of water or a

197  stream of water droplets at a pressure sufficient to provide the web with filtration enhancing

---

[3] The Joint Claim Construction Chart lists claim 2 of the '458 patent as containing the term "hydrocharging." But actually, claim 2 does not contain the word "hydrocharging" and instead contains the specification's definition of "hydrocharging"—"contacting the fluorinated article with water in a manner sufficient to produce an electret, and drying the article."

[4] Oddly, claim 3 is not listed as a claim that contains the term "hydrocharging."  But claim 3's method is the one TransWeb uses as its definition of hydrocharging.

8

198   electric charge and drying said web." ('507 patent, 1:57-62.) Referencing the '507 patent, the

199   '458 and '551 patents' "Background" section explains, "[e]lectrets are currently produce by a

200   variety of methods including . . . hydrocharging (see, e.g., U.S. Patent No. 5,496,507

201   (Angadjivand et. al))." ('458 patent, 1:20-23.) Furthermore, the specification states that "[a]n

202   example of a suitable method of hydrocharging is described in the ['507 patent]." ('458 patent,

203   5:61-63.) From these references to the '507 patent, TransWeb concludes that a person of

204   ordinary skill reading the '458 patent and '551 patent would understand "hydrocharging" as it is

205   explained in the '507 patent. But Court finds TransWeb's argument regarding the '507 patent

206   unconvincing. The specification makes clear that the method described in the '507 patent is but

207   one example of "hydrocharging" as that term is defined in the patents-in-suit.

208          Additionally, TransWeb argues that 3M's broad construction is inconsistent with the

209   specification, and "where a patentee argues for a broad interpretation of a claim term, courts

210   have found that the specification may serve to show that a narrow meaning is appropriate."

211   (Pl.'s Br. at 9; Doc. No. 129.) To support this argument, TransWeb cites two cases that

212   construed claims to cover the only embodiment described by the specification. *See Toro Co. v.*

213   *White Consol. Indus.*, 199 F.3d 1295 (Fed. Cir. 1999); *General Am. Transp. Corp. v. Cryo-*

214   *Trans, Inc.*, 93 F.3d 766 (Fed. Cir. 1996). In both of those cases, the patentee was not permitted

215   to broadly define a claim term beyond the preferred embodiment where the preferred

216   embodiment was the only one described. *General Am. Transp. Corp.*, 93 F.3d at 770 (finding

217   "nothing in the claim language, specification, or drawings" supported the patentee's broad

218   construction).

219          Both *Toro* and *General American* are inapposite. Neither of those cases involved the

220   patentee acting as his own lexicographer. Instead, the patentees in those cases offered

9

221   constructions that went beyond what the specifications and claims disclosed.  In this case,

222   however, not only does TransWeb ask the Court to ignore the patents' express definition of a

223   claim term, it asks the Court to limit a claim term to an embodiment disclosed in the

224   specification.  *See SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1340 (Fed.

225   Cir. 2001).  "[W]hen claim language is broader than the preferred embodiment, it is well-settled

226   that claims are not to be confined to that embodiment."  *DSW v. Shoe Pavilion*, 537 F.3d 1342,

227   1348 (Fed. Cir. 2008).  Here, claims include, but are not limited to the example of hydrocharging

228   provided in Example 10 and the '507 patent incorporated into the patents-in-suit.  (*Compare*

229   '458 patent claim 2 *with* claim 3.)

230          The parties also disagree on the impact of a piece of extrinsic evidence: the deposition

231   testimony of one of the '458 and '551 patent inventors, Dr. Seyed Angadjivand.  TransWeb

232   suggests that Dr. Angadjivand had not developed any hydrocharging methods other than using a

233   hydroentangler or spray nozzle, both involving impinging jets of water at high pressure.  (Pl.'s

234   Br. At 11-14; Doc. No. 129.)  Because Dr. Angadjivand had not investigated any other methods

235   for the '458 or '551 patents, had not reduced to practice any other methods, TransWeb concludes

236   that "hydrocharging" should be construed only to cover what had actually been invented—

237   impinging jets of water at high pressure.  TransWeb points to the deposition testimony of Dr.

