# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| TRANSWEB, LLC, | ) | CIVIL ACTION No. 10-04413 (FSH/PS) |
| Plaintiff and Counterclaim-Defendant, | ) ) ) ) | |
| v. | ) ) | REDACTED |
| 3M INNOVATIVE PROPERTIES COMPANY and 3M COMPANY, | ) ) ) | **Return Date: March 19, 2012** |
| Defendants and Counterclaim-Plaintiffs. | ) ) ) ) | |

---

## PLAINTIFF TRANSWEB, LLC'S
## BRIEF IN OPPOSITION TO 3M'S MOTION TO EXCLUDE
## THE EXPERT TESTIMONY OF BRADLEY N. REIFF

---

Liza M. Walsh
Christine I. Gannon
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500
*Attorneys for Plaintiff TransWeb, LLC*

Harold A. Barza (admitted *pro hac vice*)
Michael E. Williams (admitted *pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California, 90017
(213) 443-3000
*Attorneys for Plaintiff TransWeb, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................. 1

RELEVANT BACKGROUND ................................................................. 4

ARGUMENT ........................................................................................ 14

I.    THE *DAUBERT* STANDARD ................................................... 14

II.   DR. REIFF PERFORMED AN APPROPRIATE MARKET
ANALYSIS USING THE REASONABLE
INTERCHANGEABILITY STANDARD ................................... 15

    A.   A Relevant Market Is Defined By Reasonable
Interchangeability With Other Products ............................. 15

    B.   Dr. Reiff's First Relevant Market, NIOSH-Certified Respirators
For Use In Oily Environments, Was Appropriately Identified .......... 17

        1.   One of the textbook methods to determine cross-elasticity
of demand/reasonable interchangeability is the SSNIP
analysis ..................................................................... 17

        2.   Dr. Reiff's opinion that the relevant market consists of
NIOSH-certified R- and P-series respirators is reliable
and "fits" the case ..................................................... 19

        3.   3M's argument that the law requires an econometric
analysis is unsupported and contrary to binding precedent ...... 21

    C.   Dr. Reiff's Second Relevant Market, Fluorinated Polymeric
Filtration Media, Was Appropriately Identified ................. 27

III.   DR. REIFF OFFERS RELIABLE OPINIONS ON THE HARM
TRANSWEB WILL SUFFER IF 3M SUCCEEDS IN ITS
ANTICOMPETITIVE SCHEME, AN OPINION THAT "FITS" THIS
CASE ..................................................................................... 34

CONCLUSION ................................................................................... 37

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aetna Inc. v. Express Scripts, Inc.,*
261 F.R.D. 72 (E.D. Pa. 2009) ...........................................................................35

*Bacchus Indus., Inc., v. Arvin Indus., Inc.,*
939 F.2d 887 (10th Cir. 1991) ...........................................................................23

*Brown Shoe v. U.S.,*
370 U.S. 294 (1962) ...........................................................................................22

*Elcock v. Kmart Corp.,*
233 F.3d 734 (3d Cir. 2000) ..............................................................................15

*F.T.C. v. Swedish Match,*
131 F. Supp. 2d 151 (D.D.C. 2000) ...................................................................23

*Fineman v. Armstrong World Indus., Inc.,*
980 F.2d 171 (3d Cir. 1992) ..............................................................................21

*ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.,*
198 F. Supp. 2d 598 (E.D. Pa. 2002) .................................................................26

*Int'l Wood Processors v. Power Dry, Inc.,*
593 F. Supp. 710 (D.S.C. 1984) .........................................................................36

*Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.,*
588 F.3d 908 (6th Cir. 2009) ..............................................................................18

*Konstantopoulos v. Westvaco Corp.,*
112 F.3d 710 (3d. Cir. 1997) ..............................................................................15

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999) ...........................................................................................15

*Med Alert Ambulance, Inc. v. Atl. Health Sys., Inc.,*
2007 WL 2297335 (D.N.J. Aug. 6, 2007) .........................................................22

*Olin Corp. v. F.T.C.,*
986 F.2d 1295 (9th Cir. 1993) ......................................................................17, 23

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717 (3d Cir. 1994) ...........................................................................14, 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
124 F.3d 430 (3d Cir. 1997) ........................................................15, 16, 21, 24

*Sterling Merchandising, Inc. v. Nestle, S.A.,*
724 F. Supp. 2d 245 (D. Puerto Rico 2010) ......................................................23

*In re TMI Litig.,*
  193 F.3d 613 (3d Cir. 1999) ...........................................................14

*Terrell v. Household Goods Carriers' Bureau,*
  494 F.2d 16 (5th Cir. 1974) ...........................................................36

*Tunis Bros. Co., Inc. v. Ford Motor Co.,*
  952 F.2d 715 (3d Cir. 1991) ...........................................................16

*U.S. Horticultural Supply, Inc. v. Scotts Co.,*
  2009 WL 89692 (E.D. Pa. Jan. 13, 2009)............................24, 25, 26

*U.S. v. Calmar Inc.,*
  612 F. Supp. 1298 (D.N.J. 1985) ...............................................18, 23

*U.S. v. Georgia-Pacific Corp.,*
  1996 WL 634212 (D. Del. July 29, 1996) .....................................18

*Wm. Goldman Theatres, Inc. v. Loew's, Inc.,*
  69 F. Supp. 103 (E.D. Pa.), *aff'd*, 164 F.2d 1021 (3d Cir.),
  *cert. denied*, 334 U.S. 811 (1948)..................................................36

## Statutes

Fed. R. Evid. 702 ...............................................................................14

## Miscellaneous

Gregory Werden, "The 1982 Merger Guidelines
  and the Ascent of the Hypothetical Monopolist Paradigm,"
  71 Antitrust Law Review, 253-69 (2003).........................................17

Plaintiff TransWeb, LLC ("TransWeb") hereby submits its opposition to the Motion of Defendants 3M Innovative Properties Company and 3M Company (collectively, "3M") to Exclude the Expert Testimony of Dr. Bradley N. Reiff ("Motion").

## PRELIMINARY STATEMENT

This is a case about respirators worn by workers to protect themselves from inhaling harmful particulates while working in an oily environment.  Under a series of regulations from the Occupational Safety and Health Administration ("OSHA") and the National Institute for Occupational Safety and Health ("NIOSH"), only approved respirators with specific performance characteristics can be used in such circumstances.  TransWeb asserts that 3M has sought to monopolize the market for such respirators, as well as the market for certain materials used to create them, by obtaining patents through fraud on the U.S. Patent & Trademark Office and through sham litigation seeking to enforce those invalid patents.

