FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| TRANSWEB, LLC, | : | Hon. Faith S. Hochberg, U.S.D.J. |
| | : | |
| Plaintiff, | : | Civil Case No. 10-4413 |
| | : | (FSH) (JBC) |
| v. | : | |
| | : | **OPINION** |
| 3M INNOVATIVE PROPERTIES COMPANY | : | |
| and 3M COMPANY, | : | Date: April 21, 2014 |
| | : | |
| Defendants. | : | |
| | : | |

**HOCHBERG, District Judge:**

**I.     BACKGROUND**

Just breathing in a dirty or contaminated area can cause serious injury. Industrial respirators are designed to protect workers in these environments. This dispute revolves around the filtration membrane used in industrial respirators. OSHA (Occupational Safety and Health Administration) regulations govern the type and quality of these respirators, which are rated and approved by NIOSH (the National Institute for Occupational Safety and Health, a division of the Centers for Disease Control).

Both 3M and a small, new company called TransWeb LLC ("TransWeb") independently developed filtration web for use in these NIOSH-approved respirators. At issue in this case is whether 3M's patents on the filtration media are valid and infringed by TransWeb, and whether

3M violated the antitrust laws. 3M sought solely to enjoin TransWeb, and TransWeb sought damages (primarily in the amount of its attorneys' fees) and to invalidate the 3M patents.

A.     Procedural History

TransWeb filed this action on August 27, 2010, against 3M Company and 3M Innovating Properties Company (collectively, "3M"), seeking a declaratory judgment of invalidity as to claims in the family of 3M patents, unenforceability of those patents due to inequitable conduct in the prosecution of those patents, and non-infringement by TransWeb. 3M counterclaimed for patent infringement.[1]  3M is the assignee of the two patents-in-suit: U.S. Patent Nos. 6,397,458 ("the '458 patent") and 6,808,551 ("the '551 patent"). The inventors on those patents are 3M employees, and a 3M in-house lawyer prosecuted the patents.

TransWeb filed an amended complaint stating antitrust claims of *Walker Process* fraud and sham litigation. (It had also claimed that 3M infringed a TransWeb patent, but TransWeb voluntarily dismissed its claims of infringement of its patent, and 3M voluntarily dismissed its counterclaims pertaining to those patents.).

Two days before the jury trial, 3M voluntarily dismissed fifty-six of its fifty-eight patent infringement claims of the '458 patent and all patent infringement claims of the '551 patent. Only two of 3M's claims in a single patent—the '458 patent—were litigated to a jury, together with TransWeb's antitrust and patent claims. 3M contended that TransWeb willfully infringed those claims.

---

[1]     3M had originally sued TransWeb in the District of Minnesota, but voluntarily dismissed without prejudice after a hearing was conducted regarding whether TransWeb was subject to personal jurisdiction. TransWeb then filed this action.

B.      The Product and Method

At issue in this case is the method for making filtration media—specifically, plasma

fluorinated, nonwoven meltblown polypropylene electret web. That material can be used in

numerous filtration applications, but for the purposes of this case, the most important use of a

fluorinated electret was for respirators that workers must wear in oily environments.

In 1995, NIOSH began developing new regulations for oil-proof and oil-resistant

respirators. (11/16/2012 Tr. at 4.17:5-18:6, 4.102:4-103:15; 11/14/2012 Tr. at 2A.77:15-21.)  3M

first responded with a technology for making filter material using a fluorochemical melt-additive

called PFOS, (*id.*), meaning that fluorine atoms were actually integrated into the melted material

(*see* PTX-28.6.).  3M received a patent on this process in 1995, and its employees Marvin Jones

and Alan Rousseau were the inventors. (11/16/2012 Tr. at 4.17:8-12, 4.19:2-11; PTX-379.) But

in 1998, 3M informed the EPA that there was an environmental problem with PFOS, and in

2000, 3M abandoned PFOS in its products. It was replaced with the melt-additive filtration

process, the process that is the subject of this dispute. (*See* 11/16/2012 Tr. at 4.102:8-103:18.)

According to 3M, Jones had successfully "hydrocharged" plasma fluorinated meltblown

polypropylene for the first time in August 1995. (11/19/2012 Tr. at 5A.125:19-23; PTX-

1143.238-39.) "Hydrocharging" was a 3M patented process invented by Hassan Angadjivand

and claimed in U.S. Patent No. 5,496,507 that issued on March 5, 1996 (the "Angadjivand

patent"). (DTX-672.) The Angadjivand patent teaches, *inter alia*, "impinging jets of water or a

stream of water droplets onto the web at a pressure sufficient to provide the filtration-enhancing

electret charge." (*Id.*; *see also* Markman Order at 2, ECF No. 215 ("'hydrocharging' means

'contacting an article with water in a manner sufficient to impart a charge to the article, followed

by drying the article'").) Jones and his colleague, Christopher Lyons, continued to experiment

with the hydrocharging process, and eventually achieved a significant increase in the "quality factor"[2] of the material. However, 3M did not initially apply for a patent on the Jones process, to Jones's "chagrin." (11/16/2012 Tr. at 4.12:10-20.)

Eventually, 3M did apply for the patents-in-suit, but not until 1998. (The surrounding saga is told below.) The patents-in-suit claim the method of making an electret article by transferring fluorine to the article from a gaseous phase (the '458 patent), and the method of using fluorinated electrets (the '551 patent). The filtration material—nonwoven, meltblown polypropylene—is made by melting polypropylene[3] pellets in an extruder and blowing the molten polymer through a die, which creates a nonwoven web. (PTX-28.7; 11/14/2012 Tr. at 2A.63:19-64:5.) That material is then charged to create an electret, which improves filtration capacity. (PTX-28.7.) Fluorine atoms are applied to the surface of the web, allowing the filter material to retain its electret in oily environments. (*Id.*)

C.    TransWeb's Formation and Patent Applications

In this case, TransWeb asserted that it produced products for public sale using this process over a year before 3M applied for its patents. In 1996, TransWeb was formed to create specialty products for the air filtration market, including fluorinated polymeric nonwoven web. (11/14/2012 Tr. at 2A.40:16-41:5.) On April 30, 1997, Kumar Ogale, a founder of TransWeb, filed a patent application (the '348 application) for an "improved electrostatic filter medium

---

[2]    "Quality factor" is a ratio that relates the pressure drop, which is a measure of the amount of force required for air to pass through the filter, to the effectiveness of the material at removing particles from the air that passes through it. In other words, it balances how well the material filters with how hard a person using the respirator has to breathe through the material. (*See*, *e.g.*, PTX-28.7 (the '551 patent).)

[3]    Polypropylene is a polymer, meaning a long repeating chain of carbon and hydrogen. (11/14/2012 Tr. at 2A.37:19-22.)

4

including a web of electret fibers which have been treated with fluorine-containing plasma prior to being electrically charged" and "a method of producing non-woven webs which have been treated with fluorine-containing plasma prior to electrostatically charging the web." (PTX-96.6.) That application was rejected in 1998 on the ground that prior art references in the application were already well known to the public, and therefore it would be obvious to a person of ordinary skill in the art to apply fluorine to the filter by plasma treatment. (*See*, *e.g.*, 11/14/2012 Tr. at 2A.74:8-25.) Ogale and his attorney submitted amendments to the application to the Patent Office, but the examiner issued a Final Rejection on July 9, 1998, because the claims were "unpatentable [under 35 U.S.C. § 103(a)] over the prior art . . . ." (PTX-96.66.) Ogale subsequently abandoned that application. (11/14/2012 Tr. at 2A.74:8-25.)

Ogale later discovered that if he rinsed the fluorinated meltblown polypropylene, it would improve and/or stabilize the electret of the filter material. (PTX-101.) He again applied for a patent, on May 25, 2000, and this time was successful: U.S. Patent No. 6,419,871 (the "'871 patent") issued on July 16, 2002. (*Id.*)

D.     Trial

Trial commenced on November 13, 2012, on TransWeb's antitrust and patent declaratory judgment claims, and 3M's patent infringement counterclaims. At the close of TransWeb's case, 3M moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 on the claims of invalidity, infringement and willfulness, inequitable conduct, and antitrust violations. The Court reserved on those motions.

At the conclusion of the trial, the jury returned a verdict in TransWeb's favor on all but one count, finding that the 3M patent claims asserted were invalid as obvious; that 3M engaged in *Walker Process* fraud in securing and asserting its patents; and that TransWeb did not infringe

5

3M's patent. Additionally, the jury found that 3M did not commit an antitrust violation by engaging in sham litigation in pursuing its claims against TransWeb. The jury also returned a unanimous advisory verdict of inequitable conduct by 3M,[4] although the Court had instructed the jury that it would accept a non-unanimous verdict on that count. The jury found that TransWeb was entitled to damages in the amount of $34,412 in lost profits plus its attorneys' fees in defending the patent infringement claims, which the jury found were damages attributable to 3M's antitrust violations.

       3M then renewed its motions for judgment as a matter of law, and the Court instructed the parties to brief those issues, as well as the inequitable conduct claim, which is for this Court to decide. The Court held a post-trial hearing on January 10, 2013. Issues relating to the damages calculation were submitted to a Special Master, who held extensive hearings during 2013. The Special Master submitted a report and recommendation to this Court on September 24, 2013. This Court then scheduled briefing on objections to the report and recommendation. This Opinion resolves the outstanding post-trial motions; sets forth the Court's findings of facts and conclusions of law with respect to the claim of inequitable conduct; and resolves the objections to the report of the Special Master on damages.

---

[4]    Inequitable conduct was submitted to the jury on an advisory basis at 3M's request.