238   Angadjivand, where he stated that he had not recommended proceeding with other

239   hydrocharging methods because "at that time we did not have enough experience, didn't have

240   enough experiment, so we just showed the feasibility.  We were far ahead with the other two, so

241   I recommended the other two."  (Pl.'s Ex. G at 97:1-25; Doc. No. 129-1.)  But, as 3M pointed

242   out during the *Markman* hearing, this testimony is, at best, ambiguous.  3M concluded from the

243   testimony that Dr. Angadjivand invented four methods of hydrocharging—hydroentangler, spray

10

244   nozzle, funnel, and dipping—but recommended commercializing only the first two.

245   Consequently, this piece of extrinsic evidence is of no significant value and certainly cannot be

246   used to contradict the intrinsic evidence.

247         Accordingly, the Court relies on the intrinsic evidence presented by the parties and finds

248   that the evidence supports Defendants' construction.  The specification sufficiently demonstrates

249   a clear intent that the patentee wished to act as his own lexicographer in defining

250   "hydrocharging," and it is that definition that controls.  TransWeb will not be permitted to limit

251   the definition of the term to one example of that method.  Therefore, "hydrocharging" means

252   "contacting an article with water in a manner sufficient to impart a charge to the article, followed

253   by drying the article."

254

255         **2.    *Contaminants***
256

257         3M defines this term as "particles and/or other substances that generally may not be

258   considered to be particles (e.g., organic vapors)."  (JCC at 2; Doc. No. 117.)  TransWeb argues

259   this term should be defined as "particles and/or other substances that are generally considered

260   undesirable."  (*Id.*)

261         Here, again, the patentee has defined the claim term in the specification.  "When a

262   patentee defines a claim term, the patentee's definition governs, even if it is contrary to the

263   conventional meaning of the term."  *Honeywell Int'l, Inc.*, 493 F.3d at 1361.  In the "Glossary"

264   section, the specification provides that "'contaminants' means particles and/or other substances

265   that generally may not be considered to be particles (e.g., organic vapors)."  ('458 patent, 3:22-

266   24.)  3M adopts this definition verbatim.

267        TransWeb's definition of "contaminants" incorporates a part of the patent's glossary

268    definition but adds a dictionary definition, which TransWeb argues gives the term its "ordinary

269    meaning" so that a person skilled in the art can understand what a "contaminant" is. (Pl.'s Br. at

270    15; Doc. No. 129.) TransWeb argues its dictionary definition does not change the definition

271    already provided in the patents' glossary section, rather its definition is "consistent with and not

272    contradictory to any definition in the intrinsic record." (Pl.'s Reply Br. At 14; Doc. No. 160.)

273    TransWeb cites to claim language in the '458 and '551 patents, suggesting the patentee

274    considered contaminants to be "undesirable." Claim 23 states, "the fluorination step *prevents*

275    *contaminants from interfering* with the addition of fluorine atoms." ('458 patent, 13: 21-24)

276    (emphasis added). And the independent claims of the '551 patent require "passing an aerosol

277    through . . . [an electret] to *remove contaminants* from the aerosol." ('551 patent, 12:19-23,

278    13:22-25, 14:3-24) (emphasis added). This language, contends TransWeb, demonstrates that the

279    intrinsic evidence supports its addition of the dictionary definition of "contaminant" as

280    "undesirable." Should the Court adopt 3M's definition, TransWeb argues that the term will be

281    ambiguous, self-contradictory, and will offer no useable meaning. (Pl.'s Reply Br. at 11; Doc.

282    No. 160.) This is because the TransWeb reads the term to entail "particles that generally may

283    not be considered to be particles." (Pl.'s Reply Br. At 11; Doc. No. 160.)

284        But the Court notes that there is another way to read the glossary definition.

285    "Contaminants" includes two, distinguishable clauses: (1) particles, and/or (2) substances that

286    generally may not be considered to be particles. Furthermore, while there is a presumption that

287    the words of a claim will receive their ordinary meaning, *NTP, Inc.*, 392 F.3d at 1346, this

288    presumption is rebutted if the patentee acted as his or her own lexicographer. *See Brookhill-Wilk*

289    *1, LLC.*, 334 F.3d at 1298-99. When a patent applicant specifically defines a claim term in its

290   description of its invention, his definition controls. *Phillips*, 415 F.3d at 1316.  In this case, 3M

291   rebutted any presumption that a "contaminant" must be "undesirable," by expressly defining it

292   otherwise in its glossary.  The inquiry ends here.  "Contaminant" means "particles and/or other

293   substances that generally may not be considered to be particles (e.g., organic vapors)."