In support of its claims, TransWeb will offer the opinions of its antitrust expert, Dr. Bradley N. Reiff, an MIT-trained Ph.D. in economics with over 24 years of experience as an economist.  Among other things, Dr. Reiff intends to opine that there are two relevant markets at issue in this case: (1) the market for all respirators that meet the relevant NIOSH standards for respirators used in oily environments; and (2) an upstream market for a certain unique type of filtration media—fluorinated

polymeric web—used in the fabrication of certain NIOSH-certified oil-resistant and oil-proof respirators. To support his definitions of these markets, Dr. Reiff analyzed, *inter alia*, price and cost data, industry marketing materials, analyses of the products' unique characteristics and potential interchangeability, 3M's "voice of the customer" consumer preference studies, 3M's sales strategies for the products, and deposition transcripts discussing the markets in which 3M itself believed it operated. Dr. Reiff further conducted what is known as a "SSNIP" analysis for each market definition. The SSNIP analysis is a decades-old test the Department of Justice and courts routinely use to analyze reasonable interchangeability; *i.e.*, the outer boundaries of an antitrust market.[1]

In its *Daubert* motion, 3M seeks to exclude Dr. Reiff's market definition opinions by arguing that, as a matter of law, such opinions must be supported by an "econometric analysis"; *i.e.*, "the application of statistical methods to the study of economic data and problems."[2] This, however, is not the law. Extensive precedent from the Supreme Court, the Third Circuit, this Court, and elsewhere makes clear that relevant markets may be established by a variety of methods, including practical

---

[1]  Dr. Reiff also offers opinions as to the anticompetitive effects that will flow from 3M's actions in enforcing its invalid patents if it is permitted to fully carry out its anticompetitive scheme. 3M does not challenge Dr. Reiff's conclusions that 3M (a) has the requisite intent to monopolize, and (b) a dangerous probability of achieving monopoly power if it is successful.

[2]  *Merriam-Webster Dictionary*, *available at* http://www.merriam-webster.com/dictionary/econometrics (last visited Feb. 29, 2012).

considerations of product characteristics and uses, the views of market participants, qualitative assessments of consumer demand, and numerous other means. In this case, Dr. Reiff did engage in a proper analysis to define the market by analyzing reasonable product interchangeability. Indeed, 3M's own antitrust expert does not offer any different market definitions and offers no critiques of the differentiating factors Dr. Reiff concluded defined the two markets.

Dr. Reiff has also opined on the effects of 3M's conduct. In addition to past lost profits and collectible legal fees—opinions of which 3M does not attack in its *Daubert* motion—Dr. Reiff has calculated the harm TransWeb likely would suffer if 3M were able to complete its anticompetitive scheme and exclude TransWeb's fluorinated polymeric filtration media from the market. Specifically, if 3M is successful with its attempted monopolization, TransWeb would lose between approximately $14.8-18.4 million in future profits. Purchasers of TransWeb's products would also be harmed in that they would lose access to the only filtration media on the market that competes with 3M's most advanced filtration web.

3M asserts that this evidence must be excluded under the *Daubert* standard because there is no scenario in which (a) 3M's patents are found invalid and unenforceable, and (b) TransWeb actually loses all of the future profits Dr. Reiff estimates. 3M misunderstands or mischaracterizes the purpose for which this evidence is offered; to wit: (1) to show that, if left unchecked, 3M's scheme would

cause significant harm to competition; and (2) to the extent other factual testimony or evidence is introduced to demonstrate what portion of future profits TransWeb has lost due to this litigation, a segment of the future profits Dr. Reiff estimates could be recoverable antitrust damages.  3M's motion is unfounded and should be denied.

## RELEVANT BACKGROUND

Particulate Respirators, Mechanical Filters, & Electret Filters.  The end products at issue in this case are particulate respirators.  At their simplest, respirators place a physical layer—*i.e.*, a filter—between the user and the surrounding air that literally screens out particles before they reach the user's nose or mouth.  (Highly Confidential Certification of Jessica L. Palmer in Support of Opposition to 3M's Motion to Exclude Testimony of Dr. Bradley N. Reiff, filed concurrently herewith ("Palmer Cert."), Ex. B ¶¶ 16-17.)  Such filters are known as "mechanical" filters. (*Id.* ¶ 17.)

One way to enhance a mechanical filter's performance is to electrostatically charge the filter media so that it attracts particles to the media itself.  (*Id.* ¶ 18.)  This enhanced type of filter is known as an "electret."  (*Id.*)  Because electrets attract particles to themselves, they enhance filtration efficiency (the amount of particles that are stopped by the filter) as well as lower pressure drop (how difficult it is to breathe through the filter).  (*Id.*)  Regarding the latter, electrets lower pressure drop because less filter material is necessary to achieve the same filtration efficiency as would be

required with a purely mechanical filter. (*Id.* ¶¶ 16-18.) Lower pressure drop is one of the most important aspects of a respirator because it allows for better breathability and longer service life. (*Id.*, Ex. C at 4.) Because these respirators are worn by workers engaged in strenuous activity, the ease of breathing through a filter is extremely important.

The preferred filtration media for respirators is polymeric material, which is melt blown into a web of thin fibers. This material is well-suited to hold an electric charge and function as an electret. However, in an oily environment, polymeric electret filter performance tends to degrade quickly because the oil particles in the air diminish the filter's electrostatic charge as they penetrate and build up on the material's surface. (*Id.*, Ex. B ¶ 18.) Adding fluorine atoms to the surface of such filtration material helps maintain its electrostatic charge and otherwise withstand the degrading effects of oil, thus maintaining—and, indeed, improving—the performance benefits one obtains by using an electret filter in the first place. (*Id.* ¶ 29.)

Filtration Media Types And Performance Characteristics. As 3M acknowledges in its motion, there are two types of base material manufacturers use as filtration media in respirators: polymeric web and fiberglass. (Mot. at 2-3.) The former, as noted above, is a web created by melting and extruding a plastic polymer into thin fibers that form a web. (Palmer Cert., Ex. D ¶ 27.) Polymeric web can be electrostatically charged and made into an electret. (*Id.*, Ex. E ¶ 17.) Fiberglass, on

the other hand, cannot hold a charge and thus solely relies on mechanical filtration. (*Id.* ¶ 18.)

Fluorinated polymeric web has a lower pressure drop per surface area than fiberglass. As a result, polymeric filtration material is superior to fiberglass, and respirators incorporating *fluorinated* polymeric web have the best breathability and longest service life of any type of filtration media. (Certification of Christine I. Gannon in Support of Opposition to 3M's Motion to Exclude Testimony of Dr. Bradley N. Reiff, filed concurrently herewith ("Gannon Cert."), Ex. A at 532, 538; Palmer Cert., Ex. C ¶ 4.) Since at least 1998, 3M has extolled fluorinated polymeric filtration media's performance quality in public literature and noted that it far surpasses both non-fluorinated polymeric web and fiberglass. (Gannon Cert., Ex. F.) In the same literature, 3M noted that fiberglass has the highest pressure drop per surface area—*i.e.*, the worst/highest pressure drop—of the available types of filtration media. (*Id.*)

Although 3M claims that there is a filtration material known as "fluorinated fiberglass," it must be understood that adding fluorine to fiberglass does not improve the media's pressure drop or filtration efficiency, and it is not analogous to fluorinating polymeric web material. As noted above, fiberglass cannot hold an electrostatic charge. This means that fluorine is not added to fiberglass to help create or maintain an electret filter. (*See* Palmer Cert., Ex. E ¶¶ 17-18.) Instead, it is added

simply to make the fiberglass resistant to water. (*Id.*, Ex. A at 26:18-27:18.) As a result, and as explained further below, fluorinated fiberglass is completely different from fluorinated polymeric material, and they do not provide similar filtration functionality.