## II.        STANDARD ON A MOTION FOR JUDGMENT AS A MATTER OF LAW

A motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find" for the nonmovant.[5] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *Mandile v. Clark Material Handling Co.*, 131 F. App'x 836, 838 (3d Cir. 2005).

In making this determination, "the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube*, 4 F.3d at 1166 (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir. 1992)).

"The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube*, 4 F.3d at 1166 (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

---

[5]     Rule 50 provides that, after a party has been heard on an issue at a jury trial, the court may order judgment as a matter of law if it finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue. Fed. R. Civ. P. 50(a). Rule 50(b) involves renewing the motion after trial. In pertinent part, Rule 50(b) provides that: "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).

## III.    JUDGMENT AS A MATTER OF LAW AS TO INVALIDITY-OBVIOUSNESS

3M contends that TransWeb produced insufficient evidence upon which a reasonable jury could find that claims 31 and 57 of the '458 patent were invalid as obvious. The invalidity contention that was submitted to the jury was whether the '458 claims were obvious in light of the purported Ogale prior art product in combination with the Angadjivand patent. The Court will consider 3M's arguments on that issue first, because it bears on a materiality prong of the inequitable conduct allegations.[6]

As the Court instructed the jury, TransWeb had the burden of proving invalidity of the '458 patent by clear and convincing evidence. (Final Jury Instructions at F-7.) *See also* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Limited P'ship*, 131 S. Ct. 2238, 2243 (2011). 3M argues that there was insufficient evidence from which a reasonable jury could conclude that the TransWeb product samples were prior art or that the subject matter of the '458 claims would have been obvious at the time of invention to a person of ordinary skill in the art. *See* 35 U.S.C. §§ 102, 103.

The primary claimed prior art in this case consists of samples of a TransWeb product called T-Melt P, which Ogale testified that he distributed at the 1997 American Filtration & Separations Society Annual Technical Conference and Expo in Minneapolis (the "Minneapolis Expo"). The Expo took place from April 29 to May 2, 1997. (PTX-341; PTX-460.) 3M was a major participant in the Expo, which took place in its hometown, and many 3M employees

---

[6]    *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) ("Often the patentability of a claim will be congruent with the validity determination—if a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO.").

attended it. (*See* PTX-461.22; 11/16/2012 Tr. at 4.34:25-4.35:7.) Ogale testified that he handed

out samples of the oil-resistant product and data sheets explaining the filtration properties of the

product, including the amount of penetration of the particles and the pressure drop, to visitors to

the TransWeb booth at the Minneapolis Expo. (11/14/2012 Tr. at 2A.80:3-88:8.)

A.     Public Use

To qualify as prior art pursuant to 35 U.S.C. § 102(b), TransWeb had the burden to prove

by clear and convincing evidence that the invention was "in public use or on sale in this country,

more than one year prior to the date of the application for patent in the United States." In this

case, the '458 patent has an effective filing date of July 2, 1998. (PTX-1314.3.) Therefore, if the

jury could conclude that Ogale distributed the T-Melt P samples at the Minneapolis Expo, and/or

that he offered them for sale before July 2, 1997, then TransWeb's product would be prior art

and the jury's verdict of invalidity rested on ample evidence.

3M contends first that the only evidence that TransWeb displayed and distributed the

samples at the Expo is Ogale's testimony. A party must offer more than uncorroborated

testimony to carry its burden in invalidating a patent. *See*, *e.g.*, *Finnigan Corp. v. Int'l Trade

Comm'n*, 180 F.3d 1354, 1366-67 (Fed. Cir. 1999) (holding that a witness's testimony of an

invalidating public use must be corroborated to satisfy the interested party's burden of proving

invalidity by clear and convincing evidence). At oral argument on the issue, 3M further

contended that TransWeb was obligated to introduce at trial corroborating evidence in the form

of corroborating *witness testimony*, and that corroborating documentary evidence was

insufficient as a matter of law. Thus, 3M argues, TransWeb was required to put another person

on the stand who remembered seeing Ogale distributing those samples at the Expo over 15 years

after the Expo ended.

3M controlled the passage of time, and the corresponding diminution of percipient-witness memories by waiting many years before initiating suit.[7] Moreover, the Court finds no support in the law for a requirement that the corroborating evidence be solely a percipient eyewitness rather than another equally valid form of documentary evidence. Notably, 3M provided no cases to support this proposition of law.

Either direct or circumstantial evidence corroborating public use may be sufficient for a party to meet its burden of proof. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001). The role of circumstantial evidence is particularly important where so much time has elapsed between the key events and the suit. Oral testimony is "more suspect" than contemporaneous documentary evidence, "as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate." *Id.* at 1351. Instead, "each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." *Id.* at 1350.

---

[7]     The delay in bringing suit here was caused by 3M's decision not to allege infringement for at least eight years. Prior to trial, 3M claimed that it could not have known whether TransWeb's processes and products infringed its patents because "TransWeb successfully concealed its infringement for years." (3M's Trial Br. 5, ECF No. 433.) The evidence does not support that argument. The evidence shows that 3M specifically sought out TransWeb's products at the Expo (PTX-341, PTX-145, PTX-1336) and years later tested those materials repeatedly (PTX-605, PTX-1336) and even questioned Ogale in multiple meetings about his process and when he had reduced it to practice. (11/14/2012 P.M. Tr. at 60:18-61:11.) Moreover, Hanson, 3M's employee, admitted that he had reviewed TransWeb's '871 patent as soon as it issued in 2002. (11/20/2012 Tr. at 6.9:3-24.) In this litigation, 3M contended that by practicing that '871 patent, TransWeb infringed claims 31 and 57 of the '458 patent. In short, 3M was well aware of TransWeb's alleged infringement by at least 2002. This lawsuit began only after two failed attempts by 3M to purchase TransWeb. (11/14/2012 P.M. Tr. at 61:16-62:19 (2000 attempt); PTX-269 (2008 attempt).)

10

Where there is corroboration of an interested witness's testimony, the "case questions the sufficiency of the evidence," rather than "the necessity of corroboration," and is therefore appropriately a jury question analyzed under the "rule of reason" test. *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371-72 (Fed. Cir. 2007). Here, there was corroborating evidence, as well as Ogale's testimony, upon which a reasonable jury could rely in reaching its verdict. Specifically, there was evidence sufficient for a reasonable jury to conclude that Ogale in fact distributed T-Melt 30P at the Minneapolis Expo in May 1997 and that the product that Ogale distributed at the May 1997 Minneapolis Expo qualified as prior art to 3M's July 1998 patent application.

First, the brochure for the Minneapolis Expo stated that TransWeb would display "T-Melt - Melt blown nonwovens polypropylene" (PTX-460.3), as Ogale testified. (11/14/2012 A.M. Tr. at 80:3-5). Second, 3M's own emails detail how two 3M employees, Mssrs. Sundet and Christensen, were instructed to make contact with TransWeb at the Expo and discuss their "T-Melt" product. (PTX-341.) After the Expo, Christensen stated that he and Sundet had picked up samples of the T-Melt product, which would be shipped to 3M, and included the price range for the T-Melt material. (PTX-46.2.) Based on 3M's own documents, it can scarcely be ingenuously claimed there is no corroboration for TransWeb's assertion that Ogale handed out samples of the product at the Expo.

Third, Ogale's patent application describing the T-Melt P product was filed during the Expo. (PTX-96.) That application described the process that TransWeb attempted to patent, which produced the prior art that Ogale testified he distributed. Fourth, TransWeb introduced evidence consisting of correspondence between itself and a company called Fourth State, to which TransWeb initially outsourced its fluorination, setting the fluorination conditions for the

creation of the oil-resistant product distributed at the Expo. (PTX-84; PTX-86.) Fifth, TransWeb introduced documentary evidence that it was providing samples of the same material to potential customers, including Juergen Binzer, MSA, Filtration Group, and Racal. (PTX-1345; *see also* 11/14/2012 A.M. Tr. at 79:8-16, 89:16-92:2; PTX-82.19 (documenting sending of samples to MSA and Racal); PTX-441 (letter from MSA returning samples); PTX-102 (letter to Filtration Group); PTX-75 (shipping documents reflecting shipping of samples from TransWeb to Racal on May 8, 1997)). Sixth, a letter from TransWeb to the Louis M. Gerson Co. on July 1, 1997— shortly after the Minneapolis Expo—demonstrates that TransWeb was prepared to provide the prior art product to a purchaser around the time of the Expo (and before the 3M priority date). (PTX-61.)

Finally, TransWeb introduced a physical exhibit that the jury could reasonably find was a set of the actual sheets of the TransWeb T-Melt 30P product with a data sheet describing its performance. (PTX-1338.) That exhibit was found in the files of 3M employee Pierre Legare. (PTX-1353.) Just a few months before trial, when it first appeared on the proposed exhibit list for 3M, it had been identified by 3M's outside counsel only as "a physical sample comprised of four sheets of material" (*id.*), with no description connecting it to TransWeb nor identifying it by name, nor when or how it came into the possession of Legare and 3M. As the intense dispute over this piece of evidence emerged at the trial, it became clear that this identification of the evidence may have been deliberately opaque, which set in motion a drama (outside the presence of the jury).