294

295        **3.     *At least about***

296

297        3M contents that the term is straightforward and that it does not need construction.

298   (Def.'s Br. at 12; Doc. No. 128).  Alternatively, 3M argues that it means "at least

299   approximately," and that "'approximately' means within the range of experimental error a person

300   of skill in the art would expect when he/she uses the test methodology described in the Patent."

301   (JCC at 2; Doc. No. 117.)  TransWeb argues that this claim term is indefinite and offers no

302   construction.  (*Id.*)

303        "The word 'about' does not have a universal meaning in patent claims . . . the meaning

304   depends on the technological facts of a particular case." *Ortho-McNeil Pharm., Inc. v. Caraco*

305   *Pharm. Labs,* Ltd., 476 F.3d 1321, 1326 (Fed. Cir. 2007).  The court in *Amgen, Inc. v. Chugai*

306   *Pharmaceutical Co.* held that the term "about 160,000 IU/AU" (signifying erythropoietin

307   activity *in vitro*) was indefinite because nothing in the specification, prosecution history, or prior

308   art provided any indication as to what specific range of activity might be covered by the term

309   "about." *See* 927 F.2d 1200, 1218 (1991).  The court noted that no expert testimony was

310   available to facilitate construction of the term and that its "holding that the term 'about' renders

311   indefinite [the claims] should not be understood as ruling out any and all uses of this term in

312   patent claims.  It may be acceptable in appropriate fact situations." *Id.*

13

313    Generally, courts have been able to construe patent claim terms that use qualifying

314    words. "Such broadening usages as 'about' must be given reasonable scope; they must be

315    viewed by the decisionmaker as they would be understood by persons experienced in the field of

316    the invention." *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1554 (Fed.

317    Cir. 1996) (quoting *Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821-22 (Fed. Cir.

318    1988). Thus, where intrinsic evidence as to technical meaning or, if intrinsic evidence is

319    unavailable, expert testimony is supplied to assist in determining the meaning of "about," the

320    court will adopt that construction and find the terms definite. *See, e.g., Cohesive Techs., Inc. v.

321    Waters Corp.*, 543 F.3d 1351, 1369 (Fed. Cir. 2008); *BJ Servs. Co. v. Halliburton Energy Servs.*,

322    338 F.3d 1368, 1372-73 (Fed. Cir. 2003). Where such intrinsic or extrinsic evidence is not

323    available, "about" has been given its plain and ordinary meaning—"approximately." *See, e.g.,

324    Merck & Co*, 395 F.3d at 1369-70.

325    Here, neither party has offered expert testimony, but it is likely that "at least about" is

326    amenable to construction and can be given its ordinary meaning, as it would be understood by a

327    person of ordinary skill in the art. TransWeb argues that because there is no intrinsic evidence or

328    expert testimony as to a specific rate of error (e.g., ± .05/mm $H_2O$ Quality Factor), no person of

329    ordinary skill in the art could understand the metes and bounds of the claims. The intrinsic

330    evidence does not suggest any exact numerical range, but numerous courts have found this

331    acceptable and defined "about" to mean "approximately." *Merck & Co.*, 395 F.3d at 1369-70;

332    *Astrazeneca Pharms. LP v. Handa Pharms, LLC*, 2010 WL 4941431, at *4 (D.N.J. Nov. 30,

333    2010); *Teva Pharm Indus. Ltd v. Dr. Reddy's Labs, Ltd*, 2008 WL 2557510, at *6 (D.N.J. June

334    23, 2008).

14

335        Convincing here, the patents, in detail, provide the methodologies that a person of

336    ordinary skill in the art should use to assess the claim limitations.  Specifically, the patent details

337    how to measure oil resistance using Quality Factor, how to measure surface fluorination using

338    electron spectroscopy for chemical analysis ("ESCA"), and how to determine the $CF_3$:$CF_2$ ratio.