Respirator Design Types. Generally speaking, respirators are split into two types: (a) maintenance free respirators ("MFRs"), also known as disposable respirators; and (b) elastomeric facepiece respirators ("EFRs"), also known as reusable respirators. (Declaration of Gregory D. Miller, Esq. in Support of 3M's Motion to Exclude the Expert Testimony of Bradley N. Reiff dated February 24, 2012 ("Miller Decl."), Ex. A ¶ 9 (Reiff Expert Report).) The main difference between these two respirator categories is that MFRs are a single piece and discarded after use, and EFRs are split between a reusable facepiece and disposable filter(s), only the latter of which is discarded. (*Id.*)

EFR respirators are further differentiated between EFR respirators that include a hard cartridge filter, and those that use a soft disc-like replaceable filter, sometimes called a "pancake" filter.[3]

---

[3]  Some EFR facepieces can use either a disc or cartridge filter. That is a design option particular to respirator manufacturers.

Below is a representative example of an MFR respirator:



Below is a representative example of an EFR respirator utilizing a pancake-style filter:



Below is a representative example of an EFR utilizing a cartridge-style filter:



All MFRs use polymeric filtration media; none are made with fiberglass. (Palmer Cert., Ex. I at 169:2-171:23.) Likewise, the "soft" or "pancake" EFR filters on the market utilize polymeric filtration media. (*Id.* at 184:4-186:4.)[4] In contrast, cartridge filters—which have limited sales in comparison to their direct soft EFR filter and MFR counterparts—utilize fiberglass media. (*Id.* at 173:6-14.) The reason for this limited use is in part mechanical: fiberglass is brittle, and so (a) cannot be used to form a disposable face mask, and (b) will break if not contained in a hard shell. (*Id.*,

---

[4] In his deposition, Dr. Sebastian claimed that one pancake filter he tested, the North 75FFP100, was made using fiberglass filtration media. (*Id.* at 185:15-25.) Dr. Sebastian admitted that he tested two 75FFP100s, and one of those clearly used polymeric web media. (*Id.* at 194:8-195:1.) Dr. Sebastian could not identify any other pancake filter that uses fiberglass media. (*Id.* at 184:4-186:4.) Furthermore, TransWeb's own analysis of the North 75FFP100 indicated that it used polymeric web. (Gannon Cert., Ex. B at rows 24-29.) (Fiberglass media will demonstrate non-negligible amounts of Si2p, denoted in column I. The North 75FFP100 revealed no such measurable amounts of Si2p, thus indicating it is polymeric in nature.)

Ex. E ¶ 50.) Indeed, the only area where one sees any meaningful use of fiberglass is where the filter also includes carbon filtration material to filter noxious levels of gases and vapors. (Palmer Cert., Ex. F at 7.)[5]

The Respirator Regulatory Environment: OSHA And NIOSH. OSHA created safety requirements, published in the Code of Federal Regulations ("CFR"), that govern the use of respirators in work environments in the United States. (Miller Decl., Ex. A ¶ 9.) OSHA draws upon the research and expertise of NIOSH. (*Id.*) OSHA requires that all respirators used in workplaces are NIOSH-certified. (*Id.*)

There are three levels of NIOSH particulate respirator certification: N, R, and P. (Palmer Cert., Ex. C at 2-3.) Of these, only the R certification (which stands for "oil-resistant") and the P certification (which stands for "oil-proof") indicate that a respirator may be used in an oily environment. (Miller Decl., Ex. A ¶¶ 10-11.) The main difference between R- and P-series respirators is that R- respirators must be discarded after eight hours of use and P- respirators have no set time limit. (*Id.* ¶ 11.)

_____

[5]   Since 2002—the earliest point for which 3M produced sales data—3M's polymeric web respirators have outsold its fiberglass respirators█████████ ██████ (*Id.*, Ex. J.) Of 3M's fiberglass respirator lineup—which is entirely made of hard cartridges—only one respirator is a non-specialty filter. The remainder of the fiberglass respirator lineup consists of cartridges that are NIOSH-certified to protect against gases and vapors above a nuisance level. (*Id.*, Ex. F at 7.) When compared against polymeric web respirators—regardless of fluorination—3M's sole non-specialty fiberglass cartridge,████████████████████ ██████████████████ (*Id.*, Ex. J.)

NIOSH also certifies respirators based on their filtration efficiency; *i.e.*, the amount of particles they filter from the air. These filtration efficiency certifications are denoted by the numbers 95, 99, and 100, which respectively correspond to a respirator's ability to filter 95%, 99%, and 99.97% of particles from the air. (*Id.* ¶ 10.) Thus, for example, an R95 respirator is "oil-resistant" and filters 95% of particles from the air. Likewise, a P100 respirator is "oil-proof" and filters 99.97% of particles from the air.

Dr. Reiff's Expert Report. On December 16, 2011, Dr. Bradley N. Reiff, an MIT-trained Ph.D. economist, submitted an expert report "provid[ing] an economic analysis of 3M's alleged actions and to determine whether those actions have eliminated or are likely to eliminate competition and increase 3M's monopoly power in a relevant market." (*Id.* ¶ 4.)[6] Dr. Reiff also opined on (a) damages TransWeb has suffered as a result of this case, and (b) the likely future harm TransWeb would suffer if 3M were successful in its anticompetitive scheme. (*Id.*)

In its motion, 3M admits it does not challenge Dr. Reiff's qualifications as an expert, qualifications that include "industrial organization (the study of market

_____

[6] At 3M's request, Dr. Reiff revised his initial report to exclude a reference to the deposition testimony of Richard Wolfson. Dr. Reiff did so and submitted a Revised Expert Report on December 21, 2011. The above revisions were not material and the report did not change substantively. All citations to Dr. Reiff's expert report are to the revised expert report. A list of the materials Dr. Reiff considered is attached as Exhibit C to the Gannon Cert.

structure and competition), … econometrics (the application of statistics to economic phenomena) and the analysis of damages in legal proceedings." (*Id.* ¶ 1; Mot. at 6.)