Shortly before the Final Pretrial Conference, 3M disclosed for the first time that the Exhibit, PTX-1338, was a "TMelt 30P Sample." In other words, it was TransWeb's precise product and was key evidence—perhaps even "killer" evidence—of what TransWeb contended

was invalidating prior art. (*Id.*) Thus, the date when Legare or 3M obtained PTX-1338 was a fact of no minor importance. That sample—from 3M's own files—exactly matched Ogale's description of the samples that he distributed at the May 1997 Minneapolis Expo, which would show public use and distribution more than one year before 3M's July 1998 effective filing date for its patent. (11/14/2012 Tr. at 2A.83:25-84:16.) By contrast, Defendants claim that the PTX-1338 sample was received under a confidentiality agreement on June 2, 1997 when Ogale visited Racal (where Legare then worked).  Thus, Defendants argue that PTX-1338 was not publically distributed at the Minneapolis Expo in May 1997; that it was instead received by Legare under a confidentiality agreement and then sent to 3M for testing; and that it is thus not evidence of public distribution more than one year before the July 2, 1998 effective filing date of 3M's patent.

But the sample that TransWeb provided to Legare had been sent to Jones at 3M for oily testing.  Jones testified that he did conduct a test on the sample that Legare had sent him—which required putting drops of oil on the sample. (11/19/2012 Tr. at 5A.63:15-20.)  If Defendants' theory about the manner and date of receipt of PTX-1338 were true, then the samples would be soiled by the oily testing. PTX-1338, however, are sheets in pristine condition. This evidence also supports the jury verdict and indicates that PTX-1338 was a sample distributed at the Expo in May 1997 and taken back to 3M, and that it was not the sample delivered to Legare at the June 1997 meeting. Based on the condition of PTX-1338, the jury could well have found that this sample packet was either picked up at the Expo or mailed to Legare immediately at the conclusion of the Minneapolis Expo—cut from the same material that Ogale testified that he took to the Expo (11/14/2012 Tr. at 2A.84:22-85:17, 2A.95:13-16, 2A.96:9-97:10)—or that

13

PTX-1338 was picked up by Legare's coworker, Suresh Kalatoor, who attended the Expo, where Ogale was handing out these samples in this identical type of packaging. (PTX-461.22.)

In short, "this is not a case where one person makes a naked, unsupported assertion years after the fact that he made an invention before a patentee." *Adenta*, 501 F.3d at 1371. Here, Ogale's testimony was "accompanied by various supportive and consistent documents," which, viewed in light of the amount of time that has elapsed since the events, "provided a coherent and convincing story." *Id.* That corroboration is sufficient to guard against the possibility of "fraud, by providing independent confirmation of the inventor's testimony." *Kridl v. McCormick*, 105 F.3d 1446, 1450 (Fed. Cir. 1997).

B.      Whether the Method Can Be Determined

For the Expo samples to qualify as prior art against 3M's patented method, a person of ordinary skill in the art must be able to determine TransWeb's method from analyzing these samples. *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (holding that, to be prior art against the method claimed in a patent, sales of a physical product require "evidence[] that the public could learn the claimed process by examining the [physical product]"). Here, there was sufficient evidence upon which the jury could rely in reaching that conclusion.

Significantly, there was sufficient evidence from which the jury could have well inferred that 3M's employees *did in fact* determine TransWeb's method from analyzing these (or nearly identical) samples. In a report dated December 2, 1998, 3M's analysis of the TransWeb product revealed that the T-Melt 30P material was "a non-woven web"; that the surface of that web contained between 51% and 47% atomic fluorine; and that the web exhibited a carbon spectra comprising "several ove[r]lapping peaks indicative of the multiple states formed by exposure to

a high energy plasma or corona type treatment." (PTX-29.6-7.) Relying on that report, 3M's later

Supplemental Information Disclosure Statement to the PTO stated about the T-Melt 30P product

that it was a nonwoven, polymeric filtration web that was surface fluorinated with a CF3:CF2

ratio of at least 0.45, and possibly greater than 0.9, a quality factor between 0.13 and 0.62, and a

basis weight of 30 g/m$^2$. (PTX-29.1.)

 Other documents and testimony from 3M employees confirm that the method could be

readily determined from the samples. For instance, Legare wrote in an email to Jones that the

Racal samples were "samples of 30g and 50g charged web from TransWeb" that were "corona

charged polypro BMF with fluoropolymer treatment." (PTX-47.) Similarly, in his email to

Ogale, Kurtzahn, the 3M Procurement Manager, stated that none of the samples "we are

receiving from you is confidential," and that if 3M "wished to duplicate your product or litigate,

we would not have to request samples from you," because 3M could "obtain the product in the

marketplace." (PTX-26.)

The TransWeb's expert Dr. Edward Funk also testified that one of ordinary skill in the art

could determine how TransWeb made its samples by examining and feeling the samples and

running Electron Spectroscopy for Chemical Analysis tests to determine fluorination, and DOP

penetration tests before and after exposing the material to radiation to determine the charge.

(11/20/2012 Tr. at 207:9-23; 207:24-208:3; 209:4-210:6; 210:12-211:1.) The jury was entitled to

give this testimony weight in rendering its verdict.

The Court will therefore deny 3M's Motion for Judgment as a Matter of Law on the

above-described grounds.

## IV.    INEQUITABLE CONDUCT

Inequitable conduct is the "atomic bomb" of patent litigation, because it renders an entire patent—and in this case an entire patent family—unenforceable. *Therasense, Inc. v Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (quoting *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d 1334, 1349 (Fed. Cir. 2008) (Rader, J., dissenting)). The Federal Circuit has expressed its concern at the large number of cases in which defendants allege inequitable conduct by the patentee, commenting that it "has plagued not only the courts but also the entire patent system," by nearly requiring cautious patent prosecutors to "bury PTO examiners with a deluge of prior art references." *Therasense*, 649 F.3d at 1289. This Court has long shared the Federal Circuit's concern. *See, e.g.*, *Fuji Photo Film Co. Ltd. v. Jazz Photo Corp. Inc.*, 173 F. Supp. 2d 268, 276 (D.N.J. 2001) (concluding that there is "no clear and convincing evidence of inequitable conduct" and granting summary judgment); *Teva Women's Health, Inc. v. Lupin, Ltd.*, Civ. No. 10-80, 2010 WL 4392503, at *1 (D.N.J. Oct. 27, 2010) (dismissing claims for inequitable conduct).

The PTO imposes on practitioners who apply for patents a duty to disclose information material to patentability. 37 C.F.R. § 1.56. The duty applies to "[e]ach individual associated with the filing and prosecution of a patent application," *id.*, and expressly to "each inventor named in the application" and "each attorney or agent who prepares or prosecutes the application," as well as "every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." *Id.* at 1.56(c). The PTO depends on their honest and forthcoming disclosure of material prior art references of which they are aware

because "the most effective patent examination," requires the Examiner to be "aware of and evaluate[] the teachings of all information material to patentability." *Id.*

*Therasense* sets a very high bar for the accused infringer who seeks to defend on this ground: "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290.

A.    Materiality

In *Therasense*, the Federal Circuit held that, except in cases of "egregious misconduct," the accused infringer must show "but-for materiality," meaning that "the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense*, 649 F.3d at 1291-92 (rejecting the "low bar for materiality" set in PTO Rule 56.)

In this case, the materiality of the TransWeb prior art is clear. When it was disclosed to the examiner, the examiner rejected the claims in 3M's patent application as obvious based on TransWeb's prior art combined with the Angadjivand patent—the same conclusion reached by the jury. (PTX-21.4 ("Consequently, it would have been readily obvious to one having ordinary skill in the art to employ the above-noted expedients in the TW filter web in order to facilitate the removal of undesirable contaminants as taught by Angadjivand et al ('507).").)[8] To reverse the PTO's rejection, 3M argued to the Examiner that the TransWeb prior art was *only* available under a confidentiality agreement (PTX-22). The Examiner then withdrew the rejection of the claims based on that representation alone. (PTX-1312.321 ("In light of applicants' arguments filed on May 14, 2001, the rejection of all the pending claims 2-7, 21, 22, 45, and 52-59 as

---

[8]    In fact, 3M's brief does not appear to challenge the but-for materiality of the Expo samples, assuming they are prior art. Instead, 3M contends that they are not qualifying prior art as a matter of law. For the reasons set forth above, that is not correct.

applied in paragraph 4 on page 3 of the last Office action (Paper No. 27) dated January 29, 2001 [PTX-21.4] has been withdrawn.").) The prior art, if public, would invalidate the claims asserted, as the jury found. *See Therasense*, 649 F.3d at 1292 ("[I]f a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires . . . a higher evidentiary burden than that used in prosecution at the PTO.").

In sum, 3M's in-house counsel and inventor employees told the Examiner *only* about the Racal samples: these samples, they argued, were covered by a confidentiality agreement.[9] 3M's disclosure completely ignored the earlier Minneapolis Expo samples that Ogale had publicly distributed at the Expo, under 3M's careful, pre-planned focus at that Expo, as the facts adduced at trial showed beyond peradventure.

The Court now turns to the issues of knowledge and intent.[10]

B.    Knowledge/Intent

As stated above, *Therasense* sets a heavy burden to prove knowledge and intent. In addition to clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it, there must also be proof that the patentee acted with specific intent to deceive the PTO. 649 F.3d at 1290 (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* (citing *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*, 559

---

[9]    In fact, even these samples were sent to Racal without a confidentiality agreement in place, and only later was a confidentiality agreement entered into between TransWeb and Racal.

[10]    "Intent and materiality are separate requirements." *Therasense*, 649 F.3d at 1290 (rejecting the "sliding scale" for intent and materiality that prevailed previously).

F.3d 1317, 1340 (Fed. Cir. 2009)). However, specific intent to deceive "must be the 'single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star*, 537 F.3d at 1366.) Accordingly, "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* (citing *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008).)

Here, TransWeb alleges that Jones, a 3M inventor, and Hanson, a 3M in-house patent prosecutor, engaged in inequitable conduct during the prosecution of the application that became the '458 and '551 patents. Both owed duties of candor to the PTO under the express language of PTO Rule 56. The question is whether they knowingly and deliberately withheld the reference to the Expo samples (and only disclosed the purportedly confidential Racal samples) with specific intent to deceive the PTO and thereby reverse the rejection of the patent based on these samples. If so, is specific intent to deceive the single most reasonable inference to be drawn from the evidence?