339    ('458 patent, 3:42-62; 3:66-4:7; 6:20-36.)  3M's definition of "at least about" recognizes that a

340    person of ordinary skill in the art would understand these methodologies and their application to

341    the art, even if no specific ranges of error are provided.  In other words, with these testing

342    methodologies in mind, a person of ordinary skill would understand that "about" means

343    "approximately" because one generally accounts for experimental testing error.  *See BJ Servs.*

344    *Co. v. Halliburton Energy Servs.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003) ("That some claim

345    language may not be precise, however, does not automatically render a claim invalid.").  Indeed,

346    3M cites the deposition testimony of TransWeb's vice-president, Kumar Ogale, who agreed that

347    a person familiar with each of the tests above would understand approximately what the rate of

348    experimental error would be.  (Def.'s Ex. C at 216:8-218:9; Doc. No. 159-4) ("Q:  Do you or

349    would someone who's familiar with the [DOP loading] test have an understanding of

350    approximately what the error rate would be?  A: Yes.").

351        Consequently, for purposes of construing "at least about," the Court finds that a person of

352    ordinary skill would not be left without guidance as to an error range, which the specification

353    allows to be "interpreted in its technologic and stylistic context."  *Pall Corp. v. Micron*

354    *Separations*, 66 F.3d 1211, 1217 (Fed.Cir. 1995).  Preserving the issue of indefiniteness or lack

355    of written description under 35 U.S.C. 112 for dispositive motions, the Court concludes that "at

356    least about" means "at least approximately."

357

358      **4.**     ***The electrets having a quality factor of at least 1.0/mm H$_2$0***
359              ***Wherein the electrets has a Quality Factor of at least 1.5/mm H$_2$0***
360              ***Wherein the electrets has a Quality Factor of at least 2/mm H$_2$0***

361

362        3M defines these terms as meaning "[wherein] the electrets [as defined] having a quality

363 factor of at least [1.0/1.5/2 mm H$_2$0], as determined by the method for measuring Quality Factor

364 described in the patent." (JCC at 3-5; Doc. No. 117.) TransWeb argues that these terms mean

365 "[wherein] the electrets having a quality factor of at least [1.0/1.5/2 mm H$_2$0] achieved by AC

366 corona fluorination, impinging jets of water at a pressure sufficient to produce an electret and

367 then drying the article, or by using a web having a basis weight of about 200 g/m$^2$." (*Id.*)

368        The dispute concentrates on the term "quality factor." 3M insists that it has essentially

369 acted as its own lexicographer in defining this term, and its construction does not go beyond the

370 formula. The specification states:

371                 Initial DOP penetration is determined by forcing 0.3 micrometer
372                 diameter dioctyl phthalate (DOP) particles at a concentration of
373                 between 70 and 140 mg/m$^3$ (generated using a TSI No. 212 sprayer
374                 with four orifices and 30 psi clean air) through a sample of filter
375                 media which is 4.5 inches in diameter at a rate of 42.5 L/min (a
376                 face velocity of 6.9 centimeters per second). The sample is
377                 exposed to the DOP aerosol for 30 seconds until the readings
378                 stabilize. The penetration is measured with an optical scattering
379                 chamber, Percent Penetration Meter Model TPA-8F available from
380                 Air Techniques Inc. Pressure drop across the sample is measured
381                 at a flow rate of 42.5 L/min (a face velocity of 6.9 cm/sec) using an
382                 electronic manometer. Pressure drop is reported in mm of water
383                 ("mm H$_2$O"). DOP penetration and pressure drop are used to
384                 calculate the quality factor "QF" from the natural log (ln) of the
385                 DOP penetration by the following formula:

386

387

388

389

$$QF[1/\text{mm H}_2\text{O}] = \frac{-\text{Ln}\dfrac{DOPPenetration(\%)}{100}}{PressureDrop[\text{mm H}_2\text{O}]}$$

390

391

392  ('458 patent, 6:39-60.)  3M contends that this measurement and corresponding formula are

393  sufficient to define "quality factor."  It also points out that the formula was sufficient to

394  demonstrate to the USPTO that the term "quality factor" was enabled.  (Def.'s Ex. 3 at 6; Doc.