      1.   <u>Dr. Reiff's opinions on the relevant markets at issue in this case</u>

Contrary to the implications in 3M's motion, Dr. Reiff's opinion is that there are two separate relevant antitrust markets: (1) a downstream market for NIOSH-certified R- and P-series respirators (sometimes referred to herein as the "Downstream Market" or "Respirator Market"), and (2) an upstream market for fluorinated polymeric filtration media used to make such respirators (sometimes referred to herein as the "Input Market" or the "Filter Medium Market"). The Respirator Market Dr. Reiff identifies includes every single NIOSH-certified R- and P-series respirator currently available to the public, regardless of manufacturer, filtration media, or design type. The Filter Medium Market, on the other hand, is limited to fluorinated polymeric web material, because there is a distinct market for such unique filter material, in terms of the needs of respirator makers, and the lack of reasonable substitutes with similar performance capabilities. In opining as to the existence of these markets, Dr. Reiff based his opinion on a plethora of available data and information, to which he applied a SSNIP analysis, discussed *infra* at 17-24 & 30-34, which analyzed whether a hypothetical rise in price of one good posited to be in the

relevant market would increase demand for other products that are arguably in the same market.[7]

### 2.   Dr. Reiff's opinions on TransWeb's future profits

Using TransWeb's historic sales data, Dr. Reiff estimated that, if forced to stop selling fluorinated polymeric web, TransWeb would suffer between $14.8-18.4 million in lost profits over the next ten years. (Miller Decl., Ex. A ¶¶ 57-58.) He also observed that TransWeb would lose over ██% of its business in such a circumstance. (*Id.* ¶ 57.) 3M notably does not attack the methodology Dr. Reiff used to determine the dollar amount of annual profits TransWeb would lose if 3M were successful in its anticompetitive scheme.   (Mot. at 2, 9-10.)   Nor does 3M contest Dr. Reiff's conclusions regarding the amount of TransWeb's overall business that fluorinated polymeric web sales represent.  (*Compare id.*; *with* Miller Decl., Ex. A ¶ 57.)

3M's Rebuttal Antitrust Expert Report.  On January 20, 2012, 3M's witness, Dr. Michael A. Williams, Ph.D., submitted a rebuttal to Dr. Reiff's expert report. Tellingly, 3M did not provide a copy of Dr. Williams' report as an exhibit supporting its *Daubert* motion. Dr. Williams' deposition transcript demonstrates why. First, Dr. Williams offers no opinion or substantive analysis on Dr. Reiff's Respirator Market definition.   (Palmer Cert., Ex. K at 233:6.)   Second, Dr. Williams has no

---

[7]   As discussed in detail below, if the SSNIP analysis indicates demand for other products does *not* go up in response to the hypothesized price increase, they are not considered to be in the same relevant market.

13

understanding why electrostatically charging filtration media improves performance characteristics. (*Id.* at 85:5-86:16.)  Third, Dr. Williams performed no analysis of the different types of filtration media's performance characteristics and, thus, no analysis of potential differentiating factors. (*Id.* at 89:2-90:4.)  Fourth, Dr. Williams—despite insisting that "fluorinated fiberglass" should be included in Dr. Reiff's upstream Filter Medium Market definition—does not know why fluorine is used on different types of filtration media and has no idea whether fluorine on fiberglass improves its performance in any way. (*Id.* at 87:17-90:4.)  In short, Dr. Williams performed no analysis into how different filtration media work or why one type of media would or would not be a reasonable substitute for another.  He also offered no substantive opinion on how an alternative relevant market—whether upstream or downstream—would be defined.

## ARGUMENT

### I.   THE *DAUBERT* STANDARD

Federal Rule of Evidence 702 embodies a liberal admissibility requirement. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994); *see also In re TMI Litig.*, 193 F. 3d 613, 664 (3d Cir. 1999).  In order to be admissible under Rule 702, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Expert testimony shall be admitted if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product

of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Under Third Circuit authority, these three requirements can be summarized as "qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

The Third Circuit's reliability and fit standards for expert evidence are the same and "not that high." *In re Paoli*, 35 F.3d at 745. Indeed, "the grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Id.* at 744.

Once the party offering the expert testimony makes this showing, a Court must consider the following additional factors before evidence can be excluded:

> (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure the prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d. Cir. 1997).

## II.   DR. REIFF PERFORMED AN APPROPRIATE MARKET ANALYSIS USING THE REASONABLE INTERCHANGEABILITY STANDARD

### A.   A Relevant Market Is Defined By Reasonable Interchangeability With Other Products

"The outer boundaries of a relevant market are determined by reasonable interchangeability of use." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (citations omitted). "Interchangeability implies that one

product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Id.* (quoting *Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.,* 33 F.3d 194, 206 (3d Cir. 1994)).  When assessing reasonable interchangeability, "[f]actors to be considered include price, use, and qualities." *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir. 1991).[8]

When products exhibit reasonable interchangeability, the rise in price of one product will lessen demand for that product and cause consumers to shift to other like products. *Queen City Pizza,* 124 F.3d at 437-38 (citing *Tunis Bros.,* 952 F.2d at 722). This is often referred to as "cross-elasticity of demand." *Id.*

Over the decades, courts have used and relied on many different methods to determine cross-elasticity of demand and reasonable interchangeability.  One method that is widely accepted is the SSNIP Test, which Dr. Reiff used in this case.  Other methods that have been used include "econometrics," which is the application of statistical methods to the study of economic data and problems; *e.g.,* regression analysis.[9]  Contrary to 3M's assertions, however, there is no rule in the law or other basis for requiring that cross-elasticity of demand be established via econometric

---

[8]   3M's *Daubert* motion attacks Dr. Reiff's opinions on the relevant *product* markets.  3M does not question his opinions on the relevant geographic market. (*See* Mot. at 8, 10-13.)

[9]   *Merriam-Webster Dictionary, available at* http://www.merriam-webster.com/dictionary/econometrics (last visited Feb. 29, 2012).

analysis. Instead, numerous Courts, including the Supreme Court, the Third Circuit, this Court, and others have found cross-elasticity of demand—and, thus, reasonable interchangeability—where no econometric analysis was offered or contemplated.

**B.    Dr. Reiff's First Relevant Market, NIOSH-Certified Respirators For Use In Oily Environments, Was Appropriately Identified**

In his report, Dr. Reiff opines that one of the relevant markets at the center of this case is the market for NIOSH-certified oil-resistant/oil-proof respirators; *i.e.*, R- and P-series respirators. (Miller Decl., Ex. A ¶¶ 27-35.) 3M argues that Dr. Reiff cannot reliably offer this opinion because he did not perform an "econometric analysis." (Mot. at 12-13.) 3M is wrong.

**1.    One of the textbook methods to determine cross-elasticity of demand/reasonable interchangeability is the SSNIP analysis**

First promulgated in the 1982 U.S. Department of Justice Merger Guidelines,[10] the SSNIP method refers to an economic analysis in which an economist determines reasonable interchangeability—and, thus, defines the relevant antitrust market—by hypothesizing the smallest group of products for which a hypothetical monopolist could *profitably* make a "<u>S</u>mall but <u>S</u>ignificant <u>N</u>ontransitory <u>I</u>ncrease in <u>P</u>rice." Although the hypothesized increase may vary from case to case, economists usually assume a 5% price increase. *See Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1299 (9th Cir. 1993) ("In attempting to determine objectively the effect of a 'small but significant

---

[10]    *See* Gregory Werden, "The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm," 71 Antitrust Law Review, 253-69 (2003).

and nontransitory' increase in price, the Department [of Justice] in most contexts will use a price increase of five percent lasting one year.") (quoting 1984 DOJ Merger Guidelines § 2.11, *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,103, at 20556-57).