The evidence established that 3M inventors and employees, including Jones and Rousseau, were well aware of TransWeb and its products prior to and during the Minneapolis Expo. As stated above, the evidence showed that high-level 3M employees, acting pursuant to an advance plan, targeted the TransWeb booth at the Expo. The day the Expo began, Colleen Nagel, Jones's and Rousseau's supervisor, sent an email to Jones and Rousseau, reminding them again about her interest in TransWeb's product, because attached to it she re-sent them an email she had earlier sent, which reprinted a TransWeb press release from the April 1997 edition of the trade magazine *Nonwovens Industry*. (PTX-341.) The re-sent email, entitled "Transweb," noted TransWeb's new "electret fiber nonwoven line" producing the "T-Melt" product, targeting, among other things, the respirator market. (*Id.* at 341.2.) The email also essentially instructed

Jones and others that, in order to avoid too many 3M employees from engaging in conversation with TransWeb, lest it overtly show too much interest in TransWeb, the oral contacts between 3M and TransWeb would be Doug Sundet and Curt Christensen, who were designated the 3M "point people in [3M's] discussions with Transweb." (*Id.*) The email asked Jones and Rousseau, and the other recipients, to let Sundet and Christensen know if they would like information from TransWeb, including samples of TransWeb material. (*Id.*) The implication of the email is clear: 3M was highly interested in TransWeb's products. "Look, but don't engage in conversation," was the clear message to Jones and Rousseau; the talking would be done by Sundet and Christensen to avoid too many 3M employees showing TransWeb how interested they were in what it was distributing.

Jones did in fact attend the Expo, as did numerous other 3M employees (PTX-461.22), and his testimony about the Expo is revealing, especially in the context of the repeated emails from his boss, who was very interested in TransWeb. He recalled with impressive detail certain aspects of the Expo—for instance, describing a company producing meltblown material in the exhibition hall of the Expo, and recounting his interest in a company called TetraTech, which had a booth right next to TransWeb's booth at the Expo, and which also made oil-resistant filter material. (PTX-460; 11/16/2012 Tr. at 4.47:21-4.52:7.) Yet Jones professed not to remember any details about whether he visited or even saw the TransWeb booth, and changed his explanation of whether he even went to the floor of the Expo, where vendors like TransWeb were located.[11]

---

[11] At one point, Jones stated clearly "I was not in the expo area." (11/16/2012 Tr. at 4.50:6.) Merely two questions later, when TransWeb's counsel asked him to confirm that he had not walked by TransWeb's booth in the expo area, he responded, "No, that's not what I testified. I have no idea . . . . I cannot say that it's impossible." (*Id.* at 4.50:12-14.) Later, he wavered repeatedly about whether he had visited the TetraTech booth immediately adjacent to the TransWeb booth. He indicated he "was more interested" in TetraTech than TransWeb (*id.* at

(*See* 11/16/2012 Tr. at 4.47:21-4.52:7.) His testimony about his experience at the Expo (and other areas of his testimony) was simply not credible, particularly in light of the emails, exhibits, and his hostile, evasive, and sometimes flippant or arrogant demeanor. In short, his demeanor was one of a witness trying to distance himself from any knowledge of TransWeb's presence and activities at the Expo. While his boss said to him, in essence, "look, watch, figure out what you want from his booth, but don't chat directly because Sundet and Christensen are doing that." He pretended that he barely knew, or perhaps didn't even know, that TransWeb was there. In short, his testimony was not credible, and at times was hard to watch.[12]

Shortly after the Expo, on May 27, 1997, Jones's boss, Colleen Nagel, again sent Jones an email about TransWeb,[13] this time writing "fyi relevant to your transweb meeting."[14] (PTX-46.1.) The email she forwarded with that message was an update from Christensen, 3M's "point

---

4.48:23-24), but that he "doubt[ed]" he went to the TetraTech booth (*id.* at 4.49:3), and then later that he was certain he would not have been interested in any oil-resistant material at the TransWeb booth because "they had [oil-resistant media] at the adjoining booth"—the TetraTech booth—in which he was more interested (*id.* at 4.49:23-4:51-1.). Moreover, at trial, Jones was confronted with multiple brochures distributed by exhibitors at the Expo, which were produced to TransWeb from his files shortly before trial began. (*Id.* at 4.42:6-4.46:17.) He could not explain how he received the brochures. (*Id.*)

[12]   Trial Counsel was not to blame for any of this; they did the best they could with a very difficult witness who was called by the other side early in the case.

[13]   Attempting to explain his inability to recall Nagel's emails about TransWeb, Jones stated that he would only have read an email from his manager "[i]f I saw it," and that he was "not a hundred percent reliable" when it came to reading email from his boss. (11/16/2012 Tr. at 4.60:1-6.)

[14]   The evidence shows that during this time period, Ogale and other TransWeb employees were making sales calls to potential purchasers of T-Melt P materials. For instance, during this time period, Ogale visited Legare at Racal, and at some time provided samples of the T-Melt P material. (*See generally* 11/26/2012 P.M. Tr. at 134:20-135:9.)

person" for TransWeb, recounting what he had learned from TransWeb at the Expo, including

that TransWeb's "Meltblown and Electret (fibrillated PP) production lines are up and running

essentially on schedule." (PTX-46.2.) Christensen's email also stated that he and Sundet had

picked up samples of TransWeb's material at the Expo, and that additional material was being

shipped to 3M, and even included price ranges for the material. (*Id.*) Jones professed to have no

recollection of any meeting with TransWeb.[15]

TransWeb again came to the attention of Jones and Rousseau during the summer of 1998.

3M had purchased Racal in March 1998, and Legare and Suresh Kalatoor of Racal were by then

3M employees. Legare and Kalatoor visited Minneapolis and attended a barbeque with Jones at

Rousseau's house. (11/27/2012 Tr. at 8A.31:17-32:12.) While he was there, Legare told Jones

and Rousseau that he had received samples of TransWeb oil-resistant product for respirators,

and, according to Legare, they responded: "That's interesting." (*Id.* at 8A.33:22-35:8; 8A.36:25.)

Ogale testified that he had also already told Legare that he was applying for a patent for his

process, which involved surface fluorination (11/14/2012 Tr. at 2A.97:11-25), but Legare

claimed that he could not recall that at trial. (11/27/2012 Tr. at 8A.30:8-11.)

After years sitting dormant, 3M then began to rush its patent application. Christopher

Lyons, one of Jones's co-inventors, admitted that the filing was rushed. (11/27/2012 P.M. Tr. at

40:19-42:4; 50:1-12.) Indeed, for the only time in all of the years covered by Lyons's ordinarily

impeccably organized and continuously and contemporaneously witnessed lab notebook, Lyons

---

[15]      In fact, Jones stated that he had no recollection of having ever seen Ogale before the trial.
(11/19/2012 P.M. Tr. at 31:20-32:2.) However, Hanson testified that just one year ago, Jones told
him that he met Ogale for the first time in 1997 or 1998. (11/20/2012 Tr. at 6.10:18-12:8.)

kept imperfect notes that were not witnessed[16] from that summer of 1998 until December 1998, when 3M tested the TransWeb T-Melt 30P material it received from Racal. (*Id.* at 47:5-48:9.) On December 4, 1998, two days after the TransWeb T-Melt 30P sample had been analyzed by 3M, Lyons went back and entered all of his entries for that six-month period, including work that was purportedly done related to the patent application filed six months earlier on July 2, 1998, which was not "witnessed" until December 28, 1998. (PTX-1130.37-42.) Many of the examples in the specifications of the '458 and '551 patents were performed within weeks of the application filings (PTX-1125.112-120), even though 3M had purportedly been working on the inventions for over a decade, and the inventors did not sign their declarations until six weeks after the application was filed. (PTX-1312.37-38.)[17].

On November 11, 1998, 3M employees tested a Willson P-95 respirator, as requested by Jones and Rousseau. (PTX-610 (November 11, 1998 email attaching withheld ESCA testing results for Willson P-95); PTX-605 (December 2, 1998 email from Michael Prokosch to Jones and Rousseau and a third individual referring to "the Willson P-95 sample that [they] had recently submitted").)[18] On that date, if not before, Jones and Rousseau knew that plasma-fluorinated oil-resistant respirator media—the subject matter of their pending patent

---

[16]    3M procedures required inventors to describe their work daily in their lab notebooks and to have witnesses corroborate the notebook entries. (PTX-1130.3-5.)

[17]    Jones's notebook was consistently flawed. The entries allegedly from June 1997 until July 1, 1998, were all witnessed on July 8, 1998. (PTX-1125; 11/19/2012 Tr. at 5A.85:10-19.)

[18]    Jones confirmed that, in his experience, from the date an application for NIOSH certification is made to actually getting a respirator product on the market could take months. (11/19/2012 Tr. at 5A.26:23-27:2.) The clear inference is that the Willson P-95 respirator had been on the market for quite a while.

application—was on the market. The clear inference from the evidence is that they also had reason to know that the filter material in that respirator was the TransWeb material.  One week later, at Rousseau's request, Legare mailed the Racal samples of TransWeb material to Jones, which he confirmed in an email to Jones, copying Rousseau and Nagel, with the subject line "Transweb." (PTX-47 (identifying the samples as fluoropolymer corona charged polypropylene meltblown fiber); 11/19/2012 Tr. at 5A.38:22-5A.39-12.)[19]  3M tested the Racal samples of TransWeb's T-Melt 30P product, and a report analyzing them was circulated to Jones and Rousseau on December 2, 1998. (PTX-605.) In the email accompanying that report, Michael Prokosch of 3M noted that the TransWeb sample was "quite similar" to the Willson P-95 respirator's filter. (*Id.*) Jones then called Legare, who stated of the TransWeb sample: "of course they were received under a . . . confidentiality agreement," something Legare had never previously said to Jones or Rousseau, nor was any mention of it made when Legare sent the TransWeb samples to Jones. (11/19/2012 Tr. at 5A.73:21-5A.74:8; 5A.108:8-9.)