395  No. 128-4.)

396       TransWeb counters that 3M's proposed construction is too broad and that TransWeb's

397  construction properly limits the term to the techniques that must be used to achieve the required

398  quality factors.  (Pl.'s Br. at 21; Doc. No. 129.)  TransWeb relies on the fact that in most of the

399  examples in the specification for which quality factor is over 1.0/mm $H_2O$, the article was

400  produced by AC corona fluorination or impinging jets of water at a pressure sufficient to produce

401  an electret and then drying the article.  The exception, example 17, was charged using only DC

402  corona discharge, but had a basis weight of 200 $g/m^{2.5}$  TransWeb argues that the specification

403  discloses only one embodiment: "that is, only by using AC corona fluorination, impinging jets of

404  water at a pressure sufficient to produce an electret and then drying the article, or by using a web

405  having a basis weight of about 200 $g/m^2$, would one skilled in the art understand how to achieve

406  [the claimed quality factors.]"  (Pl.'s Br. at 22-23; Doc. No. 129.)  Consequently, TransWeb

407  concludes that since this is the only embodiment supporting the electrets with required quality

408  factors, those techniques limit the claim term to its proper scope.  *See Toro*, 199 F.3d 1295;

409  *General Am. Transp.*, 93 F.3d 766.

---

[5] TransWeb concludes that because hydrocharging was not used to produce a high quality factor in Example 17, it must have been the high basis weight that was the dominant factor in achieving the high quality factor.  TransWeb cites to Example 18, which used a 200 $gm^2$ basis weight and also achieved a high quality factor.  This argument is flawed for two reasons.  First, it is a classic example of correlation without causation:  TransWeb offers no evidence that it is the high basis weight that actually caused a high quality factor; it very well could have resulted from DC corona discharge.  Second, Example 18 was charged using AC corona fluorination, which TransWeb includes a technique to achieve sufficient quality factor.

17

410   The Federal Circuit has reinforced that "although the specification often describes very

411   specific embodiments of the invention, [the court has] repeatedly warned against confining the

412   claims to those embodiments." *Phillips*, 415 F.3d at 1323. Yet TransWeb's definition seeks to

413   import limitations from several different embodiments (not just one). Further, a person of

414   ordinary skill is unlikely to understand a measurement (e.g., 1.0/mm $H_2O$) in terms of the

415   processes by which it is achieved; rather one would understand it in terms of how it is calculated.

416   *Id.* ("[T]he line between construing terms and importing limitations can be discerned with

417   reasonable certainty and predictability if the court's focus remains on understanding how a

418   person of ordinary skill in the art would understand the claim terms."). Here, the term focuses on

419   the measurable characteristics of the finished product, not on the methods used to make it.

420   Therefore, the Court construes "the electret having a quality factor of at least 1.0/mm

421   $H_2O$" to mean "the electret [as defined] having a quality factor of at least 1.0/mm $H_2O$, as

422   determined by the method for measuring Quality Factor described in the patent." The term

423   "wherein the electret has a Quality Factor of at least 1.5/mm $H_2O$" means "wherein the electret

424   [as defined] has a Quality Factor of at least 1.5/mm $H_2O$, as determined by the method for

425   measuring Quality Factor in the patent." And the term "wherein the electret has a Quality Factor

426   of at least 2/mm$H_2O$" means "wherein the electret [as defined] has a Quality Factor of at least

427   2/mm $H_2O$, as determined by the method for measuring Quality Factor described in the patent."

428

429   **5.   *Charging the fluorinated [web/article] . . . in a manner sufficient to produce an***
430   ***electret***

431

432   3M asserts that this term means "imparting a charge to the [web/article] so the end

433   product is an electret [as defined]. Before one imparts the charge, the article may be either

18

434   charged or uncharged." (JCC at 7-8; Doc. No. 117.) TransWeb argues that this term is

435   indefinite, a challenge the Court will defer as explained above. (Pl.'s Reply Br. at 25; Doc. No.

436   160.) Alternatively, TransWeb defines this term as "charging the fluorinated web/article, such

437   that the charging process alone is sufficient to impart a quasi-permanent electrical charge to the

438   fluorinated web/article." (JCC at 7-8; Doc. No. 117.)