In assessing reasonable interchangeability, courts routinely perform—and assess expert testimony that opines on—a SSNIP analysis. *See, e.g., id.*, 986 F.2d at 1299-1303 (defining the relevant market based on a SSNIP analysis and discussing the history of the SSNIP test's use in antitrust case law); *U.S. v. Georgia-Pacific Corp.*, 1996 WL 634212, at *10 (D. Del. July 29, 1996) (analyzing product market by reference to practical shipping considerations and whether such considerations would defeat a SSNIP; concluding that they did not; no econometric analysis offered or required); *U.S. v. Calmar Inc.*, 612 F. Supp. 1298, 1303-05 (D.N.J. 1985) (defining relevant market based on competing expert SSNIP analyses that derived their conclusions from review of the documentary record and consumer surveys, and without econometric analysis). Dr. Reiff performed widely-accepted, textbook SSNIP analyses in forming his expert market definition opinions.[11]

---

[11]  *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908 (6th Cir. 2009), a case upon which 3M relies, precluded an expert's market definition testimony because he used his "own version" of the SSNIP analysis that "ha[d] not been tested; ha[d] not been subjected to peer review and publication; there [we]re no standards controlling it; and there [wa]s no showing that it enjoys general acceptance within the scientific community.  Further, it was produced solely for [the *Kentucky Speedway*] litigation." *Id.* at 918.  As discussed below, such a situation could not be further from the type of analysis Dr. Reiff performed.

2.     **Dr. Reiff's opinion that the relevant market consists of NIOSH-certified R- and P-series respirators is reliable and "fits" the case**

As previously discussed, Dr. Reiff noted that OSHA and NIOSH guidelines require employers to provide R- and/or P-series respirators to employees who work in oily environments. (Miller Decl., Ex. A ¶¶ 9-11.) For such employers, they legally *cannot* provide N-series respirators in oily environments. (*Id.* ¶¶ 9-11, 29) Based on these legal factors, Dr. Reiff noted that a potential relevant product market was *all* R- and P-series respirators. (*Id.* ¶ 27.) This market includes every NIOSH-certified R- and P- respirators in the market, whether made by 3M, purchasers of TransWeb's filter material, or any other market participant. (*Id.*)[12] This definition includes *all* R- and P-series respirators, regardless of the type of filtration media they use, whether fluorinated polymeric web, non-fluorinated polymeric web, or fiberglass. Dr. Reiff's downstream market definition also includes every design category of R- and P-series respirator, including both MFRs and EFRs. (*Id.* ¶¶ 27-35.)

In order to test this market definition hypothesis, Dr. Reiff conducted a SSNIP analysis in which he assumed a 5% SSNIP by a hypothetical monopolist comprising

---

[12]     To the extent 3M claims (at 5, 12) that Dr. Reiff assumes TransWeb's customers only make respirators using TransWeb's media, this is simply incorrect. Dr. Reiff's report extrapolates the share of the downstream market represented by (a) 3M respirators, (b) respirators using TransWeb's fluorinated polymeric media, and (c) all other respirators using non-TransWeb media, which potentially includes respirators from TransWeb's customers. (*Id.* ¶¶ 50-52.) In his deposition, Dr. Reiff reiterated this point. (Palmer Cert., Ex. A at 85:2-91:9.)

every manufacturer of R- and P-series respirators acting in concert. (*Id.* ¶ 28.) The main question Dr. Reiff posed was whether a sufficient number of users would switch to N-series respirators as a result of the SSNIP to make it unprofitable. (*Id.* ¶¶ 28-29.) Based on several pieces of record evidence (including internal 3M market analyses, external 3M marketing materials, and a declaration filed in this case), the statutory framework governing R- and P-series use, and his analysis that R- and P-series respirators are differentiated products, Dr. Reiff concluded that substantial switching to N-series respirators was unlikely, thus defining the outer boundaries of the market at R- and P-series respirators. (*Id.* ¶¶ 29-30.)

In conducting this analysis, Dr. Reiff did note that there were additional differentiating factors that might constitute even narrower segments of the R- and P- market. (*Id.* ¶¶ 31-34.) Indeed, 3M's 30(b)(6) witness on the market, Vaughn Grannis, apparently holds this view. (Palmer Cert., Ex. L ¶ 3.) Nevertheless, Dr. Reiff did *not* conclude the relevant Respirator Market was narrower than all R- and P-respirators. Instead, he defined what he believed was the broadest possible market and analyzed anticompetitive effects within that broad market. (Miller Decl., Ex. A ¶ 35.)[13]

---

[13] Had Dr. Reiff narrowed the market, it is likely that 3M's market power—and its dangerous probability of success in monopolizing the market—would have only been heightened.

This is a classic example of the reasonable interchangeability analysis. 3M has offered no opinions on an alternative downstream market and, despite indications from 3M itself that the market may be narrower, Dr. Reiff defines a much broader market. That is the essence of the reasonable interchangeability analysis the antitrust laws seek. *See Queen City Pizza*, 124 F.3d at 436 (seeking the "outer boundaries of a product market").

### 3.   3M's argument that the law requires an econometric analysis is unsupported and contrary to binding precedent

3M's entire attack on Dr. Reiff's market analysis is that he did not conduct an econometric analysis and therefore, is unreliable. As noted above, the proper standard is reasonable interchangeability, which can be established through multiple methods including the SSNIP analysis performed by Dr. Reiff. 3M's argument that econometric analysis is *required* is simply not supported by the law.

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992), is instructive. In *Fineman*, the Third Circuit upheld a District of New Jersey jury verdict that defined relevant markets for resilient-only floor coverings and video training aids for resilient floor coverings. *Id.* at 199-201. In so holding, the Third Circuit held that the jury was justified in defining these relevant markets based on lay and expert evidence regarding product differentiation, industry perceptions, and general pricing practices. *Id.* The Circuit neither required nor mentioned any econometric analyses in upholding the relevant market definitions. *Id.*

Similarly, in *Med Alert Ambulance, Inc. v. Atl. Health Sys., Inc.*, 2007 WL 2297335 (D.N.J. Aug. 6, 2007) (Greenaway, J.), the Court denied an antitrust defendant's motion for summary judgment because, despite defendant's argument that plaintiff's expert had conducted "no economic analysis" on the relevant market, there existed material facts sufficient to support the existence of the asserted relevant market. *Id.* at *10-11. In his opinion, Judge Greenaway found the defendant's arguments in this regard unpersuasive. Plaintiff's president had offered a declaration on industry practice and recognition of the market, and this declaration was, alone, sufficient evidence to support a determination of the relevant market, and the expert witness was justified in relying upon it. *Id.* No econometric analysis was offered; nor was it needed. *Id.*

The great weight of antitrust precedent supports this view. For example, *Brown Shoe v. U.S.*, 370 U.S. 294 (1962), one of the seminal cases on relevant market definition, stated that courts may examine "practical indicia" when defining a market's boundaries.[14] Similarly, in *U.S. v. Calmar Inc.*, 612 F. Supp. 1298 (D.N.J. 1985), the Court noted that, "[m]any factors have to be taken into account in

_____

[14] "[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325.

measuring the so-called 'cross-elasticity of demand,' for example, industry or consumer recognition of the products as a market, the peculiar uses and characteristics of the products, the kinds of production facilities, sensitivity to price change, specialized users and vendors." *Id.* at 1301.[15]

Courts from other Circuits hold similarly uniform views.[16]  One notable example is *Olin Corp. v. F.T.C.*, 986 F.2d 1295 (9th Cir. 1993).   In *Olin*, the plaintiff—which had been ordered to divest its assets from a merger due to anticompetitive concerns raised by the F.T.C.—argued that the F.T.C.'s cross-elasticity of demand analysis for market definition purposes was faulty because it solely relied on industry participant statements to establish the substitutability between different products.   *Id.* at 1303.   The Ninth Circuit rejected this argument because, after a substantive review of the statements in question, it concluded that they did, in

---

[15]   The cross-elasticity of demand analyses in *Calmar* did not involve any econometric analysis.  Rather, both sides' experts reviewed the documentary evidence and conducted consumer surveys.  *Id.* at 1304.