Clearly, a conversation then ensued within 3M about TransWeb's product that had been distributed the prior year at the Minneapolis Expo. A little over three weeks after testing the Willson respirator that contained the TransWeb material, on December 27, 1998, Rousseau forwarded to Jones and patent attorney Hanson the email from the start of the 1997 Expo that Nagel had earlier sent about TransWeb. (PTX-341.) (That was the email that notified Jones, Rousseau, and others that TransWeb would exhibit at the Expo a new "electret fiber nonwoven line" producing the "T-Melt" product targeting, among other things, the respirator market. (*Id.*))

---

[19]     In his email to Jones and Nagel, Legare made no mention of any confidentiality agreement with TransWeb, and at trial he could not explain why he would send confidential samples to 3M, TransWeb's primary competitor. (11/27/2012 Tr. at 8A.42:3-44:12.)

Forwarding the email to Jones and Hanson, Rousseau stated, "Found this while cleaning out old notes. Notice that at this time there was no mention of oil resistant electret filter web." (*Id.*)[20] The inference is clear that Rousseau realized that the TransWeb products at the Expo and in *Nonwovens Industry* were likely the same products 3M had just analyzed and found in the Willson respirator. And thus he so informed Jones and Hanson.[21] The comment about "no mention of oil resistan[ce]" appears to be a follow-up to an oral conversation they had been having about the TransWeb product given out at the Expo over a year earlier.

Recognizing the problem, Jones and Rousseau and attorney Hanson spoke with Gary Kurtzahn, a purchasing manager, and instructed him to order samples from TransWeb. (PTX-1336 ("I requested the various samples from Transweb on 3/15/99 per our telecon.").) In his request to TransWeb, Kurtzahn noted that the materials had been advertised in *Nonwovens Industry* (PTX-145)—indicating that they were advertised more than one year before the 3M priority date—and clearly referring to the email Rousseau and Jones received from Colleen Nagel before the 1997 Expo.[22] Sometime during the correspondence with Kurtzahn in 1999, a

---

[20]     Despite the fact that he knew that 3M's Sundet and Christensen had been the point men for collecting information and samples from TransWeb, Hanson testified that he never asked Sundet or Christensen about the Expo. (11/19/2012 P.M. Tr. at 111:3-17; 11/20/2012 Tr. at 6.83:1-84:2.)

[21]     Indeed, there is no evidence to suggest that as of December 27, 1998, Jones, Rousseau or Hanson were aware of any non-fluorinated T-Melt product made by TransWeb.

[22]     In its brief, 3M argues that Kurtzahn's request for the samples was "in order to consider it as a potential supplier of filter media for several 3M businesses." (3M's Br. in Supp. of its Request for a Finding of No Inequitable Conduct 6, ECF No. 516.) That is not a plausible explanation in the context of other contemporaneous conversations between the inventors at 3M, as well as the Willson testing, all occurring at 3M at that time, nor in the context of the emails preceding the letter, nor the letter itself, which refers back to the April 1997 edition of *Nonwovens Industry*. Moreover, the individuals who asked Kurtzahn to order the samples were the two inventors and the patent prosecutor for the 3M patents-in-suit. The only reasonable

confidentiality agreement provided by 3M was signed by Ogale. (PTX-25.) The samples were then delivered to Jones, although Jones professed to have no memory of receiving them. (11/19/2012 Tr. at 5A.82:5-24.)

Meanwhile, Hanson—the patent prosecutor, who at that time had never contacted TransWeb—proceeded to write to Ogale a letter which a non-attorney would read as being about 3M's interest in doing business with TransWeb in 1999, but which interwove in its verbiage a description of a purported prior confidentiality agreement between 3M and TransWeb. At the end of the letter, attorney Hanson asks Ogale to confirm its contents, which has this rather odd interlineation of a reference to a confidentiality agreement mixed in with a 1999 transaction. This Court still cannot discern a good faith purpose of the interlineation in that letter, and 3M has struggled mightily to explain it. The letter clearly asks Ogale to agree to the termination of the confidentiality agreement between Racal and TransWeb, which was signed before Racal was ever acquired by 3M, and then goes on to say that the 1999 samples sent by TransWeb to 3M are covered only by the 3M confidentiality agreement provided by Kurtzahn. (PTX-641.) However, Hanson also intermixed in this letter a few unnecessary extraneous lines stating that TransWeb had provided Racal with samples of its T-Melt products pursuant to the June 2, 1997 TransWeb-Racal confidentiality agreement, when in fact samples were sent before that date without a confidentiality agreement.[23] (*Id.*) Ogale signed that letter, which was most easily understood by a

---

inference is that Kurtzahn's request was because of the concern of these 3M employees that TransWeb's products were prior art.

[23]    Legare testified that all of the T-Melt P samples that Racal received were delivered by Ogale on June 2, 1997, and therefore covered by the Racal-TransWeb confidentiality agreement signed at that meeting. Despite purportedly recalling that meeting in great detail, he had no recollection of a meeting he had with Ogale just six months before, in late 1996. (PTX-72; 11/26/2012 P.M. Tr. at 128:12-129:6.) He also could not explain which samples were sent to him

businessman as confirming the 1999 confidentiality agreement. However, Hanson and 3M continually quote only the oddly intermixed lines as an "admission" by Ogale that the 1997 samples were given to Legare on June 2, 1997, when a confidentiality agreement was signed. (*Id.*) And when Hanson finally disclosed the Racal samples to the PTO, he represented that Ogale agreed that they were covered by the TransWeb-Racal confidentiality agreement—and said nothing more about the actual subject of the letter. (PTX-29.1) No reasonable patent examiner, juror, or judge could find that 3M's selective quotation and proposed interpretation of the letter makes much sense to lawyers, let alone lay businessmen. It is clear on the letter's face that Ogale would have thought that he was agreeing that the new samples were subject to the 3M-TransWeb agreement, and that the Racal-TransWeb agreement had ended. Hanson wrote that letter in 1999, ostensibly about the 1999 confidentiality agreement, as a pretext to get a purported "admission" about the timing of the earlier TransWeb-Racal interaction.  In fact, this Court is persuaded by the evidence that the samples were shipped to Racal prior to the signing of any confidentiality agreement between Racal and TransWeb.

Hanson apparently discussed with Legare whether the Racal samples were public. In 1997, right after the Expo, Ogale had mailed the samples to Racal without any request for a confidentiality agreement, and thereafter when Legare and Ogale met in person, a confidentiality agreement was signed at Legare's office at Racal. (*See* n.23.) Once Hanson began to focus on the problem, he met with Legare, who only then typed up the handwritten notes he had taken in his meeting with Ogale some eighteen months prior. (11/27/2012 Tr. at 8A.22:9-23; *compare* PTX-

---

by Ogale in May, one month before the June 2 meeting. (PTX-75.2-4.; 11/26/2012 P.M. Tr. at 135:10-13.) Finally, Legare's notes implied that he did not in fact receive the samples at the June 2 meeting. (DTX-153.)

90 (the typed notes) *with* DTX-153.) The inference is clear that Hanson asked for a typed version

of the notes. The typed notes have additional information that was not included in the

handwritten contemporaneous notes—for instance, that "discussion ensued around 3M patent,

Kumar assured no conflict with 3M as different technical approach applied but no details

provided;" and "My comment Racal does not want to be pulled into any actions from 3M so they

need to be absolutely certain of their position." (PTX-90.) Legare could not explain why those

statements were not in the original notes. (*See* 11/27/2012 Tr. at 8A.26:1-11, 27:18-28:7.)

Hanson's meeting with Legare thus led to materially altered meeting notes, and is circumstantial

evidence of the false Legare story about the origin of the PTX-1338 samples. Hanson helped

prepare Legare for his deposition, and attended Legare's deposition (11/26/2012 P.M. Tr. at

141:16-19). And then we have Legare's surprise—dubious—assertion that the TransWeb sample

pack marked PTX-1338 was provided by Ogale to Racal on the day Ogale signed a

confidentiality agreement, which even 3M's own outside counsel was "unable to confirm" after a

lengthy "investigation." (PTX-1353.)

Legare's testimony was not credible in crucial respects, particularly in his manner when

challenged about his sudden new recollection at trial of a precise date when he received PTX-

1338. For the first time, 15 years after the event, when no dates appeared on PTX-1338 nor any

associated document, Legare testified to a precise, self-serving date for when he got the sample

pack. Indeed, evidence was introduced showing that 3M's own lawyers did not believe Legare.