439          The dispute surrounding this term focuses on whether the preferred embodiment is

440   included in the parties' proposed constructions. 3M argues that its proposed construction should

441   be adopted because it includes the preferred embodiment, whereas TransWeb's construction does

442   not. "A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and

443   would require highly persuasive evidentiary support.'" *Adams Respiratory Therapeutics, Inc. v.*

444   *Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (quoting *Vitronics Corp. v. Conceptronic*

445   *Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996)). Specifically, 3M notes that, in the preferred

446   embodiment, the fluorination step charges the web before the "charging step." (Def.'s Br. at 20;

447   Doc. No. 128.) This is because "[t]he electrical discharge applied during the fluorination process

448   is capable of modifying the surface chemistry of the polymeric article when applied in the

449   presence of a source of fluorine containing species." ('458 patent, 5:21-24.) Consequently, 3M

450   concludes that "before one imparts the charge, the article may be either charged or uncharged."

451   (JCC at 7-8; Doc. No. 117.) 3M faults TransWeb's construction "because it reads the preferred

452   embodiment out of the claims by requiring the electret to become charged through 'the charging

453   process alone.'" (Def.'s Br. at 21-22; Doc. No. 128.)

454          But TransWeb's construction does not read out the preferred embodiment. TransWeb

455   and 3M agree that the critical "charging step" occurs after the web is fluorinated. The logical

456   inference is that it is the charging step that is applied to the fluorinated web (not fluorination

19

457    itself) that must be sufficient to produce an electret. That is consistent with the intrinsic

458    evidence. After the specification details the fluorination process, it explains that "[c]harging the

459    polymeric article to produce an electret can be accomplished using a variety of techniques."

460    ('458 patent, 5:45-46.) Thus, it is logical that the "charging process" is alone sufficient to impart

461    the defined characteristics of an electret. While a charge may be created through fluorination,

462    that charge is not sufficient to produce an electret. Otherwise, the "charging step" (e.g.,

463    hydrocharging and corona charging) would be unnecessary.

464         TransWeb argues that, according to 3M's construction, an article or web could start out

465    as an electret. That is based on 3M's second sentence, which adds that "before one imparts the

466    charge, the article may be either charged or uncharged." But the second sentence finds support

467    in the specification and claims. Claim 1 separates steps, reciting a "method of making an electret

468    comprising: [1] fluorinating a polymeric nonwoven web to produce an article having surface

469    fluorination; and [2] charging the fluorinated web in a manner sufficient to produce an electret . .

470    . ." ('458 patent, 11:63-67) (brackets added). It is that first step, reflected in 3M's second

471    sentence, that may impart some charge. ('458 patent, 5:21-24) ("The electrical discharge applied

472    during the fluorination process is capable of modifying the surface chemistry of the polymeric

473    article when applied in the presence of a source of fluorine containing species."). And according

474    to 3M, a person of ordinary skill in the art would understand that fluorination may impart a

475    charge. (Def.'s Br. at 20; Doc. No. 128.)

476         The Court finds that both constructions convey ordinary meaning and are harmony with

477    the intrinsic evidence. Fluorinating the article can result in a charged or uncharged article, but

478    the "charging process" alone, imparts a charge sufficient to impart a quasi-permanent electrical

479    charge to the fluorinated web/article. However, to be precise, the first step (fluorination) is not

20

480    implicated directly by the disputed claim term and does not require defining.  Only the second

481    step (charging the fluorinated web sufficient to produce an electret) requires construction.

482    TransWeb's proposed construction, because it focuses on the charging step, best accomplishes

483    this task.  Accordingly, the Court construes "charging the fluorinated [web/article] . . . in a

484    manner sufficient to produce an electret" to mean "charging the fluorinated web/article, such that

485    the charging process alone is sufficient to impart a quasi-permanent electrical charge to the

486    fluorinated web/article."

487

488    **III.    CONCLUSION**

489             For the reasons stated herein and for the reasons set forth on the record during the

490    *Markman* hearing, the Court construes the terms of the of U.S. Patent No. 6,397,458 and U.S.

491    Patent No. 6,808,551 as announced in the order accompanying this memorandum opinion.

492

493    Dated: November  16 , 2011

494                                                         ___Garrett E. Brown, Jr._____
495                                                         GARRETT E. BROWN, JR., U.S.D.J.
496

497

21