[16]   *See, e.g., Bacchus Indus., Inc., v. Arvin Indus., Inc.,* 939 F.2d 887 (10th Cir. 1991) (holding that the plaintiff properly defined the relevant market by presenting lay testimony concerning distinctive uses and qualities of product); *Sterling Merchandising, Inc. v. Nestle, S.A.,* 724 F. Supp. 2d 245 (D. Puerto Rico 2010) (noting that an econometric analysis is just one way to define relevant market, and that a "practical, fact-driven approach" that "tak[es] into consideration the economic and commercial realities of a particular industry" may also guide the court's analysis); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 160-61 (D.D.C. 2000) (comparing and contrasting economic expert testimony on relevant market to econometric analysis on the same, opting for neither, and instead relying on lay evidence to define the relevant market).

fact, substantiate the F.T.C.'s assumptions regarding cross-elasticity of demand and, thus, demonstrated the outer boundaries of a relevant market.  *Id.*

3M's argument that detailed econometric studies are required to establish a relevant market relies exclusively on two cases, *Queen City Pizza*, 124 F.3d 430, and *U.S. Horticultural Supply, Inc. v. Scotts Co.*, 2009 WL 89692 (E.D. Pa. Jan. 13, 2009). Neither supports 3M's view that only an econometric analysis can be used to establish reasonable interchangeability for relevant market definition.

In *Queen City Pizza*, the plaintiff franchisees asserted that their franchisor, Domino's Pizza, Inc., had violated the antitrust laws by insisting that the franchisees purchase their pizza ingredients only from Domino's-approved suppliers.  124 F.3d at 433.[17]  In support of this claim, the franchisees alleged that the relevant market was the market for approved suppliers of ingredients and supplies for use in Domino's restaurants.  *Id.* at 437-38.  The district court dismissed the case pursuant to Rule 12(b)(6) on the grounds that the market definition was unreasonably narrow; the Third Circuit affirmed this finding.  *Id.* at 437-441.  In doing so, the Court noted that reasonable interchangeability focuses on "commodities reasonably interchangeable by consumers for the same purposes."  *Id.* at 438.  The plaintiffs could not therefore exclude suppliers of pizza ingredients simply on the basis that they were not

---

[17]  Domino's Pizza, Inc. supplied its franchisees with over 90% of their needed materials.  *Id.* at 433-34.

"Domino's-approved" suppliers. *Id.* at 438-39.  Nowhere in this analysis did the Court state or imply that the only method by which a plaintiff could establish such facts was through an econometric analysis. *See generally id.*

3M's other cite is to an opinion from the Eastern District of Pennsylvania, *U.S. Horticultural*, 2009 WL 89692.  In that case, the plaintiff alleged that the defendant conspired to push plaintiff out of the mid-Atlantic and New England markets for sales to nurseries of a plant chemical called CRF.  *Id.* at *1-9.  The Court found for defendant on summary judgment, specifically noting that there was no evidence of a conspiracy.  *Id.* at *9-15.  After making this finding, the Court then turned to the proposed relevant product market: CRF sold through a specific distribution channel— plant nurseries—to the exclusion of all other channels. *Id.* at *17-18.  In denying this market definition, the Court concluded that the plaintiff's expert had not looked at substitution in the face of price increases or differentiating factors between potential substitute products.  *Id.* at *18-20.  In fact, the plaintiff's expert did not compare defendant's products to other products, and never mentioned price. *Id.* at *19.  The expert in *U.S. Horticultural* used no industry-accepted methods to arrive at his proffered opinion.  2009 WL 89692, at *18-20.

In contrast to the plaintiff's expert in *U.S. Horticultural*, Dr. Reiff reviewed and relied upon internal and public materials that specifically compared the products in his hypothesized relevant markets to *other* products.   Many of these documents

specifically discussed prices and differentiating factors between the products.  (*See,
e.g.*, Palmer Cert., Exs. G, J, M, N.)  Dr. Reiff also conducted a classic economic test
for market definition, the SSNIP.  *See* Section II.B.2., *supra*.

Although the court in *U.S. Horticultural* noted that the plaintiff's expert did not
"perform[] any econometric analysis" (Mot. at 11 (quoting *U.S. Horticultural*, 2009
WL 89692, at *18).), it is clear from the opinion and well-established precedent that
the court was not suggesting that this was the only way to prove reasonable
interchangeability.   A review of the *U.S. Horticultural* opinion makes clear that the
Court was referring to solid *economic* analysis, not statistical methods applied to
economic observations. *See* 2009 WL 89692, at *18-20. The *U.S. Horticultural* court
was not intending to create a sea-change in decades-old precedent including previous,
binding court opinions.  Indeed, the Eastern District of Pennsylvania—from which the
*U.S. Horticultural* opinion hails—has itself found relevant market expert testimony
admissible where it was based solely on general economic evidence and no
econometric analysis. *See, e.g., ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*,
198 F. Supp. 2d 598, 603-05 (E.D. Pa. 2002) (finding expert testimony on relevant
market reliable where it generally analyzed manufacturing costs, economic incentives
for purchase decisions, economic incentives for general pricing models, and product
characteristics).  Furthermore, as the case law cited above indicates, numerous courts,
including the Supreme Court and Third Circuit, have found cross-elasticity of

demand/reasonable interchangeability time and again through analyses that were not econometric in nature at all.

There is simply no hard and fast requirement that an antitrust expert use econometric analysis to establish reasonable interchangeability for purposes of a relevant market. Although it is an accepted field of study, it is not the only permitted method.