When 3M finally disclosed, just before Final Pretrial Conference, that PTX-1338 was a

TransWeb product sample found in Legare's files, a testy email correspondence between

TransWeb's counsel and one senior associate on 3M's trial team ensued, in which TransWeb

counsel asked how and when Legare acquired the samples. (PTX-1353.) That senior associate

represented that 3M was "investigating" that issue, and also that TransWeb was not entitled to the information. (*Id.*) When TransWeb threatened to raise the issue with the Magistrate Judge at that Final Pretrial Conference and repeatedly asked for more information, the senior associate stated that the matter was still being investigated. When pressed for the fourth time about the results of 3M's "investigation," the senior associate[24] represented that "3M ha[d] been unable to confirm when Legare obtained this sample."  (*Id.*)

The senior associate's representation ensured that TransWeb would not raise the discovery issue with the Magistrate Judge and seek to reopen Legare's deposition, a disturbing tactical maneuver on professionalism grounds.[25] But, as questionable tactics often do, it also boomeranged as a non-privileged substantive admission of 3M that effectively impeached its own witness' sudden resurrected memory of that date. Legare did in fact testify at trial that he received the sample at the June 2, 1997 meeting.  This incredible testimony by Legare formed the basis of 3M's contention that the PTX-1338 samples—exemplars of the prior art withheld from the PTO—were covered by the confidentiality agreement of that date. Legare also testified that he "absolutely . . . told [3M counsel] that I had gotten it at that meeting, as I've told everyone that I got it at that meeting." (11/27/2012 Tr. at 8A.19:9-11.) The only reasonable interpretation of counsel's statement after so much "investigation"—that 3M could not confirm when Legare received the sample—is that 3M's own counsel doubted his statement.

---

[24]     No other attorney on 3M's trial team apart from this particular senior associate was aware of this side drama until it arose at trial.

[25]     While not relied upon for purposes of the findings in this opinion, the senior associate on 3M's trial team actually *knew* when she sent the email, but did not disclose, that Legare would testify at trial that he received the sample on that key date of June 2, 1997, even though months of "investigation" could not confirm the accuracy of this date of receipt.

There was good reason to doubt the credibility of Legare's testimony about this important date. The facts are, instead, that samples were shipped by TransWeb to Racal before June 2, with no request for confidentiality. On June 2, at Legare's request, a confidentiality agreement was executed. These samples were later sent to Jones for oily testing and would thus be dirty; and PTX-1338 is untouched by oil and in pristine condition. PTX-1338 is a TransWeb sample from Legare's files that looks just like the samples publicly distributed by Ogale at the Expo (and immediately thereafter).

Legare's credibility problems were compounded by his selective memory. When describing the dates that key events occurred, without fail, he purported to remember in great detail dates which helped 3M's case (such as the June 2 meeting), but he could not recall any other details, including purportedly forgetting entirely a meeting he had with Ogale a mere six months prior (PTX-72; 11/26/2012 P.M. Tr. at 128:12-129:6), or receiving a mailed sample of the filtration material from TransWeb in May 1997, prior to the June meeting. (PTX-75.2-4.; 11/26/2012 P.M. Tr. at 135:10-13.) Legare's self-serving selective memory is unsurprising, as he met with Hanson in the months leading up to trial (11/26/2012 P.M. Tr. at 143:3-9; 11/27/2012 Tr. at 8A.9:15-19), and, contrary to 3M's representations, they did not discuss any other patents during those meetings (11/27/2012 Tr. at 8A.53:8-10). They were thus discussing this case.

Regarding Hanson's conduct with respect to the PTX-1338 samples, he waited many years before he disclosed anything about TransWeb's prior art product to the Examiner. Instead, 3M first explored the possibility of purchasing TransWeb, while continuing to probe information from Ogale about the prior art. On April 20, 2000, 3M invited Ogale to visit 3M headquarters, and 3M employees asked him for information about TransWeb's business and product lines, including how long the company had been in business. (11/14/2012 P.M. Tr. at 60:18-61:11.)

Following the meeting, John Reed, a 3M employee, circulated an email to numerous 3M employees including Rousseau and Legare, in which he wrote, "As a follow-up note to the meeting on April 20 with Transweb . . . Minimize direct contact with TransWeb. . . . Minimize written exchanges. Maximize verbal exchange of info . . . ." (PTX-1335.) The clear intent was to grill Ogale about the prior art, under the pretext of 3M becoming a big customer of TransWeb. In July 2000, 3M invited Ogale to return to Minneapolis with Richard Granville, his angel investor, and expressed its interest in purchasing the entire TransWeb company. (11/14/2012 P.M. Tr. at 61:16-62:19.) Those discussions fell apart. (*Id.* at 62:21-22.)

Only after the acquisition discussions failed, upon being notified that 3M's patent was ready to issue, did Hanson finally make a Supplemental Information Disclosure to the Examiner. (PTX-29.) That disclosure caused the Examiner to reject 3M's patent. While there may be no violation of the duty of disclosure where the information is before the examiner in time for him to act on it, *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007), the law does not authorize deliberate strategic withholding of information, nor does it permit the applicant to choose to delay disclosure to suit its own timetable for issuance of the patent. Here, however, strategic delay is not the only problem. The real problem is that the substance of what was finally disclosed was not the whole truth. Hanson attempted to avoid disclosure for as long as possible, and, when that could no longer work, he and others deceived the Examiner about the public distribution of TransWeb's filtration material at the Expo and elsewhere.

At trial, Hanson struggled to explain his conduct. He testified that the reason for his delay in disclosing the reference, until November 2000, was to allow the Confidentiality Agreement between TransWeb and Racal—which he had terminated on April 28, 1999—to expire. (11/19/2012 P.M. Tr. at 58:18-59:23, 60:12-61:1.) But the very MPEP provision that Hanson

cited to the PTO (when requesting expungement of his supplemental disclosure from the public

record) states that a patentee must submit material information to the PTO even if it is

confidential. Manual of Patent Examining Procedure § 724 (7th ed. July 1998). Hanson knew

that the expungement provisions provide a method to protect truly confidential information, so

this was not a credible explanation of the delay strategy. Hanson wilted on the witness stand,

head down, and, finally, hostile. In the disclosure he finally gave to the Examiner, Hanson stated

that "[a]pplicants do believe . . . that the product may have been subsequently commercialized by

Transweb" after 3M's patent was filed. (PTX-29.2.) The disclosure also said that "neither the

Transweb Tmelt 30P product, nor the product sheet, was shown or otherwise known to the

inventors named in this patent application, or the undersigned, before the July 2, 1998 filing date

of this [3M] patent application." (*Id.*)

 Based on the evidence in this case, these statements were untrue. The only reasonable

inference is that Hanson and Jones knew they were not true. When they rushed their own patent

through the process, fudging the "witnessing" of the notebooks, they knew that 3M had been

focused on TransWeb in advance of the Expo; they knew that TransWeb was at the Expo,

distributing its prior art product; they knew that Sundet and Christensen had collected samples;

Jones had tested the Racal samples cut from the same roll distributed at the Expo; Legare had

PTX-1338 in his files, which was identical to the samples distributed by Ogale at the Expo; and

when they were concerned that TransWeb's samples were in fact prior art, they ordered—and

Jones tested—examples of the prior art as advertised in *Nonwovens Industry*, confirming that the

samples were prior art. They did not disclose any of this information to the Examiner. No

mention was made of the T-Melt 50P product, nor of the Willson P-95 filter material, nor of the

PTX-1338 sample pack from the Expo that was in Legare's files.[26] Regrettably, the only reasonable inference that explains the actions of Hanson and Jones is that they delayed in saying anything to the Examiner, and then finally made a materially misleading disclosure.

When the Examiner rejected the patent after later being told about only a minor portion of the prior art (the Racal samples, but not the public distribution at the Expo), Hanson and Jones then enlisted the assistance of outside counsel to further mislead by insisting that all of the prior art was covered by a confidentiality agreement, when it was not.[27] Seen in its best light, Hanson and Jones had a weak argument that one set of samples sent to Legare without a confidentiality agreement were "covered" by the agreement signed a few weeks later. If this were the only prior art, then inequitable conduct would be a much closer call. However, the evidence in this case is powerful that there were multiple sources of prior art known to Hanson, Jones, Rousseau, and others at 3M, and that no confidentiality agreement took that art out of the "public" realm. This entire category of prior art—products from the Expo (as advertised in *Nonwovens Industry*), products sold to Willson—was knowingly omitted from the patent application materials and Supplemental Disclosure because, if the Examiner knew about it, the patent would be rejected without any possible rebuttal argument about confidentiality.

---

[26]     Hanson did not disclose the T-Melt 50P sample from Racal at all, and had no explanation as to why. (11/20/2012 A.M. Tr. at 6.90:2-91:7.) Importantly, that was the exact product that was in public use in the Willson P-95 respirator, which Hanson and Jones also failed to disclose to the PTO. (11/19/2012 Tr. at 5A.47:9-18; 11/19/2012 P.M. Tr. at 75:17-76:12.) Instead, misleadingly, Hanson's Supplemental IDS stated that the inventors "believe[d] . . . that the product may have been subsequently commercialized by Transweb" after 3M's patent was filed. (PTX-29.2.) In fact, they knew it had been earlier commercialized.

[27]     This Court does not find that outside counsel retained for this purpose had knowledge of the falsities perpetrated by Jones and Hanson.

The Court has reviewed the record in exhaustive detail. Inequitable conduct turns on the actions of individuals who owe a duty of candor to the PTO: whether those individuals knew of the prior art reference, knew it was material, knew that it should be disclosed, and intentionally failed to disclose it or misled the PTO about the reference. *Therasense*, 649 F.3d at 1290. The Court finds that the evidence of the inequitable conduct by Hanson and Jones is clear and convincing. *See Avid Identification Sys., Inc. v. Crystal Import Corp.*, 603 F.3d 967, 974 n.1 (Fed. Cir. 2010) ("[O]nly individuals, rather than corporations, owe a duty of candor to the PTO," so "only individuals can breach that duty and give rise to a finding of inequitable conduct."). In this case, the actions of other 3M employees—Rousseau,[28] Legare, Nagel, Lyons, and others—provide strong corroborating evidence of the inequitable conduct of Jones and Hanson. The Court, after receiving full post-trial briefing; conducting its own de novo review of all the facts in the case; after having observed the demeanor of the witnesses; and conducting its own credibility determinations based on those observations, finds that the '458 and '551 patents were the result of inequitable conduct by individuals who owed a duty of candor to the PTO. U.S. Patents 6,397,458 and 6,808,551 are unenforceable.  The advisory jury unanimously reached the same conclusion.