## C.    Dr. Reiff's Second Relevant Market, Fluorinated Polymeric Filtration Media, Was Appropriately Identified

The second relevant market Dr. Reiff identifies is the upstream market for fluorinated polymeric filtration media. (Miller Decl., Ex. A ¶¶ 25-26.) As noted in his report, there are only two suppliers of fluorinated polymeric filtration media in the world: 3M and TransWeb. (*Id.* ¶ 25.) Because 3M does not sell, and has never sold, its fluorinated polymeric filtration media to any other manufacturer, TransWeb is the only merchant supplier of this media, and has been the only such supplier for over a decade. (*Id.*) Accordingly, if TransWeb were eliminated from the market (regardless of the market definition), purchasers would have no other source of fluorinated polymeric filtration media. (*Id.*)[18]

Based on his review of the record, Dr. Reiff concluded that fluorinated polymeric web is a unique type of filtration medium and, thus, in a separate market

---

[18]    A corollary conclusion is that only 3M would be able to sell respirators incorporating such filtration media. (*Id.* ¶ 26 n.39.)

from other types of filtration media. (*Id.* ¶¶ 12-13, 25-26, 34.)  Specifically, Dr

Reiff's analysis led him to conclude that (a) respirators with lower pressure drop—

especially significantly lower pressure drop—are desirable for a variety of reasons,

including better breathability and longer service life; (b) the way one can achieve high

filter efficiency and low pressure drop is to use electrostatically charged filtration

media; (c) fluorine on polymeric web media helps preserve electrostatic charge in the

face of an oily environment challenge, allowing a respirator to use less layers of

fluorinated polymeric web than other types of filtration media, thus maintaining low

pressure  drop  while  achieving  high  efficiency;  (d) fiberglass  cannot  be

electrostatically charged, and adding fluorine to fiberglass neither lowers pressure

drop nor improves filtration efficiency; (e) due to its performance characteristics and

electrostatic charge stability, fluorinated polymeric web is especially well-suited for

oily environments; (f) no other filtration media, whether non-fluorinated polymeric

web or any kind of fiberglass, has anywhere near the same performance characteristics

as fluorinated polymeric web; and (g) fluorinated polymeric web respirators are

distinctly priced from respirators incorporating other types of filtration media. (*Id.* ¶¶

12-13, 34-35; Palmer Cert., Ex. A at 25:24-30:11.)

As part of his upstream market analysis, Dr. Reiff analyzed performance

characteristics between fluorinated polymeric web, non-fluorinated polymeric web,

and *all* types of fiberglass. (*Id.* ¶¶ 12-13, 25-26, 34; Palmer Cert., Ex. A at 25:24-

26:8, 26:23-27:2, 43:4-44:6.)  When, in its rebuttal reports, 3M claimed that Dr. Reiff should have also included "fluorinated fiberglass" in his upstream relevant market definition, Dr. Reiff reassessed his previous analysis and, based on further factual inquiries, testified at his deposition that adding fluorine to fiberglass did not impart any of the performance benefits that differentiated fluorinated polymeric web, and thus did not affect his reasonable interchangeability conclusions as to the Filter Medium Market.   (Palmer Cert., Ex. A at 26:18-30:11.)   The 3M "fluorinated fiberglass" respirators have pressure drops almost *3x as high* as fluorinated polymeric web respirators, confirming that fluorine on fiberglass does not, in fact, create comparable filtration media.   (*Id.*, Ex. F at 8 (pressure drops for 3M respirators incorporating media other than fluorinated polymeric web, including the 6092x series of specialty fiberglass respirators, which incorporates "fluorinated fiberglass"); Ex. G (pressure drops for 3M's fluorinated respirators).)[19]

---

[19]   TransWeb conducted an analysis of 3M's fiberglass respirators and identified a similar amount of fluorine on the fiberglass in those respirators as in competitor respirators 3M claims use "fluorinated fiberglass."   (*Compare, e.g.,* Gannon Cert., Ex. B at rows 23, 63, & 74-75, column F (competitor fiberglass respirators' surface fluorine content); *with id.* at rows 68 & 71, column F (3M fiberglass respirators' surface fluorine content).)   In its discovery responses, 3M described the fiberglass respirators TransWeb tested as "non-fluorinated."  (Gannon Cert., Ex. H at 8.)  The fact that a fiberglass respirator may have fluorine on its surface does not mean it is reasonably interchangeable with fluorinated polymeric respirators, particularly in light of the substantially different performance and limited applications of these fluorinated fiberglass respirators.

Dr. Reiff also analyzed the types of filters in which fiberglass media is typically used, and noted that such filters are predominantly specialty cartridges that offer different, additional types of protection than just oily particulate filtration. (*Id.*, Ex. A at 28:12-30:2.)  Accordingly, Dr. Reiff clarified in his deposition that his report's references to "fluorinated filtration media" meant "fluorinated polymeric filtration media," and that he believed his upstream market definition remained accurate. (*Id.* at 24:14-25:20.)[20]

As with the downstream market, Dr. Reiff tested his upstream market definition by conducting a SSNIP analysis.  The hypothetical monopolist in this test was all manufacturers of fluorinated polymeric filtration media; *i.e.*, 3M and TransWeb. (Miller Decl., Ex. A ¶ 26.)  The assumed SSNIP, as before, was five percent.  (*Id.*) The question posed was whether sufficient numbers of fluorinated polymeric filtration media purchasers would switch to other types of filtration media so as to make a SSNIP unprofitable.  (*Id.*)

Dr. Reiff concluded they would not, based on several factors.  First, as noted previously, Dr. Reiff concluded that fluorinated polymeric web's inherent performance characteristics make it a unique product. (*Id.* ¶¶ 12-13, 25-26, 34.)  A

---

[20]   As should be clear, contrary to 3M's assertion (at 4) that Dr. Reiff "changed" his market definition, he, in fact, responded to 3M's rebuttal criticisms by clarifying his terminology and explaining why 3M's rebuttals were unfounded.

Also, as noted in the previous footnote, it appears that 3M's use of the term "fluorinated fiberglass" is neither clear nor consistent.

purchaser faced with a SSNIP would have to consider whether the demand for those performance characteristics was outweighed by the price increase. (*Id.* ¶¶ 25-26, 34.) Second, Dr. Reiff noted that 3M's maximum cost to manufacture R- and P- respirators was █████ of the average sales price. (*Id.* ¶ 26 n.38.) Assuming that the *entirety* of the manufacturing cost was filtration media—itself an extremely conservative assumption—Dr. Reiff noted that a 5% SSNIP would affect the end price of a respirator incorporating fluorinated polymeric filtration media by, at most, █████ (*Id.*) Under these maximized assumptions and his differentiation analysis, Dr. Reiff concluded that a respirator manufacturer would be unlikely to switch as a result of the SSNIP, demonstrating that other types of filtration media are not reasonably interchangeable with fluorinated polymeric web and thus outside the relevant market. (*Id.*)

3M's main criticism of this SSNIP analysis is that it is not "econometric" in nature and that it supposedly establishes a "*per se* rule that if the cost of a component represents █████ or less of the sales price of a finished product, the manufacturer of the finished product will not care if the component manufacturer is charging inflated monopoly prices." (Mot. at 10.) This is a mischaracterization of Dr. Reiff's opinion and misses the point. First, as previously discussed in detail, reasonable interchangeability may be analyzed through innumerable types of evidence, not just econometric analyses. *See* Section II.B.3. *supra.* Second, Dr. Reiff's conclusion is

that fluorinated polymeric web is a *unique* product, and the respirators that incorporate it are differentiated due to that incorporation. If a purchaser has no other choice for a unique input and a 5% SSNIP would only cause a maximum ███ increase in the finished product price that incorporates the unique input, Dr. Reiff's expert opinion is that the SSNIP would not cause purchasers to switch in sufficient numbers to make the increase unprofitable. This is not a "*per se*" rule; it is an analysis that relies on the fact that the demand for fluorinated polymeric media is derived from the demand for differentiated characteristics of fluorinated polymeric respirators in the downstream market. Importantly, *3M does not contend that Dr. Reiff's differentiation analysis is incorrect.* (Mot. at 2-4, 11.) Indeed, 3M could not. Fluorinated polymeric web is 3M's best performing filtration media, period. (Palmer Cert., Ex. N at 3M0081429.)