---

[28]     In particular, while Rousseau's actions constitute some evidence of the knowledge and intent of Jones and Hanson, TransWeb has not sought to prove by clear and convincing evidence that Rousseau committed inequitable conduct. Rather, his participation in the group actions is included here because he contributed to the conduct of Hanson and Jones. As a named inventor, Rousseau clearly had a duty of candor to the Patent Office, but the extent to which he engaged in inequitable conduct has not been developed or proven factually in this case.

**V.      JUDGMENT AS A MATTER OF LAW ON ANTITRUST COUNTS**

3M also moves for Judgment as a Matter of Law on the antitrust claims. Because the jury

returned a verdict in 3M's favor on the sham litigation claim, the motion is moot as to that issue.

The Court will therefore address the Rule 50(b) arguments that pertain to *Walker Process* fraud.

As an initial matter, based on the fact findings set forth above concerning inequitable

conduct, the Court finds that there was sufficient evidence from which a reasonable jury could

conclude that 3M's employees engaged in *Walker Process* fraud by intentionally misleading the

Examiner about a material issue.

3M raises the following remaining arguments in challenging the *Walker Process* fraud

verdict: A) alleged failure to present evidence of the relevant geographic market, the United

States; B) alleged failure to present evidence of an upstream market limited to fluorinated

polymeric material for respirators; C) alleged failure to prove that 3M's share of the relevant

market is sufficient to constitute a monopoly or a dangerous probability of obtaining a

monopoly; D) alleged failure to prove a dangerous probability of obtaining a monopoly and

failure to prove anti-competitive effects from the lawsuit; and E) alleged failure to prove antitrust

injury to TransWeb.

A.      Evidence of the Relevant Geographic Market

"The relevant geographic market is the area in which a potential buyer may rationally

look for the goods or services he or she seeks." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952

F.2d 715, 726 (3d Cir. 1991) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71

(1966)); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 331-32 (1961) (defining the

relevant geographic area as "the market area in which the seller operates, and to which the

purchaser can practicably turn for supplies" or as the area in which suppliers "effectively

compete"). "Consequently, the geographic market is not comprised of the region in which the

seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Tunis Bros.*, 952 F.2d at 726.; *see also U.S. Horticultural Supply v. The Scotts Co.*, 367 F. App'x 305, 311 (3d Cir. 2010) (noting that the geographic market is based on buyer behavior). TransWeb bore the burden of proving its relevant geographic market. *Tunis Bros.*, 952 F.2d at 722. On a motion for judgment as a matter of law, the Court must determine whether there were facts from which a reasonable jury could determine that TransWeb had carried its burden. *Cf. Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 219 F. Supp. 2d 600, 604 (D.N.J. 2002) (the court grants judgment as a matter of law if "after viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.").

Here, there was evidence from which a jury could conclude that the geographic market was the United States for the downstream market in NIOSH-certified respirators. First, NIOSH is a U.S. agency that sets standards for respirators used by companies operating within the U.S. so that they may provide their U.S.-based workers with respiratory protection that complies with the U.S. Occupational Safety & Health Administration's regulations. (11/14/2012 A.M. Tr. at 2A.77:15-21; 11/15/2012 P.M. Tr. at 4.11:9-18; 11/16/2012 Tr. at 4.28:9-29:6). Second, 3M's own internal documents divide geographic markets into the U.S. and other regions, and assess competition from such respirator manufacturers within the U.S. (PTX-125.4; PTX-132.3, 6-8, 12; PTX-245.2-3; DTX-316 (detailing U.S. sales)). Third, TransWeb's economics expert, Dr. Bradley Reiff—the only antitrust expert in this case—testified that the geographic market was the U.S., which was based on his previously-uncontested expert opinion. (11/26/2012 P.M. Tr. at 14:3-10, 29:2-20.)

Similarly, evidence was introduced that the geographic market for the upstream market in filtration material was the United States. It was undisputed that the only merchant supplier—*i.e.*, company selling fluorinated polymeric media—in the world is TransWeb. (11/26/2012 A.M. Tr. at 7A.15:7-15:15). Thus, the only place "in which a potential buyer may rationally look for the goods or services he seeks"—in this case, plasma fluorinated polymeric filtration media—is the U.S. *See Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005).

B.     Evidence of an Upstream Market Limited to Fluorinated Polymeric Material for Respirators

The relevant product market must include all products that are "roughly equivalent to [one] another for the use to which [they are] put" even if there "may be some degree of preference for the one over the other." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 480 (3d Cir. 1992) (en banc) (finding that the market includes "Chrysler cars and cars that are reasonably interchangeable with Chrysler cars"); *Crestron Elecs., Inc. v. Cyber Sound & Sec. Inc.*, Civ. No. 11-3492, 2012 WL 426282, at *6 (D.N.J. Feb. 9, 2012) ("[T]he interchangeability of these components produced by different manufacturers is vital to defining the relevant product market.").[29] "The product market is defined by reference to the reasonable

---

[29]     A brand name alone does not indicate a distinct submarket—Domino's competes with other pizza delivery companies, Chrysler with other car manufacturers, and Crestron with other home electronic system developers. A plaintiff must point to additional indicia of the submarket, such as distinctive physical characteristics or uses, in addition to price differences and consumer preferences. Those indicia must be tested for reasonable interchangeability, as Reiff did here. Definition of the relevant market is a question of fact. *See, e.g.*, *IGT v. Alliance Gaming Corp.*, 702 F.3d 1338, 1344 (Fed. Cir. 2012). In this case, there was sufficient evidence that both the upstream and downstream markets are distinctive—physically, chemically, in their price and performance, and in the minds of consumers—for the question to have gone to the jury. 3M's arguments now go to weight, but that is not the standard on a motion for judgment as a matter of law. This question has been decided by the jury, and 3M has not made a showing that the Court should set aside the verdict.

interchangeability in use among competing products or by reference to the cross-elasticity of demand between a product and its substitutes." *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1351 (Fed. Cir. 2011) (citing, *inter alia*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). In defining a submarket for antitrust purposes, plaintiffs may rely on "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price change, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

Here, there was evidence upon which the jury could rely in concluding that TransWeb proved that fluorinated polymeric material for respirators is a distinct market from other types of filtration material. First, evidence was introduced that fluorinated polymeric media has the best combination of low pressure drop and high filtration efficiency of all types of respirator filtration media. (11/26/2012 A.M. Tr. at 7A.50:14-22; PTX-245.4.) Second, fiberglass filters have much higher pressure drop than fluorinated polymeric media because they rely solely on mechanical filtration (as opposed to electret filtration). (11/27/2012 P.M. Tr. at 79:13-24; 11/14/2012 A.M. Tr. at 2A.5:19-20, 8:18-20.) Third, evidence adduced at trial indicated fluorinated polymeric filtration media allows respirators to have a lower pressure drop and longer service life than respirators incorporating other types of filtration media. (11/14/2012 A.M. Tr. at 9:12-10:23; PTX-125.2, 4, 6, 11; PTX-245.4.) Fourth, there was evidence that using fluorinated polymeric media in a respirator lowers the total cost of ownership of such respirators because they last longer, which is a competitive advantage that 3M advertises. (11/26/2012 A.M. Tr. at 7A.26:7-27:13; 11/26/2012 P.M. Tr. at 66:6-67:3; PTX-125.11.) Finally, 3M's Voice of the Customer consumer surveys indicate that consumers will pay more for the lower pressure drop and longer service life that fluorinated polymeric filtration media provides to respirators. (PTX-125.4.)

C.      3M's Share of the Relevant Market

"Monopoly power is the ability to control prices and exclude competition in a given market. If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (internal citations omitted).

Here, 3M's potential monopoly power over the upstream market in the media (had it excluded TransWeb from the market) cannot be disputed, because TransWeb is the only other supplier of the media. (11/26/2012 A.M. Tr. at 7A.15:7-15:15.)

The jury could have relied on Reiff's testimony in concluding that there was a dangerous probability that 3M would achieve a monopoly in the downstream market in respirators as well. Reiff testified that in reaching his conclusion, he used 3M and TransWeb's actual costs and sales data to determine the relative share of all 3M R and P respirators as compared to all R and P respirators using TransWeb's fluorinated filtration media.[30] (11/26/2012 P.M. Tr. at 35:4-36:3). This market share analysis included both disposable and reusable respirators, and included all non-3M, non-TransWeb media respirators. (*Id.* at 33:12-36:3). Moreover, evidence was introduced that there are barriers to entry in the market.[31,32] Reiff testified that there are barriers

---

[30]    The sales data on which Reiff relied were introduced into evidence. (*See* PTX-119; 123; 132; 134; 242; 245; 290; 291; 1114; 1115; 1117; 1118; 1119; 1120; 1121; 1306; and 1307.)

[31]    *Broadcom*, 501 F.3d at 307 ("Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices.") Here, NIOSH approval clearly serves as a regulatory barrier, although that alone is insufficient to show potential monopoly power. *See Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 113 (3d Cir. 1992) (FDA approval alone is not a barrier to entry).

[32]    3M's only evidence in opposition to this conclusion is the testimony of Vaughn Grannis, a 3M employee, that the reusable segment of the market is larger than the disposable segment, and that 3M's share of the disposable segment is larger than its share of the reusable segment.

to entry, as demonstrated by 3M's current high market share and extremely high profit margins

on its R and P respirator products. (11/26/2012 P.M. Tr. at 83:18-24).