Empirically, Dr. Reiff's opinion "fits" with the record evidence. For example, internal 3M materials extol the virtues of fluorinated polymeric filtration media over non-fluorinated polymeric web, and note that 3M's Voice of the Customer ("VOC") market surveys indicated that end consumers were willing to pay more for respirators that were more breathable and had longer service life; *i.e.*, the hallmarks of fluorinated polymeric web. (*Id.*, Ex. M at 3M0039729.)

3M's productions also demonstrate that every respirator incorporating non-fluorinated polymeric web or any type of fiberglass (including what TransWeb has determined is "fluorinated fiberglass" under 3M's loose definition) has significantly

higher pressure drop than fluorinated polymeric web respirators. (*Id.*, Ex. F at 8 (listing 3M's "non-fluorinated" respirators' pressure drop); Ex. G (listing 3M's fluorinated respirators' pressure drop).)   Indeed, some "fluorinated fiberglass" respirators—*e.g.*, 3M's 6092x series of respirators—have pressure drops that are nearly *three times* as high as fluorinated polymeric web respirators; *e.g.*, the 2291, 2296, and 2297. (*See id.*)

Third, in its historical dealings with TransWeb, 3M always differentiated between fluorinated and non-fluorinated polymeric web, specifying when it wanted "oil resistant" (fluorinated) web and when it did not. (*See, e.g., id.*, Ex. O.)

Fourth, 3M's sales materials indicated its marketing personnel should advertise the "per shift" costs of fluorinated polymeric web respirators.   (*Id.*, Ex. M at 3M0039736.)[21]   Even employing the 5% SSNIP to 3M's own products—leading to the hypothesized maximum ███ increase in respirator price—3M 's internal materials demonstrate that the fluorinated respirators would *still* ██████████████

---

[21]   Specifically, in an internal marketing presentation regarding 3M's newest line of fluorinated polymeric web respirators—the 2200 series—3M suggests that its sales representatives conduct a "pencil sell" product comparison for their customers. Using the longer service life a customer can expect to achieve with a fluorinated polymeric web respirator, 3M concludes that sales representatives can claim the 2200 series respirators cost less than their non-fluorinated polymeric web counterparts on a "per shift" basis.   Thus, even though the 2200 series costs more as an initial matter, the customer's overall costs would go down due to the fluorinated polymeric web's special characteristics. (*Id.*)

33

████████████████████████████████ thus permitting 3M to continue to market the "lower per shift cost" for fluorinated polymeric web respirators. (*Id.*)

Finally, the parties have long been aware of a real world example of a respirator manufacturer which, when faced with losing TransWeb as a supplier, opted to leave the market rather than substitute to a different filtration media product. That manufacturer, of course, is Safe Life. (TransWeb's Second Amended Complaint ¶¶ 89, 109, 114 (Dkt. 104).)

### III.   DR. REIFF OFFERS RELIABLE OPINIONS ON THE HARM TRANSWEB WILL SUFFER IF 3M SUCCEEDS IN ITS ANTICOMPETITIVE SCHEME, AN OPINION THAT "FITS" THIS CASE

As Dr. Reiff explained in his deposition, he is not offering an opinion on the future lost profits damages TransWeb can collect if and when a jury finds that 3M violated the antitrust laws of the United States. (Palmer Cert., Ex. A at 107:15-108:12.) Instead, Dr. Reiff opined on the sales 3M would preclude if it pushed TransWeb out of the market—itself an indication of competitive harm to TransWeb and its purchasers—and provided a set of future profit estimates from which the jury may derive TransWeb's actual damages when combined with other fact testimony; *e.g.*, Kumar Ogale's testimony that TransWeb has already lost future product development orders from major customers due to this lawsuit. (*Id.* at 108:13- 110:1; Miller Decl., Ex. A ¶ 56.) In this vein, Dr. Reiff explicitly noted that he did not think

TransWeb could collect the full amount of the potential future lost profits he estimated.  (Palmer Cert., Ex. A at 108:1-12-110:1.)

3M's motion completely ignores Dr. Reiff's explanation regarding the scope of his future lost profits opinion.  Indeed, 3M does not criticize Dr. Reiff's technical methodology and, instead, focuses solely on his supposed assumption that TransWeb can collect future lost profits in perpetuity.  Even if this were Dr. Reiff's opinion—which, as demonstrated above, it is not—such an error is not a basis to find an expert opinion unreliable or a bad "fit."  The jury is charged with sifting through facts and awarding proper damages.  So long as the damage estimates are based on reasonable methods, an error in the calculation of the damages end date does not affect the expert opinion's admissibility.  *See, e.g., Aetna Inc. v. Express Scripts, Inc.*, 261 F.R.D. 72, 81-82 (E.D. Pa. 2009) (noting that expert report on future damages was not inherently unreliable or a bad "fit" simply because it estimated contract damages two years beyond the contract's termination date).

With his future lost profits analysis, Dr. Reiff has demonstrated the substantial harm that will occur to TransWeb if 3M succeeds in its anticompetitive scheme.  Regarding damages, he has provided an undisputed analytical backdrop against which the jury may, with the right factual testimony and/or supplemental evidence, determine what portion of future lost profits TransWeb has lost due to this lawsuit.  3M offers no reason why such a backdrop is unreliable or fails to "fit" the facts of this

case. Indeed, a plaintiff is clearly permitted to seek and obtain all future lost profits that directly stem from an attempted monopolization. *See, e.g., Wm. Goldman Theatres, Inc. v. Loew's, Inc.*, 69 F. Supp. 103 (E.D. Pa.), *aff'd*, 164 F.2d 1021 (3d Cir.), *cert. denied*, 334 U.S. 811 (1948) (permitting expert testimony regarding antitrust plaintiff's future lost profits stemming from the alleged antitrust violations); *Int'l Wood Processors v. Power Dry, Inc.*, 593 F. Supp. 710, 723 (D.S.C. 1984) (citing *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 22-25 (5th Cir. 1974)) ("It is well established that an antitrust plaintiff may recover lost future profits.").

## CONCLUSION

For all of the foregoing reasons, TransWeb respectfully requests that the Court

deny 3M's motion to preclude the expert testimony of Bradley N. Reiff.

DATED:  March 5, 2012

/s/ Liza M. Walsh

Liza M. Walsh
Christine I. Gannon
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068-1765
Tel.: (973) 535-0500
Fax: (973) 535-9217

Harold A. Barza
(admitted *pro hac vice*)
Michael A. Williams
(admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel.: (213) 443-3000
Fax: (213) 443-3100

*Attorneys for Plaintiff*
*TransWeb, LLC*