D.      Dangerous Probability of Obtaining a Monopoly; Anti-Competitive Effects

        "The offense of attempted monopolization need not cause actual market damage, but

need merely threaten to produce the type of market damage contemplated in the antitrust laws."

*Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 994 (5th Cir. 1983). 3M argues that

TransWeb has not been eliminated, and cannot be eliminated unless 3M won the lawsuit, so

there is no dangerous probability. That reasoning is entirely circular and does not correctly state

the law. *See*, *e.g.*, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-69 (Fed.

Cir. 1998) (noting *Walker Process* fraud liability attaches when patentee obtained patent by fraud

and was aware of that fraud "when bringing suit"); *see also Multiflex*, 709 F.2d at 994 ("The

mere attempt [to monopolize] is the offense.").

        3M also contends that "[a]ll Section 2 claims—including attempted monopolization—

require a showing that competition was harmed by the defendant's conduct." (Mem. in Supp. of

3M's Mot. for J. as a Matter of Law on the Antitrust Claim 14-15, ECF No. 494 (citing *Spectrum

Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993); *Race Tires Am., Inc. v. Hoosier Racing Tire

Corp.*, 614 F.3d 57, 75 (3d Cir. 2010)).) However, in the attempted monopolization context, the

test "is whether the 'dangerous probability of success,' *if it had materialized*, would have caused

the type of market damage the antitrust laws seek to prevent." *Multiflex*, 709 F.2d at 994

(emphasis in original).

---

(11/26/2012 Tr. at 7A.79:1-5.) Reiff testified that Grannis's claim includes N respirators, which
may skew the market share estimates in the reusable segment, and that he had seen no
documentary evidence to support that claim. (11/26/2012 P.M. Tr. at 72:25-73:20, 75:11-76:12.)
This is an issue of fact that the jury decided, based on the competing evidence in the case. There
was sufficient evidence upon which the jury rested its verdict.

E.      Antitrust Injury

3M argues that attorneys' fees cannot be antitrust damages because TransWeb must show that paying the fees caused the disruption in a relevant market. This misstates the law in several ways. First, a *Walker Process* fraud claim where a defendant attempts to monopolize does not require actual disruption—it requires a showing that the fraud "threaten[s] to produce the type of market damage contemplated in the antitrust laws." *Multiflex*, 709 F.2d at 994. Second, the antitrust damages need not be identical to the antitrust injury—they only need to flow from the anticompetitive conduct. *See*, *e.g.*, *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 483 (3d Cir. 1998) (the proof for antitrust damages is whether "*some* damage flow[s]" from the anticompetitive conduct) (emphasis in original). Attorneys' fees can be the damages that flow from the injury. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979) ("In a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which 'flows' from the antitrust wrong."); *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 374 (6th Cir. 1977) ("When the antitrust violations are causally connected to the infringement action it is permissible to include the expenses of defending that action in the award of damages."); *see also Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 540, 543-45 (D.N.J. 2000) (relying on *Handgards* to find that an accused infringer claiming *Walker Process* fraud in an ANDA case can rely on the costs of suit to show injuries).

TransWeb adduced sufficient evidence of its antitrust claims to support the jury's verdict. 3M's motion is denied.[33]

---

[33]    3M also moved for judgment as a matter of law that TransWeb willfully infringed the 3M '458 patent claims. In light of the jury's invalidity verdict and the Court's decision on unenforceability, the Court need not address the motion, and it is therefore terminated as moot.

## VI. ATTORNEYS' FEES

3M challenges the calculation of TransWeb's award of attorneys' fees. By consent of the parties, this Court referred the determination of attorneys' fees, in light of the jury verdict for TransWeb, to a Special Master, Hon. Alfred M. Wolin [ECF No. 523]. Judge Wolin was tasked with calculating both the antitrust cost of suit and antitrust damages. The cost of suit included the attorneys' fees TransWeb paid to its attorneys from the firm Quinn Emanuel Urquhart & Sullivan, LLP, to successfully prosecute its antitrust claims against 3M. Because the jury found that TransWeb suffered antitrust injury—in the form of paying patent defense attorneys' fees— antitrust damages include the attorneys' fees TransWeb paid to defend against 3M's patent suit. As all parties agreed, fees related to patent defense shall be trebled as antitrust damages, whereas fees related to TransWeb's antitrust claims are recoverable on a one-to-one basis as costs of suit.

The parties spent months presenting their evidence and arguments to Judge Wolin. The Special Master issued a Report and Recommendation awarding a total of $26,146,493.45 in attorneys' fees and costs [ECF No. 567]. Pursuant to Federal Rule of Civil Procedure 53, Defendants filed objections to the Report & Recommendation and seek de novo review of the findings. They argue that the Special Master's calculations are erroneous: because TransWeb's billing entries are purportedly too vague to distinguish between patent defense fees (subject to trebling) and antitrust prosecution fees (not trebled); and because the attorneys' fees TransWeb paid to the law firm Quinn Emanuel to litigate this case are allegedly above the market rate.

As the parties agree, TransWeb's burden to establish the amount of antitrust cost of suit—antitrust litigation fees—may be satisfied by a lodestar analysis, whereas TransWeb's burden to prove the amount of antitrust damages—patent litigation fees—is satisfied by providing a "reasonable estimate." (Report & Recommendation 10, ECF No. 567). In

determining whether TransWeb had proffered a reasonable estimate of antitrust damages, the Special Master undertook an exhaustive analysis of the billing entries and timekeeping procedures by TransWeb's attorneys. Although some of Quinn Emanuel's billing entries were labeled as either "antitrust" or "patent," other block-billed entries represented hours spent on mixed patent defense and antitrust litigation issues, e.g., "prepared for trial." TransWeb consented to treating any block-billed entry that contained even a single explicit reference to the antitrust claims entirely as antitrust fees to eliminate the possibility of improper trebling. Judge Wolin and the parties examined the remaining block-billed entries to determine which portion should be designated as patent defense fees, subject to trebling, and which portion should be designated as antitrust litigation fees.

Judge Wolin's well-considered analysis reflects months of examining hundreds of time entries billed by Quinn Emmanuel, affidavits regarding reasonable billing rates, and declarations attesting to the basis for designation of the block-billed fees. Based on that evidence, and confirmed by the history of this litigation, Judge Wolin found that this case was primarily about patent defense. Consequently, for block-billed entries that did not specify whether the work was related to patent or antitrust issues, the Special Master assigned a presumptive weight of 75% patent and 25% antitrust fees. On June 5, 2013, Judge Wolin held a ten-hour in-person hearing and heard argument on the allocation of hours for the 656 challenged block-billed entries, as related either to patent defense or antitrust litigation, on an entry-by-entry basis. The Special Master also discussed the reasonableness of Quinn Emanuel's hourly rate and whether the amount of time spent on each challenged task was reasonably expended. Based on this hearing, and the context of the surrounding entries, Judge Wolin adjusted the presumptive percentage for some of the block-billed entries. He also discounted some entries after determining that the work,

though done by an attorney, could have been performed by a paralegal. He noted that TransWeb had voluntarily adopted a conservative approach to billing, did not seek reimbursement of miscellaneous billing items, and did not request fees for work related to local counsel, paralegals, or non-attorney support staff.

Defendants contend that the Special Master erred by allocating approximately 75% of the challenged block-billing entries as patent defense work, subject to trebling. 3M argues that, for any block-billed entry that includes mixed antitrust and patent issues, the entire entry should be treated as antitrust litigation fees and recovered on a one-to-one basis. They request a corresponding reduction in fees of $1,405,935.54 from the $26,146,493.45 total. The Court disagrees. Judge Wolin's detailed analysis of the nature of the case and the challenged entries supports the proportion allocated to antitrust fees and represents a reasonable estimate of antitrust damages.

Defendants further argue that the hourly rate at which Quinn Emanuel billed its client should be discounted by twenty percent, purportedly to reflect the prevailing rates at which attorneys charge for patent litigation in New Jersey. Examining whether the rates that Quinn Emanuel charged were a reasonable market rate based on the complexity of the services, the Special Master considered the affidavits of other attorneys from national firms and compared the rate to attorneys of similar skill and experience. Accordingly, he found that TransWeb's choice of Quinn Emanuel, although not a New Jersey firm, was reasonable given that the survival of the company required successfully defending a patent case against a multinational corporation with extensive resources.[34] As Judge Wolin noted, 3M is currently engaged in 31 patent cases and has

---

[34]     Evidence adduced at trial showed that, when Ogale was sued by 3M, he was forced by economic realities of the cost of defense to sell a major stake in his small company to an investor

the "economic muscle" to demand discounts from top law firms. TransWeb, a firm that had 55

employees at its peak, does not have similar bargaining power. The Court agrees with the Special

Master that, because TransWeb's existence hinged upon winning a complex patent litigation

with novel and difficult substantive issues, a premier litigation firm was a reasonable choice.

## VII. CONCLUSION

For the foregoing reasons, 3M's motions for judgment as a matter of law as to

TransWeb's antitrust claim and its invalidity claims is denied, and the Court finds that 3M's

patents, '458 and '551, are unenforceable due to inequitable conduct. The Special Master's

calculation of attorneys' fees is found to be properly analyzed and correctly calculated. An

appropriate Order will follow.


**IT IS SO ORDERED**


**/s  Faith S. Hochberg_____**
**Hon. Faith S. Hochberg, U.S.D.J.**

---

with resources to finance the litigation defense costs. He could not afford to keep his company's
ownership for himself, even if he were able to win the litigation. (11/14/2012 P.M. Tr. at 82:1-
15.)